## STATE OF CONNECTICUT v. MICHAEL SKAKEL
### (SC 16844)

Sullivan, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

Argued January 14, 2005—officially released January 24, 2006

*Hope C. Seeley,* with whom were *Hubert J. Santos, Steven D. Ecker,* and, on the brief, *Patrick S. Bristol* and *Sandra L. Snaden,* for the appellant (defendant).

*Susann E. Gill,* senior assistant state's attorney, with whom were *Christopher L. Morano,* chief state's attorney, and *Jonathan C. Benedict,* state's attorney, for the appellee (state).

*Opinion*

PALMER, J. On October 31, 1975, fifteen year old Martha Moxley was found bludgeoned to death in a wooded area on the grounds near her family home in Greenwich. No one was charged in connection with her murder until twenty-five years later, when the defendant, Michael Skakel, a fifteen year old neighbor of the victim at the time of her death, was arrested and charged with the crime. The case initially was brought in the Superior Court for Juvenile Matters and, thereafter, transferred to the regular criminal docket of the Superior Court. Thereafter, the case was tried to a jury, which found him guilty of murder in violation of General Statutes (Rev. to 1975) § 53a-54a (a).[1] The trial court rendered judgment in accordance with the jury verdict,[2] from which the defendant appealed.[3] On appeal, the defendant claims that: (1) his case improperly was transferred from the docket for juvenile matters to the regular criminal docket of the Superior Court; (2) his prosecution was time barred by the five year statute of limitations for felonies that was in effect when the victim was murdered in 1975; (3) the state failed to disclose certain exculpatory evidence in violation of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), thereby depriving him of his right to a fair trial;

[1] General Statutes (Rev. to 1975) § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] The trial court sentenced the defendant to a term of twenty years to life imprisonment.

[3] The defendant appealed from the judgment of the trial court to the Appellate Court. Because the defendant should have taken his appeal directly to this court; see General Statutes § 51-199 (b) (3); his case was transferred to this court pursuant to Practice Book § 65-4.

(4) the state's attorney engaged in pervasive misconduct during closing argument in violation of the defendant's right to a fair trial; (5) the trial court improperly permitted the state to introduce into evidence the prior sworn testimony of a certain witness in violation of the defendant's constitutionally protected right of confrontation; and (6) the trial court improperly permitted the state to present evidence of several incriminating statements that the defendant made while a resident at a school for troubled adolescents in Maine. The defendant also challenges the propriety of several other evidentiary rulings of the trial court. We reject each of the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Sometime between 6:30 and 7:30 p.m. on the evening of Thursday, October 30, 1975, the victim left her home on Walsh Lane, located in the Belle Haven section of Greenwich, with a friend, Helen Ix, to play and socialize in and around the neighborhood. It was the night before Halloween, commonly referred to as "mischief night," an evening when the neighborhood children were known to engage in playful mischief. The victim and Ix soon were accompanied by other friends who lived nearby. Several times that night, the group stopped by the Skakel home, which was located on Otter Rock Drive.[4] The first time they did so, the defendant was dining at the Belle Haven Club with his siblings, Rushton Skakel, Jr., Julie Skakel, Thomas Skakel, John Skakel, David Skakel and Stephen Skakel, their cousin James Dowdle,[5] their tutor Kenneth Littleton, and Julie Skakel's friend Andrea Shakespeare. The Skakel group arrived home from dinner before 9 p.m., at which time

---

[4] The victim's home was located on Walsh Lane, diagonally across the street from the defendant's home, which faced Otter Rock Drive.

[5] Dowdle also was known as James Terrien.

the victim and her friends again visited the defendant's house.

Shortly thereafter, the defendant, joined by the victim, Ix and Jeffrey Byrne, a friend of the victim, entered one of the Skakel family vehicles, a Lincoln Continental, which was parked on the Skakels' side driveway, to talk and listen to music. Thomas Skakel, the defendant's then seventeen year old brother, soon joined the group. Sometime before 9:30 p.m., the group was interrupted by Rushton Skakel, Jr., and John Skakel, who needed to use the Lincoln Continental to drive Dowdle home, where they planned to watch a television program scheduled to air at 10 p.m. Consequently, Thomas Skakel, Ix, Byrne and the victim exited the car. As Ix began to leave the Skakel property with Byrne, she observed Thomas Skakel and the victim engaging in flirtatious horseplay at the other end of the driveway. Feeling "a bit embarrassed by the flirting," Ix left to go home.[6]

The victim's mother, Dorothy Moxley, expected that the victim would be home that evening by 10:30 or 11 p.m. At about 1:30 or 2 a.m., upon discovering that her daughter had not returned home, she sent the victim's brother, John Moxley, out to look for her. Dorothy Moxley thereafter telephoned anyone who she thought might know the victim's whereabouts, including the defendant's family, whom Dorothy Moxley called several times. Dorothy Moxley's efforts to locate the victim were unsuccessful, and she eventually contacted the

---

[6] The trial testimony was less than definitive as to whether the defendant had accompanied his brothers when they drove Dowdle home or whether he had stayed behind with the victim and the others. For example, Shakespeare testified that the defendant had stayed behind and did not accompany his brothers to Dowdle's home that night. Shakespeare, however, was unable to articulate the basis of her recollection and conceded that she had no specific memory either of the Lincoln Continental leaving without the defendant or seeing the defendant in the house after the car had departed for Dowdle's home. Rushton Skakel, Jr., John Skakel and Dowdle all testified that the defendant had accompanied them to Dowdle's home that evening.

Greenwich police department, which dispatched an officer to the Moxley home. The officer made a missing persons report and briefly searched the surrounding area. The next morning, at about 8:30 a.m., Dorothy Moxley, believing that the victim may have fallen asleep in the Skakel family motor home that usually was parked in the Skakels' driveway, went to the defendant's house. The defendant answered the door, appearing "hungover" and dressed in jeans and a T-shirt. The defendant informed Dorothy Moxley that the victim was not at his home, and an inspection of the motor home by a Skakel employee confirmed that she was not there either.

Later that day, at about noon, a neighborhood friend discovered the victim's dead body under a large pine tree in a wooded area on the Moxley property. The victim was lying facedown, with her pants and panties pulled down around her ankles. Forensic tests revealed that the victim had died from multiple blunt force traumatic head injuries. A large quantity of blood was discovered in two areas in a grassy region approximately seventy feet from the victim's body, with a distinct drag path leading from the pools of blood to the location where the victim's body was found. The victim likely was assaulted at or near the farther end of her circular driveway and then dragged approximately eighty feet to the pine tree under which her body subsequently was discovered. Remnants of the murder weapon, a Tony Penna six iron golf club, also were found at the crime scene. The head of the golf club and an eight inch section of its shaft were found on the circular driveway, approximately 116 feet from the area where the large accumulation of the victim's blood was found. Another piece of the shaft was discovered on the grassy area near the two large pools of blood. The remaining part of the shaft attached to the club handle never was found.

Harold Wayne Carver II, a forensic pathologist and the state's chief medical examiner, testified regarding the findings of the original autopsy performed by then chief medical examiner Elliot M. Gross, also a forensic pathologist. Carver stated that the victim's injuries appeared consistent with having been inflicted by a golf club. In addition to the fatal head injuries, the victim had been stabbed in the neck with a piece of the golf club shaft. According to Carver, Gross had used an ultraviolet light to detect the presence of semen on the victim's pubic region and also had taken vaginal and anal swabs. No semen was found in those areas, however. Nothing in the autopsy report indicated that the ultraviolet light had been applied to the victim's buttocks or to other parts of the victim's body. With respect to the time of death, Carver testified that the victim had been dead for some time before her body was found. He further opined that the time of death more likely was closer to 9:30 p.m. on October 30, 1975, when she was last seen alive, rather than noon the following day, when her body was discovered. Because the autopsy was conducted twenty-four hours after the discovery of the victim's body, a more precise time of death could not be ascertained.[7]

Henry Lee, a forensic scientist and the former state chief criminalist, reviewed the documents, photographs and physical evidence compiled by the investigators and performed a partial reconstruction of the crime scene. On the basis of his investigation, Lee testified as to the likely nature and sequence of events leading

[7] The evidence revealed that residents in the neighborhood heard a disturbance between 9:30 and 10 p.m. on October 30, 1975, near the Moxley property. Dorothy Moxley testified that, around that time, she heard a commotion coming from the general direction of the area where the victim's body subsequently was discovered. She recalled hearing dogs barking and what sounded like excited young voices. Ix testified that her dog began to bark incessantly shortly after 9:30 p.m. David Skakel also recalled hearing dogs barking at approximately 10 p.m. that night.

up to the victim's death. In particular, he indicated that the golf club that was used to assault and kill the victim probably had broken into pieces from the force with which the victim had been struck. This force, according to Lee, likely propelled the head of the golf club, and a piece of its shaft, over seventy feet, from the location of the fatal assault to the location inside the circular driveway where those pieces subsequently were discovered. According to Lee, the remaining piece of the golf club shaft then was used as a sharp weapon to stab the victim. Lee further testified that, in light of the amount of blood found on the inside of the victim's jeans and panties, those garments likely were pulled down before the assault occurred. Lee also stated that the absence of vertical blood drippings on the victim's shoes and jeans indicated that the victim was lying on the ground when the perpetrator inflicted the injuries to her head and neck.

James Lunney, a detective with the Greenwich police department in 1975, testified that, on the day that the victim's body was discovered, he briefly visited the defendant's home and noticed a barrel containing several items, including golf clubs, in a hallway near the rear of the home. Lunney testified that one of the golf clubs, a Tony Penna four iron, later was seized from the property with the written consent of the defendant's father. Thomas G. Keegan, a captain in the detective division of the Greenwich police department in 1975, testified that an examination of the seized golf club and the golf club parts found at the crime scene revealed that the murder weapon came from the defendant's home.[8]

---

[8] The seized golf club had two labels affixed to the shaft just below the handle of the grip. One label, from the Greenwich Country Club, indicated that the club had belonged to "Mrs. R. W. Skakel" of "Greenwich, Conn.," the defendant's deceased mother. Keegan testified that, along with the visible similarities between the murder weapon and the club seized from the Skakel home, namely, the brand and the make, a criminalist's examination of the murder weapon and the seized club revealed that the markings on the heads

In the days and months following the victim's murder, the Greenwich police conducted numerous interviews in furtherance of its criminal investigation into the victim's death. The defendant and his siblings were among those interviewed in the early stages of that investigation. On November 15, 1975, the defendant, who was accompanied by his father, gave a tape-recorded interview to the Greenwich police at the police station. Responding to inquiries concerning his whereabouts on the night of the murder, the defendant explained that he had accompanied his brothers and Dowdle to Dowdle's home, which was about twenty minutes away, and watched the television show "Monty Python's Flying Circus." According to the defendant, he returned to his home around 10:30 or 11 p.m.,[9] and went to bed about fifteen minutes later. When asked specifically about whether he left the house after he went to his bedroom that night, the defendant responded, "no." The defendant acknowledged, however, that, on other occasions, he had left his home after ostensibly retiring to his room for the night.

In 1977, two years following the victim's murder, the defendant revealed certain feelings of guilt and remorse to Larry Zicarelli, who then was employed by the defendant's family as a driver and general handyman. While being driven by Zicarelli to an appointment in New York City, the defendant, distraught from an earlier altercation with his father, told Zicarelli that he "had done something very bad" and that he "either had to kill himself or get out of the country." On another occasion, Zicarelli and the defendant were stopped in traffic on

---

of the clubs were consistent with the two clubs previously having come in contact with one another.

[9] Dowdle and Rushton Skakel, Jr., corroborated the defendant's statement that he had spent part of that evening at Dowdle's home watching television. Shakespeare, however, recalled seeing the defendant at his home after Dowdle and Rushton Skakel, Jr., departed for Dowdle's home in the Lincoln Continental.

the Triborough Bridge in New York on their way home when the defendant "opened the [car] door, started to jump out of the car and ran to the side . . . of the bridge." Zicarelli ran after the defendant and forced him back into the car. As Zicarelli was proceeding to the driver's side door, the defendant again exited the car and ran toward the other side of the bridge. Zicarelli once again hurried toward the defendant and forced him back into the car. Just before Zicarelli and the defendant arrived at the Skakel home, Zicarelli asked the defendant, "[W]hy would [you] want to do what [you were] trying to do?" The defendant responded that, "if [you] knew what [I] had done, [you] would never talk to [me] again."[10] Immediately following this incident, Zicarelli terminated his employment with the Skakels.[11]

From 1978 to 1980, the defendant was a resident at the Elan School, a residential facility for troubled adolescents located in Poland Springs, Maine. Several former Elan residents testified about the deplorable conditions at the institution, which employed a behavioral modification approach predicated on controversial techniques of intimidation, confrontation and humiliation of its residents. As a result, Elan residents regularly endured mental and physical abuse at the hands of their peers and Elan staff members. While a

---

[10] On cross-examination, defense counsel asked Zicarelli whether he was aware that, on the night before this incident, the defendant "had slept in his dead mother's dress and felt bad about it . . . ." Zicarelli responded that he had been unaware of any such incident. Julie Skakel testified that the defendant had contemplated jumping off the Triborough Bridge because he felt guilty about having slept in his deceased mother's dress.

[11] The state also introduced the testimony of Matthew Tucharoni, who stated that, in the spring of 1976, the defendant, accompanied by Rushton Skakel, Jr., and Julie Skakel, came to the barbershop in Greenwich where Tucharoni then was employed and inquired about a haircut. Tucharoni testified that while he was preparing to cut the defendant's hair, he overheard the defendant say, "I am going to kill him." According to Tucharoni, Julie Skakel responded, "you can't do that," and the defendant replied, "Why not? I did it before . . . ."

resident at Elan, the defendant frequently was confronted and interrogated about his involvement in the victim's murder. For example, Charles Seigen, who was enrolled at Elan with the defendant from 1978 to 1979, testified that he recalled attending two or three group therapy sessions, supervised by a staff member and typically attended by eight residents, during which the defendant was confronted about the victim's murder. According to Seigen, the defendant sometimes responded to such probing with annoyance. On other occasions, however, the defendant became very upset, cried and stated that he did not know if he had done it. The defendant also stated in these group sessions that, on the night of the victim's murder, he was "blind drunk" and "stumbling."[12]

Dorothy Rogers, another former resident of Elan, testified that, on one occasion, when she and the defen-

---

[12] Seigen also described the nature of the "general meetings" at Elan, which were convened to confront residents about specific issues. According to Seigen, "[a] general meeting was probably the scariest word that you would hear when you were at Elan." A typical general meeting, which was attended by 100 or more Elan residents and staff, focused on one or two residents who were singled out for violating Elan rules. Seigen recalled that the defendant was the subject of a general meeting as a result of his failed attempt to run away from the facility. Seigen stated that he first learned of the defendant's possible involvement in the victim's murder when it was announced at a general meeting by Joseph Ricci, Elan's executive director. Elizabeth Arnold, another former Elan resident, testified that, at that particular general meeting, which lasted approximately three hours, Ricci continuously had confronted the defendant about various issues and that four or five Elan residents "brutalized" the defendant in a boxing ring. Other former residents of Elan also testified about the details of the torment that the defendant had endured at this meeting, including accusations leveled against the defendant that he had killed the victim. The defendant's initial response to this interrogation was to deny his involvement in the murder. After several rounds in the boxing ring, however, the defendant stated, "I don't know" or "I don't remember" in response to questioning regarding his involvement in the murder. During the course of his enrollment at Elan, the defendant also was forced to wear a large cardboard sign around his neck, another form of punishment at Elan. The sign read, "Confront me on why I murdered Martha Moxley," or words to that effect.

dant were talking at an Elan social function, the defendant told her that he had been drinking on the night of the murder and that he could not recall whether he was involved in the victim's death. The defendant further explained to Rogers that his family had enrolled him at Elan because they feared that he may have murdered the victim and wanted him in a location far removed from the investigating officers. Gregory Coleman, a resident at Elan from 1978 to 1980, testified about an exchange that he had had with the defendant while Coleman stood "guard" over the defendant following the defendant's failed escape attempt from Elan. During this conversation, the defendant confided in Coleman about murdering a girl who had rejected his advances. According to Coleman, the defendant had admitted killing the girl with a golf club in a wooded area, that the force with which he had hit her had caused the golf club to break in half, and that he had returned to the body two days later and masturbated on it. John Higgins, another former resident of Elan, recounted certain emotional admissions that the defendant had made to him while the two were on guard duty one night on the porch of the men's dormitory at Elan. In particular, Higgins testified that the defendant had told him that, on the night of the murder, there was a "party of some kind or another" at the defendant's home. The defendant also told Higgins that he remembered rummaging through his garage looking for a golf club, running through the woods with the club and seeing pine trees. Higgins further stated that, as the conversation continued, the defendant's acknowledgment of his culpability in the victim's murder progressed from "he didn't know whether he did it" to "he may have done it" to "he must have done it," and finally to "I did it."

Elizabeth Arnold and Alice Dunn, both of whom had attended Elan during the defendant's stay at the facility, also testified about certain inculpatory statements that

the defendant had made to them. Both testified that the defendant had expressed uncertainty as to whether he or his brother had murdered the victim. Arnold also recalled a group therapy session in which the defendant, upon being questioned about the victim's murder, stated that "[h]e was very drunk and had some sort of a blackout" that night, that his brother had "fool[ed] around" with his "girlfriend," and that his brother had stolen her from him. Dunn, who graduated from Elan in 1978 and subsequently became a staff member there, testified that while she was employed at Elan, the defendant stated that he was not in "his normal state" on the night of the murder.

Thereafter, in the summer of 1987, the defendant told Michael Meredith, a former Elan resident who was staying temporarily in the defendant's home, that, on the night of the victim's murder, he had climbed a tree on the Moxley property and masturbated in the tree while watching the victim through her window. According to Meredith, he first learned of the victim's murder in this conversation. The defendant also told Meredith that while he was in the tree, he saw his brother Thomas Skakel walk across the Moxley property toward the victim's home but that Thomas Skakel had not seen him in the tree. The defendant related a similar story to Andrew Pugh, a close childhood friend, when the two saw one another in 1991. The defendant had expressed a desire to renew their friendship, which gradually had faded following the victim's murder. In an effort to ease Pugh's concerns about the defendant's involvement in the victim's death, the defendant assured Pugh that he did not kill the victim but mentioned that he had masturbated in a tree on the night that she was murdered. Pugh understood that the tree to which the defendant referred was the tree under which the victim's body was discovered.

The most descriptive account of the defendant's activities on the night of the murder came in 1997 from an taped-recorded conversation between the defendant and Richard Hoffman, a writer who was collaborating with the defendant on a book about the defendant's life. On that tape, the defendant explained to Hoffman that, earlier in the evening of the victim's murder, he had invited the victim, who was seated with the defendant in his father's car, to accompany him to his cousin's house to watch the Monty Python Flying Circus television show. The victim declined the invitation because of her curfew, and the two instead made plans to go "trick or treating" the next night. The defendant thereafter left for Dowdle's home with his brothers Rushton Skakel, Jr., and John Skakel, as well as Dowdle.

The defendant told Hoffman that, after returning to his own home from Dowdle's house, he had walked through the house in search of various people. Upon observing that the door to his sister's room was closed, he had "remember[ed] that [his sister's friend, Shakespeare] had gone home . . . ." He then indicated that he had gone into "the master bedroom [but] there was nobody there, the [television] was on but nobody was there." The defendant went upstairs to bed shortly thereafter, but he became "horny" and decided to spy on a "lady" who lived on Walsh Lane. The defendant then "snuck out" of his house and went to this person's home, hoping to see her through her window. Unsuccessful in that endeavor, he thought, "[f]uck this . . . Martha likes me, I'll go, I'll go get a kiss from Martha." (Internal quotation marks omitted.) The defendant then proceeded to the victim's home, climbed a tree near the victim's front door and masturbated in the tree for about thirty seconds. Shortly thereafter, "a moment of clarity came into [his] head," and the defendant climbed down from the tree and walked back home. On his way home, he threw rocks into the dark, repeatedly yelling,

"Who's in there?" He and his friends previously had done this while shooting BB guns into the dark. The next morning, the defendant awoke to "[Dorothy] Moxley saying 'Michael . . . have you seen Martha?'" The defendant thought to himself, "Oh my God, did they see me last night?" At that moment, the defendant told Hoffman, he "remember[ed] just having a feeling of panic."

The state also adduced evidence establishing that the defendant, who was infatuated with the victim, had grown resentful of her flirtatious friendship with his older brother Thomas Skakel, whom he considered his nemesis. According to Pugh, who in 1975 was friendly with the victim and the defendant, the defendant had "told [him] that he liked Martha quite a bit and had a crush on her." Pugh also testified that the defendant had told him that "he would have liked to have a relationship with her." Pugh testified that he had observed the defendant and the victim engage in "horseplay, roughhousing, fooling around . . . [and] kissing one time in the [Skakel family motor home]." With respect to Thomas Skakel's relationship with the victim, Jacqueline Wettenhall O'Hara, a neighborhood friend of the victim, recounted observing flirtatious conduct between the victim and Thomas Skakel in the months leading up to the victim's death. Entries recorded in the victim's diary in the two months preceding her murder disclosed the victim's friendship with the defendant and Thomas Skakel, and also revealed the sometimes flirtatious nature of her relationship with Thomas Skakel.[13] In addition, Ix testi-

[13] For example, the victim made an entry in her diary on September 12, 1975, in which she stated that, while she was out driving in Thomas Skakel's car with several other teenagers, including the defendant, "I drove a little then . . . I was practically sitting on [Thomas Skakel's] lap [be]cause I was only steering. He kept putting his hand on my knee. . . . [T]hen we went to Friendly's [restaurant and] Michael [the defendant] treated me [and] he got me a double but I only wanted a single so I threw the top scoop out the window. Then I was driving again [and Thomas Skakel] put his arm around me. He kept doing stuff like that." A diary entry from September

fied that she had observed the victim and Thomas Ska-kel engaging in flirtatious horseplay the last time she saw the victim alive. Moreover, one of the sneakers that the victim was wearing when her body was recovered had the name "Tom" written on it.

The defendant raised an alibi defense at trial. In particular, he claimed that the victim had been murdered at approximately 10 p.m. on October 30, 1975,[14] and that he was at Dowdle's home, some twenty minutes away from the murder scene, at that time. The defendant also raised a third party culpability defense, pointing to Littleton as a likely perpetrator of the victim's murder. In fact, Littleton, who had been hired as a part-time tutor by the Skakel family, had taken up residence at the Skakel home on October 30, 1975, the day that the victim was last seen alive, and had slept there with the Skakel children that night. Littleton testified that, after returning home from dinner at 9 p.m., he remained at the house all night, stepping outside briefly at approx-

19, 1975, recounted the victim's activities with other neighborhood friends that day. In that entry, the victim stated that "Michael was so totally out of it that he was being a real asshole in his actions [and] words. He kept telling me that I was leading [Thomas Skakel] on when I don't like him (except as a friend) [and] I said, well how about you [and] Jackie. You keep telling me that you don't like her [and] you are all over her. . . . Michael jumps to conclusions. I can't be friends [with Thomas Skakel] just because I talk to him, it doesn't mean I like him." In a subsequent entry, dated October 4, 1975, the victim describes events that had occurred at a school dance and at a party after the dance at a neighbor's home. The entry included the following: "Afterwards I went to Mouakaud's for a party! I saw everybody. [Thomas Skakel] was being an ass. At the dance he kept putting his arms around me [and] making moves."

[14] Defense counsel adduced testimony from Joseph Alexander Jachimczyk, a forensic pathologist from Houston, Texas, who concluded that the time of the victim's death most likely was around 10 p.m. on October 30, 1975. Jachimczyk's testimony was bolstered by the testimony of several people, including Dorothy Moxley, Ix and David Skakel, that they had heard dogs barking in the vicinity of the crime scene at approximately that time. See footnote 7 of this opinion.

imately 9:30 p.m. only to investigate a disturbance.[15] In addition, testimony adduced by the defendant revealed that Littleton, who began to manifest serious psychiatric and behavioral problems in the years following the murder, may have made a statement, several years after the killing, in which he implicated himself in the crime. Littleton emphatically denied that he had had anything to do with the victim's death, however.

At the conclusion of the trial, the jury found the defendant guilty of murder. The trial court denied the defendant's posttrial motions and, thereafter, sentenced the defendant to a period of incarceration of twenty years to life imprisonment. Additional facts will be set forth as necessary.

## I

We first address the defendant's claim that the court, *Dennis, J.* (juvenile court), improperly transferred his case from the docket for juvenile matters to the regular criminal docket of the Superior Court. Specifically, the defendant claims that the juvenile court improperly: (1) failed to require a complete investigation into the defendant's personal history and background in accordance with General Statutes (Rev. to 1975) §§ 17-60a[16]

---

[15] According to Littleton, he was unable to discern the cause of the disturbance.

[16] General Statutes (Rev. to 1975) § 17-60a provides: "The juvenile court shall have the authority to transfer to the jurisdiction of the superior court any child referred to it for the commission of a murder, provided any such murder was committed after such child attained the age of fourteen years. No such transfer shall be valid unless prior thereto the court has caused a complete investigation to be made as provided in section 17-66 and has found, after a hearing, that there is reasonable cause to believe that (1) the child has committed the act for which he is charged and (2) there is no state institution designed for the care and treatment of children to which said court may commit such child which is suitable for his care or treatment or (3) the safety of the community requires that the child continue under restraint for a period extending beyond his majority and (4) the facilities of the superior court provide a more effective setting for disposition of the case and the institutions to which said court may sentence a defendant are more suitable for the care or treatment of such child."

and 17-66,[17] which, at all times relevant to this appeal, governed the transfer of a juvenile matter to the regular criminal docket of the Superior Court; (2) relied on the current regulations of the department of children and families (department) in concluding that there was no state institution suitable for the care and treatment of the defendant within the meaning of § 17-60a (2); and (3) failed to explore the existence of facilities outside the state suitable for the care and treatment of the defendant. We reject the defendant's claim that the juvenile court improperly transferred his case to the regular criminal docket of the Superior Court.[18]

The following facts and procedural history are relevant to our resolution of this claim. Because the defendant was fifteen years old at the time of the offense, he initially was charged as a delinquent in the Superior Court for Juvenile Matters. The state subsequently filed a motion under § 17-60a to transfer the defendant's case to the regular criminal docket. The juvenile court there-

Hereinafter, all references to § 17-60a in this opinion are to the 1975 revision.

[17] General Statutes (Rev. to 1975) § 17-66 provides: "Prior to the disposition of the case of any child found to be delinquent, investigation shall be made of the facts as herein specified by the probation officer, and until such investigation has been completed and the results thereof placed before the judge, no disposition of the child's case shall be made. Such investigation shall consist of an examination of the parentage and surroundings of the child, his age, habits, and history, and shall include also an inquiry into the home conditions, habits and character of his parents or guardians. Where a child is or legally should be in attendance at school, it shall further contain a report of the child's school adjustment, which shall be furnished by the school officials to the court upon its request. The court shall, when it is found necessary to the disposition, cause a complete physical or mental examination, or both, to be made of the child by persons professionally qualified to do so."

Hereinafter, all references to § 17-66 in this opinion are to the 1975 revision.

[18] The state contends that the defendant is not entitled to appellate review of these claims because he failed to raise them in the juvenile court. We reject the state's contention because our review of the proceedings in the juvenile court indicates that these claims were raised, with adequate specificity, in that court.

after conducted a hearing to determine whether, pursuant to § 17-60a, there was reasonable cause to believe that the defendant had committed the murder with which he had been charged. Following the presentation of evidence on that issue, the juvenile court concluded that there was reasonable cause to believe that the defendant had committed that offense.[19] The juvenile court also issued an order pursuant to § 17-60a directing that an investigation be conducted in accordance with § 17-66.

After the investigation was complete, the juvenile court reconvened the defendant's statutorily mandated transfer hearing for the purpose of addressing the remaining elements of § 17-60a. At the hearing, the parties elicited testimony from the supervisor of juvenile probation, Joseph Pacquin, who had been assigned to conduct the investigation required by § 17-60a. Pacquin acknowledged that his investigation had focused primarily on the possible availability of a state facility that would be suitable for the defendant, and not on the defendant's personal, family and educational background. See General Statutes (Rev. to 1975) § 17-66. Pacquin gave several reasons for failing to investigate the defendant's personal history and family background, notwithstanding the dictates of § 17-66, including the fact that the defendant was forty years of age at the time of the transfer hearing. With specific regard to the defendant's education, Pacquin testified that he had not looked into that facet of the defendant's background because § 17-66 does not require such a review unless the child is or legally should be attending school. Additionally, Pacquin testified that he had not sought a physical or mental examination of the defendant because the court had not ordered such an examination to be conducted pursuant to § 17-66. With respect to

[19] The defendant does not challenge the juvenile court's reasonable cause finding on appeal.

possible residential and treatment alternatives, Pacquin testified that the department is the state agency solely responsible for the detention and treatment of juveniles, and that the department cannot lawfully accept for placement persons over the age of eighteen. Pacquin's testimony in this regard was consistent with the testimony of Judith Kallen, a program director employed by the department, who testified at the defendant's reasonable cause hearing that department regulations prohibited the commitment or placement of individuals over the age of eighteen into the care and custody of the department.

In support of his objection to the state's motion to transfer, defense counsel adduced testimony from Clinton Roberts, a former state probation officer and president of Alternative Sentencing Consultants, Inc., a private sentencing consulting firm. Roberts indicated that, contrary to the testimony of Pacquin, there is a private, nonprofit facility located in Newtown that admits both juveniles and adults, and that the Newtown facility might serve the residential treatment needs of the defendant. On cross-examination, however, Roberts conceded that the facility operated primarily as a substance abuse treatment center, and he could not say whether the facility was appropriate for the defendant. Defense counsel also elicited testimony that the state juvenile justice system occasionally places juveniles in programs located in other states, but that these placements are reserved for juveniles with special needs that cannot be met in programs located within the state.

In a memorandum of decision issued after the conclusion of the hearing, the juvenile court noted that, under the particular circumstances presented, the provisions of § 17-66 "are not totally applicable . . . ." The court further observed that department regulations prohibit the placement with the department of anyone over the age of eighteen. The court also noted that, although

General Statutes (Rev. to 1975) § 17-68 (c)[20] provides for the commitment of a child directly to a hospital or other appropriate institution if the child is determined to be mentally ill, the issue of mental illness never was raised at any time by the defendant, and the record otherwise was devoid of any indication that the defendant suffered from any such illness. The court thereafter concluded that "there [was] no available or suitable state institution designed for the care and treatment of children to which the juvenile court could commit the . . . forty year old [defendant] that would be suitable for his care and treatment, should he be adjudicated delinquent for the murder of [the victim]," and that "the facilities of the adult criminal division of the Superior Court afford[ed] and provide[ed] a more effective setting for the disposition of this case, and the institutions to which the adult criminal division of the Superior Court may sentence a defendant [were] more suitable for the care and treatment of this [defendant], should he be found guilty of the murder of [the victim]." Accordingly, the juvenile court transferred the case to the regular criminal docket.[21]

Before addressing the defendant's claims, we set forth the legal principles that govern our resolution of

[20] General Statutes (Rev. to 1975) § 17-68 provides in relevant part: "(c) Any child coming within the jurisdiction of the court, who is found to be mentally ill, may be committed by said court to a hospital or other institution empowered by law to treat mentally ill children; and, if the court adjudges a child to be delinquent and finds him to be mentally deficient, it may commit him to an institution for mentally deficient children or defective delinquents. . . ."

Hereinafter, all references to § 17-68 in this opinion are to the 1975 revision.

[21] We note that the defendant filed an interlocutory appeal to the Appellate Court from the transfer order of the juvenile court, and we transferred the case to this court upon the joint motion of the parties. On appeal, we agreed with the state that the order of the juvenile court transferring the case to the regular criminal docket was not a final appealable judgment; *In re Michael S.*, 258 Conn. 621, 631, 784 A.2d 317 (2001); and, therefore, we dismissed the appeal. Id.

those claims. "There is no dispute that adjudication as a juvenile rather than prosecution as an adult carries significant benefits, chief among which are a determination of delinquency rather than criminality . . . confidentiality . . . limitations with respect to sentencing . . . erasure of files . . . and isolation from the adult criminal population." (Citations omitted.) *State* v. *Angel C.*, 245 Conn. 93, 103, 715 A.2d 652 (1998). Accordingly, "a juvenile in whom a liberty interest in his or her juvenile status has vested, has a substantial liberty interest in the continuation of that juvenile status and that the juvenile cannot and should not be deprived of that status without [proper] procedural protections . . . ." Id.; see also *Kent* v. *United States*, 383 U.S. 541, 557, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966) (juvenile court's failure to conduct full investigation, as required by statute, prior to juvenile's transfer to regular criminal docket resulted in deprivation of liberty without due process of law). Importantly, however, "[a]ny [special treatment] accorded to a juvenile because of his [or her] age with respect to proceedings relative to a criminal offense results from statutory authority, rather than from any inherent or constitutional right." (Internal quotation marks omitted.) *State* v. *Angel C.*, supra, 104. Accordingly, in the present matter, to the extent that the defendant possesses a liberty interest in his juvenile status, that interest derives from, and is limited by, the statutory provisions governing the transfer, adjudication and commitment of juveniles.

We turn next to the relevant statutory provisions. Under the statutory scheme in effect in 1975,[22] the juvenile court had original and exclusive jurisdiction "over all proceedings concerning uncared-for, neglected,

---

[22] As we previously have explained, the juvenile court applied the law in effect at the time of the commission of the offense. See, e.g., *In re Daniel H.*, 237 Conn. 364, 377, 678 A.2d 462 (1996). That determination has not been challenged by either party to this appeal.

dependent and delinquent children within this state . . . ." General Statutes (Rev. to 1975) § 17-59. Statutes governing the authority and proceedings of the juvenile court define a "child" as "any person under sixteen years of age," who may be found "delinquent" by the court if, inter alia, the child "has violated any federal or state law or municipal or local ordinance . . . ." General Statutes (Rev. to 1975) § 17-53. With respect to a child who has been referred to the juvenile court because that child allegedly had committed the crime of murder, § 17-60a authorizes the court to transfer the child to the regular criminal docket of the Superior Court provided that the child was at least fourteen years of age when the murder was committed. Such a transfer is not permitted by § 17-60a, however, unless an investigation of the child's personal and family background has been completed in accordance with § 17-66, and the juvenile court has determined, after a hearing, that there is reasonable cause to believe that: (1) the child has committed the crime charged; (2) there is no available state institution designed for the care and treatment of children that would be suitable for the child, or community safety requires that the child be detained in a custodial setting for a period extending beyond majority age; and (3) the facilities of the Superior Court provide a more effective setting for disposition of the case and the adult institutions to which the child may be sentenced are more appropriate for his or her care or treatment. With respect to the mandated investigation, General Statutes (Rev. to 1975) § 17-66 mandates that the required investigation include an examination of "the parentage and surroundings of the child, his age, habits, and history, and . . . also an inquiry into the home conditions, habits and character of his parents or guardians."[23]

---

[23] Section 17-66 identifies other potential areas of investigation. See footnote 17 of this opinion. Those other areas, however, are not implicated by this appeal.

The defendant first claims that his transfer from the docket for juvenile matters to the regular criminal docket was improper because Pacquin did not conduct a complete investigation into the defendant's personal and family background as required by §§ 17-60a and 17-66. We agree with the defendant that Pacquin's investigation did not satisfy the requirements of § 17-66, and that, normally, a failure to meet those requirements would render invalid the transfer of any case from juvenile court to the regular criminal docket pursuant to § 17-60a. It also is clear, however, that a § 17-66 investigation is mandated by § 17-60a solely for the purpose of assisting the juvenile court in its determination of whether, under the circumstances, there exists a suitable state institution to which the child may be committed in preference to the facilities otherwise available for the treatment and punishment of adult offenders. In the present case, however, testimony adduced at the transfer hearing established that the age of the then forty year old defendant foreclosed his adjudication in juvenile court because the department was prohibited by state regulations[24] from accepting for placement anyone over the age of eighteen, regardless of whether such placement would involve a custodial or noncustodial setting. Thus, the juvenile court necessarily would have concluded, irrespective of the results of a complete investigation in accordance with § 17-66, that the defendant's age mandated the transfer of his case to the regular criminal docket. Consequently, Pacquin's failure to complete the investigation contemplated by § 17-66, and the juvenile court's failure to consider facts that might have been brought to light upon the completion of that investigation, had no bearing on that court's ultimate decision under § 17-60a to transfer the defendant's case to the regular criminal docket.[25]

[24] See Regs., Conn. State Agencies § 17a-145-48 (e).

[25] For the first time on appeal, the defendant claims that, if a complete § 17-66 investigation had been performed, the juvenile court might have concluded that the defendant suffers or suffered from a mental illness or

The defendant next claims that the juvenile court improperly relied on regulations of the department that were in effect at the time of the transfer hearing in concluding that there was no state institution suitable for his care and treatment. In particular, the defendant claims that the juvenile court's reliance on the regulations prohibiting the placement with the department of anyone over the age of eighteen thwarts the will of the legislature as expressed in the statutory scheme that was in effect in 1975, because that age limitation on placements with the department was not a part of the statutory scheme at that time.

General Statutes (Rev. to 1975) § 17-60a provides in relevant part that no transfer shall be valid unless the juvenile court finds that "there is no state institution designed for the care and treatment of children *to which [the] court may commit such child* which is suitable for his care or treatment . . . ." (Emphasis added.) We agree with the juvenile court that this statutory provision "narrowly focus[es] on the availability and suitability of state institutions 'designed for the care and treatment of children' to which the juvenile court *has authority to 'commit such child.*' " (Emphasis

---

deficiency and, on that basis, the juvenile court reasonably might have committed the defendant to a mental health facility pursuant to § 17-68 (c). See footnote 20 of this opinion. We are not persuaded by this contention. First, at no time during the transfer stage of the proceedings in juvenile court did the defendant ever claim that he was mentally ill or deficient, and he never challenged the express finding of the juvenile court that there was nothing in the record to suggest that a mental health commitment was warranted. Second, the defendant concedes that the juvenile court could not have ordered him to undergo a physical or mental evaluation because the court was barred from doing so by Practice Book, 1963, § 1125 (2) (Cum. Sup. 1974) (effective July 1, 1974), which provides that, subject to certain exceptions not applicable to the present case, "[n]o such examination . . . shall be made of any child denying responsibility for [his or her allegedly] delinquent behavior . . . ." In such circumstances, the defendant's belated attempt to raise the possibility of a commitment under § 17-68 (c) is unavailing.

added.) Thus, under § 17-60a, the commitment alternatives available to the juvenile court are those alternatives available at the time of the transfer hearing.[26] Because the juvenile court properly considered those commitment options, and not the commitment options that might have been available in 1975, the defendant's claim must fail.

We also disagree with the defendant's final claim, namely, that the juvenile court improperly failed to explore the suitability of placing the defendant in an out-of-state institution. Under General Statutes (Rev. to 1975) § 17-420, the commissioner of children and families (commissioner) may transfer "any person committed, admitted or transferred to the department . . . to any private agency or organization within or without the state under contract with the department," provided that certain conditions are satisfied. Thus, a necessary prerequisite to the out-of-state transfer of a juvenile found to be delinquent is that the juvenile first must be "committed, admitted or transferred" to the care and custody of the department. As the trial court properly determined, however, under state law, no person over the age of eighteen may be committed to the care and custody of the department. Because the defendant could not be placed with the department, he could not be transferred by the commissioner to an out-of-state institution and, accordingly, the juvenile court properly declined to explore out-of-state placement alternatives for the defendant.

For the foregoing reasons, the defendant has failed to establish that the juvenile court improperly transferred his case to the regular criminal docket. Because

---

[26] We note, moreover, that, in 1975, the legislature necessarily contemplated that the department would adopt and enforce regulations for the purpose of effectuating the statutory scheme relating to children because the legislature expressly had authorized the department to do so. See General Statutes (Rev. to 1975) § 17-415 (b).

that transfer was proper, the state's prosecution of the defendant as an adult was lawful.

## II

The defendant next claims that the trial court improperly concluded that his prosecution for murder was not barred by the applicable statute of limitations. We disagree, albeit on the basis of an analysis that differs from that of the trial court.

The following factual and procedural background is necessary to our resolution of this claim. The defendant was arrested on January 19, 2000, for the October, 1975, murder of the victim and, as we have explained; see part I of this opinion; his case was transferred from the docket for juvenile matters to the regular criminal docket. Prior to trial, the defendant filed a motion to dismiss the information on the ground that his prosecution for murder was barred by the five year limitation period of General Statutes (Rev. to 1975) § 54-193,[27] the statute of limitations that was in effect at the time of the victim's murder. The trial court, *Kavanewsky, J.*, denied the defendant's motion to dismiss, concluding that the five year limitation period of § 54-193, although

[27] General Statutes (Rev. to 1975) § 54-193 provides: "No person shall be prosecuted for treason against this state, or for any crime or misdemeanor of which the punishment is or may be imprisonment in the Connecticut Correctional Institution, Somers, except within five years next after the offense has been committed; nor shall any person be prosecuted for the violation of any penal law, or for other crime or misdemeanor, except crimes punishable by death or imprisonment in the Connecticut Correctional Institution, Somers, but within one year next after the offense has been committed; but, if the person, against whom an indictment, information or complaint for any of said offenses is brought, has fled from and resided out of this state, during the period so limited, it may be brought against him at any time, within such period, during which he resides in this state, after the commission of the offense; and, when any suit, indictment, information or complaint for any crime may be brought within any other time than is limited by this section, it shall be brought within such time."

Hereinafter, all references to § 54-193 are to the 1975 revision unless otherwise indicated.

facially applicable to all felonies, including murder and all other class A felonies, was inapplicable to the crime of murder.[28] The trial court acknowledged that § 54-193 contains no express exception for murder and that this court, in *State* v. *Paradise*, 189 Conn. 346, 350, 456 A.2d 305 (1983), had concluded that the 1976 amendment to § 54-193; Public Acts 1976, No. 76-35, § 1 (P.A. 76-35); which excepted all class A felonies, including murder, from the purview of § 54-193, did not apply retroactively to offenses committed prior to April 6, 1976, the effective date of P.A. 76-35. The trial court further recognized that, in *Paradise*, we ultimately had determined, on facts materially identical to the facts of the present case, that the prosecution of the defendants for murder in that case was barred by the five year limitation period of the pre-1976 amendment version of § 54-193, the same version of § 54-193 that was in effect at the time of the murder of the victim in the present case. The trial court explained, however, that our determination in *Paradise* must be considered in light of two subsequent cases, *State* v. *Ellis*, 197 Conn. 436, 460, 497 A.2d 974 (1985),[29] and *State* v. *Golino*, 201 Conn. 435, 438–39, 518 A.2d 57 (1986), the holdings and rationale of which, in the trial court's view, lead to the conclusion that the

---

[28] The defendant filed a similar motion while his case was pending in the juvenile court. The juvenile court, however, concluded that the defendant's motion was premature because § 54-193 applies to prosecutions under the regular criminal docket of the Superior Court.

[29] The defendants in *Ellis* were Brian Ellis and Wilmer Paradise, the same defendants who, in *State* v. *Paradise*, supra, 189 Conn. 346, successfully had defended the trial court's dismissal of the murder charges that had been lodged against them. Id., 347; see *State* v. *Ellis*, supra, 197 Conn. 438. The appeal in *Ellis* followed the decision by the state, after our decision in *Paradise*, to charge Ellis and Paradise with capital felony arising out of the same murder that had been the subject of the appeal in *Paradise*. Following the trial court's dismissal of the capital felony charges against Ellis and Paradise, the state appealed, and we reversed the judgment of the trial court, concluding, inter alia, that the prosecution of Ellis and Paradise was not barred by the five year limitation period of the pre-1976 amendment version of § 54-193. *State* v. *Ellis*, supra, 460.

five year limitation period of the pre-1976 amendment version of § 54-193 was inapplicable to the crime of murder.[30] The trial court therefore denied the defen-

---

[30] In *Paradise*, the sole issue presented was whether P.A. 76-35, which, as we have explained, expressly excepted all class A felonies, including murder, from the five year limitation period otherwise applicable to felonies, applied retroactively to offenses committed prior to the effective date of that amendment, that is, April 6, 1976. *State* v. *Paradise*, supra, 189 Conn. 347. After concluding that the amendment had prospective effect only; id., 350; we affirmed the judgment dismissing the murder charges, which was based on the trial court's application of the five year limitation period of the pre-1976 amendment version of § 54-193. In light of the narrow issue raised by the parties in *Paradise*, we had no occasion expressly to consider, in that case, whether the legislature had intended to subject the offense of murder to the five year limitation period of the pre-1976 amendment version of § 54-193; rather, we assumed, like the parties, that the limitation period applied equally to murder as to all other felonies. Thereafter, in *Ellis*, we were required to decide whether the five year limitation period of the pre-1976 amendment version of § 54-193 applied to the offense of capital felony. See *State* v. *Ellis*, supra, 197 Conn. 441. After undertaking a detailed historical analysis of this state's criminal statutes of limitation, we concluded that the statutory scheme governing capital felonies was not intended to upset the "deep-rooted understanding"; id., 459; that capital crimes, because of their gravity, are not subject to repose. Id., 459–60. We reached a similar conclusion in *State* v. *Golino*, supra, 201 Conn. 435. In *Golino*, this court considered the claim of the defendant, Anthony Golino, that his prosecution for a 1973 murder in violation of General Statutes (Rev. to 1972) § 53a-54 (a) was barred by the five year limitation period of the pre-1976 amendment version of § 54-193 because Golino had not been charged with that murder until 1984. In contrast to the 1975 revision of the murder statute under which the defendants in *Ellis* were charged, the 1972 revision of the murder statute under which Golino was charged effectively had been declared unconstitutional by the United States Supreme Court in *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). As we explained in *Golino*, the then applicable murder statute carried a possible penalty of death; *State* v. *Golino*, supra, 439; see General Statutes (Rev. to 1972) § 53a-54 (c); and, therefore, for statute of limitation purposes, we treated the case as one "punishable by death . . . ." (Internal quotation marks omitted.) *State* v. *Golino*, supra, 447. We further concluded that, although the state was barred by *Furman* from seeking the death penalty against Golino, that fact did not affect the conclusion, based on our historical analysis, that we had reached in *Ellis*, namely, that the legislature never intended for capital crimes, because of their gravity, to be subject to any period of limitation. See id., 444–45. The trial court in the present case relied heavily on the historical analysis that we employed in *Ellis* and *Golino* in concluding that, despite the broad language of the pre-1976 amendment version of § 54-193, the legislature never intended to establish a limitation period for the offense of murder because of the gravity of *that* offense.

dant's motion to dismiss, and the case proceeded to trial, following which a jury found the defendant guilty of murder.

In support of his claim that the trial court improperly declined to dismiss the information as time barred, the defendant maintains that this case is both factually and legally indistinguishable from *State* v. *Paradise*, supra, 189 Conn. 346, which, the defendant asserts, is therefore controlling and requires the dismissal of the information in the present case. The state asserts that we should overrule our holding in *Paradise* that P.A. 76-35, § 1, did not apply retroactively, a conclusion that was predicated on our determination that criminal statutes of limitation presumptively have prospective applicability only. See id., 351–53. Alternatively, the state maintains that the trial court correctly concluded that *Paradise* does not bar the state's prosecution of the defendant for murder because our determination in *Paradise* that the murder prosecutions in that case were time barred rested on a faulty assumption, namely, that the five year limitation period of the pre-1976 amendment version of § 54-193 applied to murder as well as to all other felonies. See footnote 30 of this opinion.

Upon reconsideration, we are persuaded that *Paradise* was wrongly decided. In particular, we conclude that we were misguided in establishing a presumption that, in the absence of a contrary indication of legislative intent, an amendment to a criminal statute of limitations is not to be applied retroactively. As we explain more fully hereinafter, we are convinced that, with respect to those offenses for which the preamendment limitation period has not expired, it is far more likely that the legislature intended for the amended limitation period to apply to those offenses. In view of the fact that the five year limitation period of the pre-1976 amendment version of § 54-193 had not expired with respect to the October, 1975 murder of the victim when

the 1976 amendment to that statutory provision became effective, we conclude that P.A. 76-35, § 1, is the operative statute of limitations for purposes of this case.[31] Because, under P.A. 76-35, § 1, there is no time period within which murder and other class A felonies must be prosecuted, the trial court properly denied the defendant's motion to dismiss the information.

We begin our analysis of this issue with a brief overview of the pertinent statutory provisions. The defendant was convicted of murder in violation of § 53a-54a, which, in 1975, specified that the offense "is punishable as a class A felony unless it is a capital felony and the death penalty is imposed as provided by section 53a-46a." General Statutes (Rev. to 1975) § 53a-54a (c). Because the defendant was not charged with capital murder,[32] his offense was punishable as a class A felony, which, pursuant to General Statutes (Rev. to 1975) § 53a-35 (b) (1), carries a maximum sentence of life imprisonment. At the time of the offense in October, 1975, General Statutes (Rev. to 1975) § 54-193 provided in relevant part: "No person shall be prosecuted . . .

[31] In light of our conclusion that P.A. 76-35, § 1, applies to the offense in the present case, we have no reason to address the state's alternate contention that the legislature never intended to establish a limitation period for murder and, consequently, that the five year limitation period of the pre-1976 amendment version of § 54-193, despite its facial applicability to *all* felonies, including murder, does not bar the state's prosecution of the defendant for the murder of the victim. Indeed, this court is bound to consider *first* the state's claim that P.A. 76-35, § 1, applies retroactively to the offense in the present case because, if that claim has merit, P.A. 76-35, § 1, necessarily trumps the possible applicability of the pre-1976 amendment version of § 54-193. Because we conclude that P.A. 76-35, § 1, does, indeed, have retrospective applicability to the offense in the present case, the issue of whether the legislature intended for the pre-1976 limitation period of § 54-193 to apply to murder is a moot question for purposes of this case. For purposes of our analysis and resolution of the issue presented, however, we assume, without deciding, that the five year limitation period of the pre-1976 amendment version of § 54-193 applies to murder.

[32] There is no dispute that the murder of the victim in the present case did not give rise to a charge of capital murder.

for any crime or misdemeanor of which the punishment is or may be imprisonment . . . except within five years next after the offense has been committed . . . ." In 1976, however, the legislature amended § 54-193 to provide: "No person shall be prosecuted for any offense, except a capital felony or a class A felony for which the punishment is or may be imprisonment in excess of one year, except within five years next after the offense has been committed . . . . There shall be no limitation of time within which a person may be prosecuted for a capital felony or a class A felony." P.A. 76-35, § 1.

We next turn to a review of our relevant prior precedent construing legislative amendments to criminal statutes of limitation, beginning with *Paradise*. In *Paradise*, the defendants, Brian Ellis and Wilmer Paradise, were charged, in 1981, with murder, felony murder and kidnapping, all class A felonies, in connection with a murder that had been committed in 1974. *State* v. *Paradise*, supra, 189 Conn. 347. The trial court dismissed the charges against Ellis and Paradise; id., 348; concluding that their prosecutions were barred by the five year limitation period of the pre-1976 amendment version of § 54-193, which was in effect at the time of the offenses. See id., 350. On appeal, the state claimed that P.A. 76-35, § 1, which excluded class A felonies, including murder, from the purview of the five year limitation period of § 54-193, was procedural in nature and, therefore, had retroactive applicability absent a contrary legislative intent. Id. In support of its position, the state relied primarily on "an extensive body of civil case law"; id.; in which this court had held that "procedural statute[s] . . . ordinarily will be applied retroactively without a legislative imperative to the contrary . . . ."[33] Id., 351.

---

[33] In *Paradise*, the state maintained that the retroactive application of the 1976 amendment to § 54-193 did not affect Paradise's or Ellis' substantive rights because, at the time that they allegedly had committed the murder

We declined, however, to decide whether the 1976 amendment was substantive or procedural. Id., 353. Although we reaffirmed "the continued vitality and utility of the principle that procedural statutes will be applied retrospectively absent a contrary legislative intent in the civil field"; id., 351; we concluded that this tenet was inapplicable to criminal statutes in light of the principle that such statutes "must be strictly construed." Id., 352. In accordance with this principle, we concluded that "criminal statutes are not to be accorded retrospective effect absent language clearly necessitating such a construction . . . ."[34] Id., 353. After observing that § 54-193 must be strictly construed because it is "penal in nature"; id., 352; we explained that, because the language of P.A. 76-35, § 1, did not indicate "a clear legislative intent that the statute have a retrospective effect"; id., 353; it could not be applied retroactively to conduct that had preceded its effective date. See id. In view of the fact that all of the parties in *Paradise* had proceeded on the assumption that the five year limitation period of the pre-1976 amendment version of § 54-193 applied to all felonies, including murder, we affirmed the judgment of the trial court dismissing the information as time barred.

---

with which they were charged, the five year limitation period of the pre-1976 amendment version of § 54-193 had not yet expired. See *State* v. *Paradise*, Conn. Supreme Court Record & Briefs, December Term, 1982, Pt. 2, State's Brief p. 5.

[34] Our conclusion in *Paradise* that criminal statutes are not subject to retroactivity analysis on the basis of whether they are substantive or procedural was predicated on *State* v. *Jones*, 132 Conn. 682, 47 A.2d 185 (1946), a case in which this court had concluded that a statute requiring the examination of certain criminal defendants for venereal disease was not retroactive in light of the general principle that, "in a criminal case a retrospective construction of a statute should not be adopted unless its language clearly makes such a construction necessary." (Internal quotation marks omitted.) Id., 685. We nevertheless acknowledged in *Paradise*—albeit without elaboration or specification—that "[t]he civil-criminal distinction enunciated in *Jones* and affirmed [in *Paradise*], is not necessarily applicable to other areas of the criminal process." *State* v. *Paradise*, supra, 189 Conn. 353 n.5.

In *State* v. *Crowell*, 228 Conn. 393, 398–99, 636 A.2d 804 (1994), we expressly reaffirmed our conclusion in *Paradise* that criminal statutes of limitation are accorded prospective effect only. The sole issue presented in *Crowell* was whether the seven year limitation period of General Statutes (Rev. to 1993) § 54-193a was applicable to the state's prosecution of the defendant, Martin Crowell, for offenses relating to his alleged sexual molestation of a child when the amendment establishing that seven year limitation period became effective after the commission of the charged offenses but prior to the expiration of the preamendment five year limitation period. Id., 394–95. In urging this court to overrule *Paradise*, the state maintained that our holding in that case was "based on the faulty premise that a statute of limitations that extends a previous limitation period before that previous period has expired is 'retroactive.' " Id., 398. Specifically, the state claimed that, "to be 'retroactive,' a statute must affect a 'vested right' that existed on the date it took effect. Because a defendant has no right to a statute of limitations defense while the original limitation period remains unexpired, a new statute of limitations that takes effect before the original limitations period has expired does not affect a vested right and therefore cannot be retroactive." Id. We rejected the state's claim, noting that "[t]he holding in *Paradise* was based firmly on the principle that criminal statutes must be strictly construed . . . [and] not, as the state claims, on a technical misunderstanding of the nature of retroactivity." (Citation omitted.) Id., 399. Because there was nothing in the language of the amendment to indicate that the extended limitation period had retrospective effect, we concluded that the trial court properly had followed the dictates of *Paradise* in dismissing as time barred the charges against Crowell.

The next case relevant to our inquiry is *In re Daniel H.*, 237 Conn. 364, 678 A.2d 462 (1996), in which this

court addressed the issue of whether a 1994 amendment to General Statutes § 46b-127, the mandatory juvenile transfer statute, had retroactive applicability. See id., 366–67. We concluded that the 1994 amendment, which eliminated the right to an immediate appeal from a court order transferring a juvenile matter to the regular criminal docket, had prospective effect only. See id., 378. In so concluding, we explained, first, that our resolution of the issue was guided by the canon of strict construction applicable to criminal statutes.[35] Id., 373. In contrast to *Paradise*, however, that conclusion did not end our analysis. After noting that, under General Statutes § 55-3,[36] substantive changes to the law presumptively have prospective application only; id., 372; we stated that "[t]he first step in ascertaining whether the 1994 amendment was intended to apply retroactively . . . is to decide whether the removal of a juvenile's ability to appeal immediately from a court's transfer order is a substantive change in the law." Id., 373. We answered that question in the affirmative and, therefore, concluded that the change presumptively had prospective applicability only. Id., 375–76. We further determined that, because the presumption of prospective applicability was not rebutted by a clear expression of legislative intent to the contrary, the amendment did not apply retroactively. Id., 376.

Thereafter, in *State* v. *Parra*, 251 Conn. 617, 619–20, 741 A.2d 902 (1999), we considered whether a statutory amendment limiting the time within which a defendant

---

[35] We observed that, although statutes concerning juvenile matters generally are considered to be civil in nature, statutes relating to alleged criminal misconduct of juveniles, such as § 46b-127, are subject to the canon of strict construction applicable to criminal statutes. In re Daniel H., supra, 237 Conn. 373.

[36] General Statutes § 55-3 provides: "No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have a retrospective effect."

may move to vacate a judgment and withdraw a previously entered plea properly was applied to crimes committed prior to the effective date of the amendment. The defendant, Juan Parra, relied on *Paradise* in support of his claim that the amendment could not operate retroactively because it lacked explicit statutory language requiring such an application. Id., 622. Although we acknowledged that "*Paradise* created a bright line rule on matters involving the statutory construction of criminal statutes . . . namely, that the language of the statute itself must clearly necessitate a retrospective construction for one to be given"; (citation omitted; internal quotation marks omitted) id., 624; we nevertheless reasoned that "the breadth of [our] holding in *Paradise*"; id.; is limited to "certain types of criminal statutes, such as a statute of limitations for the prosecution of a crime . . . ." Id., 625. In reaching this conclusion, we noted that, in *In re Daniel H.*, we previously had "made clear that there are instances in which . . . *Paradise* . . . [does not prevent] this court from considering the legislative history of a criminal statute in determining whether such a statute should be applied retroactively." Id. As we explained in *Parra*, "[i]n *In re Daniel H.*, we determined whether a statutory amendment eliminating the right to an immediate appeal from an order transferring a juvenile matter to the regular criminal docket applied retroactively. . . . While we specifically held that the statutory amendment at issue was a criminal statute that affected substantive rights . . . we, nonetheless, looked to its legislative history to determine whether the amendment should be applied retroactively. . . . Thus, we did not limit our analysis to a determination of whether the language of the amendment clearly necessitated a retrospective application, but, rather, used the normal tools of statutory construction to determine the legislature's intent on the issue of retroactive application of the amendment." (Citations omitted.) Id.

We further explained that the amendment at issue in *Parra* fell within "those other areas of the criminal process . . . to which the holding of *Paradise* does not extend"; (citation omitted; internal quotation marks omitted) id., 626; because the provision "affect[ed] an area of the criminal process far removed from the actual criminal conduct for which the defendant originally was charged. For example, [the amendment did] not change the elements of the crime with which the defendant was charged, alter the elements of his defense to that crime or make more burdensome the punishment for that crime, after its commission." Id. Accordingly, we concluded that we were not restricted to the language of the amendment in determining whether the legislature had intended that it be applied retroactively; rather, the "proper test . . . [was] whether the language of [the amendment] or its legislative history . . . indicates that the legislature clearly and unequivocally intended for the statute to apply retroactively." Id., 627. We noted, finally, that, because the pertinent legislative history evinced a clear legislative intent to apply the amendment retroactively; id., 628; it was not necessary to determine whether the amendment was substantive or procedural. Id., 628 n.8.

With this background in mind, we now reexamine our conclusion in *Paradise* that P.A. 76-35, § 1, has prospective effect only. As we explain hereinafter, that conclusion is fundamentally flawed because it is founded solely on the mistaken premise that the rule of strict construction bars the presumption of retroactivity otherwise applicable to amendments to statutes of limitation. In view of our determination that our conclusion in *Paradise* rested on a faulty premise, we are obliged to take a fresh look at the issue of whether a criminal statute of limitations should be applied retroactively or prospectively in circumstances such as those of the present case, in which the legislature has not clearly

evinced an intent one way or the other. For the reasons that follow, we conclude that, with respect to those criminal offenses for which the applicable preamendment statute of limitations period has not yet expired, an amendment to that statute of limitations is presumptively retroactive. Because the limitation period of the pre-1976 amendment version of § 54-193 had not expired with respect to the offense in the present case prior to the effective date of the 1976 amendment, and because the legislature did not evince an intent to have the amendment apply prospectively only, we conclude that P.A. 76-35, § 1, provides the operative statute of limitations in the defendant's case.

Of course, our ultimate objective in construing statutes is to discern and effectuate the apparent intent of the legislature. E.g., *Cogan* v. *Manhattan Auto Financial Corp.*, 276 Conn. 1, 7, 882 A.2d 597 (2005); *State* v. *Ledbetter*, 263 Conn. 1, 12, 818 A.2d 1 (2003). Although that objective is the same for both civil and criminal statutes, we have recognized that certain principles of statutory construction bear special relevance to our interpretation of criminal statutes, one of which is the rule of strict construction. Thus, it has long been held that, "unless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 69, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Indeed, the rule, which "is perhaps not much less old than construction itself"; *United States* v. *Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L. Ed. 37 (1820); finds its roots in Sir Edward Coke's opinion in *Heydon's Case*, 76 Eng. Rep. 637 (Ex. 1584); see M. Radin, "A Short Way with Statutes," 56 Harv. L. Rev. 388, 389 (1942); and, in this state, it can be traced back to at least 1821. See *Daggett* v. *State*, 4

Conn. 60, 63 (1821). Succinctly stated, "[t]he purpose of the rule of strict construction is . . . to enable the people of the State to know clearly and precisely what acts the legislature has forbidden under a penalty, that they may govern their conduct accordingly, and to make sure that no act which the legislature did not intend to include will be held by the courts within the penalty of the law." *State* v. *Faro*, 118 Conn. 267, 274, 171 A. 660 (1934); accord *State* v. *Zazzaro*, 128 Conn. 160, 167, 20 A.2d 737 (1941). "Strict construction is a means of assuring fairness to persons subject to the law by requiring penal statutes to give clear and unequivocal warning in language that people generally would understand, concerning actions that would expose them to liability for penalties and what the penalties would be." 3 J. Sutherland, Statutes and Statutory Construction (6th Ed. Singer 2001) § 59:3, p. 142. "Another reason for strict construction is to protect the individual against arbitrary discretion by officials and judges. . . . A related argument is to the effect that since the power to declare what conduct is subject to penal sanctions is legislative rather than judicial, it would risk judicial usurpation of the legislative function for a court to enforce a penalty whe[n] the legislature had not clearly and unequivocally prescribed it." Id., pp. 144–45.

The requirement that criminal statutes shall be strictly construed is therefore predicated on two fundamental principles. First, the public is entitled to fair notice of what the law forbids. Second, legislatures and not courts are responsible for defining criminal activity. Neither of these two principles is advanced, however, by applying the rule of strict construction to criminal statutes of limitation. Because the statutory limitation period has nothing to do with the scope or reach of the substantive offense, neither the public's right to fair warning of the legislatively proscribed conduct nor the risk that the offense will be enlarged judicially beyond

the contemplation of the legislature is implicated by the statutory limitation period. Consequently, applying the rule of strict construction to criminal statutes of limitation would be "[t]o enforce the rule beyond its purpose [and, thereby] to exalt technicalities above substance." *State* v. *Faro*, supra, 118 Conn. 274.

Indeed, because criminal statutes of limitation do not define criminal conduct, establish the punishment to be imposed or otherwise burden defendants, such statutes are not truly penal at all. See, e.g., *Commonwealth* v. *George*, 430 Mass. 276, 279, 717 N.E.2d 1285 (1999) ("[s]tatutes of limitation do not define criminal conduct, are not penal statutes, and may not be subject to . . . strict construction against the [state]"). In fact, such statutes represent an expression of "legislative grace"; *State* v. *Hodgson*, 108 Wash. 2d 662, 667, 740 P.2d 848 (1987), cert. denied sub nom. *Fied* v. *Washington*, 485 U.S. 938, 108 S. Ct. 1117, 99 L. Ed. 2d 277 (1988); for "they are a surrendering by the sovereign of its right to prosecute"; id.; after a specified period of time has elapsed from the acts constituting the offense. Put differently, because such statutes inure to the *benefit* of criminal defendants, it is illogical to characterize those statutes as penal for purposes of determining the proper approach to their construction. ·

In *Paradise*, we did not explain our conclusion that § 54-193 is penal in nature, and, therefore, that that provision must be strictly construed. Indeed, we cited only one case, namely, *State* v. *Anonymous (1976-6)*, 33 Conn. Sup. 34, 358 A.2d 691 (1976) (*Anonymous*), to support that conclusion. See *State* v. *Paradise*, supra, 189 Conn. 352. In *State* v. *Anonymous (1976-6)*, supra, 39, a judge of the Court of Common Pleas[37] concluded, also without analysis or explanation, that § 54-193 is a

---

[37] The Court of Common Pleas was merged into the Superior Court in 1978. See General Statutes § 51-164s.

penal statute and, therefore, subject to the canon of strict construction. In support of its assertion that § 54-193 is a penal statute, the court in *Anonymous* relied solely on *State* v. *Bello*, 133 Conn. 600, 53 A.2d 381 (1947), a case in which this court affirmed the conviction of the defendant, Riggs Bello, for gambling. See id., 601, 604. In *Bello*, however, we applied the canon of strict construction in connection with our interpretation of the antigambling statute itself, not any applicable statutory limitation period. See id., 604. Thus, the cases that provide the basis for our conclusion in *Paradise* that § 54-193 is a penal statute to which the canon of strict construction applies simply do not support that conclusion.

Contrary to our determination in *Paradise*, § 54-193, like other criminal statutes of limitation, is *remedial* in nature. "The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity." *Toussie* v. *United States*, 397 U.S. 112, 114–15, 90 S. Ct. 858, 25 L. Ed. 2d 156 (1970). Indeed, it is because of the remedial nature of criminal statutes of limitation that they "are to be liberally interpreted in favor of repose."[38] (Internal quotation marks omitted.) Id., 115.

---

[38] Thus, like all remedial statutes, a criminal statute of limitation must be construed liberally to effectuate the legislature's intent. See, e.g., *Knight* v. *F.L. Roberts & Co.*, 241 Conn. 466, 474, 696 A.2d 1249 (1997); *Dysart Corp.* v. *Seaboard Surety Co.*, 240 Conn. 10, 18, 688 A.2d 306 (1997). Because the remedial purpose of a criminal statute of limitation is to provide for repose after the expiration of a specified period of time, the statute must be con-

In *Paradise*, the rule of strict construction provided the sole basis for our determination that P.A. 76-35, § 1, has prospective effect only. See *State* v. *Paradise*, supra, 189 Conn. 352. Because we are not persuaded that that rule applies to criminal statutes of limitation, the validity of our holding in *Paradise* necessarily is suspect.[39] Even if we were to assume that the rule is applicable to such statutes, however, we see no reason why its application would lead inexorably to the presumption against retroactivity that we announced in *Paradise*. Indeed, as we had recognized long before *Paradise*, "[t]he rule of strict construction does not require that the narrowest technical meaning be given to the words employed in a criminal statute in disregard of their context and in frustration of the obvious legislative intent." (Internal quotation marks omitted.) *State* v. *Faro*, supra, 118 Conn. 274. In other words, the principle of strict construction should not be applied in a manner that is "hostile" to an evident legislative pur-

strued liberally to effectuate that purpose. This maxim of liberal construction, however, is not determinative of whether the *pre*-1976 amendment version or the *post*-1976 amendment version of § 54-193 applies to the criminal conduct that is the subject of the present case because *both* provisions represent a legislative mandate; the question is *which* such mandate applies. Of course, once it has been determined which provision is applicable, then that provision must be liberally construed in favor of repose. But until such time as the applicable statute is identified, the doctrine of liberal construction has no applicability. Thus, although in *Paradise*, we referred to this tenet of statutory construction; *State* v. *Paradise*, supra, 189 Conn. 352; it provides no guidance on the issue of whether the pre-1976 amendment or the post-1976 amendment version of § 54-193 applies to the defendant's conduct.

[39] We also note that our holding in *Paradise* leads to a result that is inconsistent with the rationale underlying that holding when it is applied to a statutory amendment that *reduces* the limitation period. In such circumstances, the prospective application of the amendment would inure to the *detriment* of the defendant because the original, longer limitation period presumptively would be applicable. This result is incompatible with the rationale of our holding in *Paradise*, namely, the rule of strict construction, a rule that, when applicable, requires us to construe statutes against the state and in favor of criminal defendants. The bizarre nature of this result substantiates our rejection of the rote application of the rule of strict construction to criminal statutes of limitation in *Paradise*.

pose; *State* v. *Levy*, 103 Conn. 138, 141, 130 A. 96 (1925); or in a way that is contrary to common sense. See *State* v. *Reynolds*, supra, 264 Conn. 70. Thus, as a leading commentator on statutory construction has explained, "[t]he rule of strict construction is not the only factor which influences the interpretation of [criminal] laws. Instead, the rule is merely one among various aids which may be useful in determining the meaning of penal laws. This has been recognized time and again by the decisions, which frequently enunciate the principle that the intent of the legislature, or the meaning of the statute, must govern and that a strict construction should not be permitted to defeat the policy and purposes of the statute." 3 J. Sutherland, supra, § 59:6, pp. 159–61. At a minimum, therefore, our reliance in *Paradise* on the canon of strict construction, to the exclusion of all other considerations, casts serious doubt on the validity of our conclusion.[40]

For the foregoing reasons, we reject as logically unfounded our holding in *Paradise* that the canon of strict construction requires the conclusion that P.A. 76-35, § 1, has prospective effect only. We therefore must determine whether our conclusion in *Paradise* nevertheless was correct. We conclude that it was not.

It is axiomatic that, "[w]hether to apply a statute retroactively or prospectively depends upon the intent

---

[40] As we previously have noted, in *State* v. *Crowell*, supra, 228 Conn. 393, this court reaffirmed our holding in *Paradise*, stating: "After a thorough consideration of the parties' arguments in . . . *Paradise* . . . and the reasoning behind that decision, we conclude that it should not be overruled." Id., 399. We then expressed our approval of the rationale on which our holding in *Paradise* was based, namely, "the principle that criminal statutes must be strictly construed . . . ." Id. These conclusory assertions in *Crowell* notwithstanding, we engaged in *no* analysis or explanation as to why the rule of strict of construction constituted a sound basis for our determination that criminal statutes of limitation presumptively have prospective effect only. Consequently, *Crowell* is no more persuasive a precedent than is *Paradise*.

of the legislature in enacting the statute." (Internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 695, 741 A.2d 873 (1999). In seeking to discern that intent, "[o]ur point of departure is . . . § 55-3,[41] which . . . we have uniformly interpreted . . . as a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only. . . . The Legislature only rebuts this presumption when it clearly and unequivocally expresses its intent that the legislation shall apply retrospectively."[42] (Internal quotation marks omitted.) *Rice* v. *Vermilyn Brown, Inc.*, 232 Conn. 780, 786, 657 A.2d 616 (1995); see also *Coley* v. *Camden Associates, Inc.*, 243 Conn. 311, 316, 702 A.2d 1180 (1997). As a corollary to this principle, we also "have presumed that procedural or remedial statutes are intended to apply retroactively absent a clear expression of legislative intent to the contrary . . . ."[43] *Miano* v. *Thorne*, 218 Conn. 170, 175, 588 A.2d 189 (1991); accord *In re Daniel H.*, supra, 237 Conn. 372–73. "While there is no precise definition of either [substan-

---

[41] See footnote 36 of this opinion.

[42] "[This] presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal." (Internal quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 196, 842 A.2d 567 (2004), quoting *Immigration & Naturalization Service* v. *St. Cyr*, 533 U.S. 289, 316, 121 S. Ct. 2271, 150 L. Ed. 2d 347 (2001).

[43] Since our decision in *Paradise*, we repeatedly have recognized the utility of this approach to statutory construction as a guide to determining whether the legislature intended for a particular criminal statute to have retrospective effect. See, e.g., *State* v. *Faraday*, 268 Conn. 174, 197, 842 A.2d 567 (2004); *In re Michael S.*, 258 Conn. 621, 630, 784 A.2d 317 (2001); *State* v. *Parra*, supra, 251 Conn. 628 n.8; *In re Daniel H.*, supra, 237 Conn. 372. Indeed, as we have explained, in *Paradise*, we acknowledged the applicability of this approach in regard to certain unspecified "areas of the criminal process." *State* v. *Paradise*, supra, 189 Conn. 353 n.5.

tive or procedural law], it is generally agreed that a substantive law creates, defines and regulates rights while a procedural law prescribes the methods of enforcing such rights or obtaining redress." (Internal quotation marks omitted.) *Carr* v. *Planning & Zoning Commission*, 273 Conn. 573, 593, 872 A.2d 385 (2005). Moreover, the "retroactive application of a law occurs only if the new or revised law was not yet in effect on the date that the relevant events underlying its application occurred." *State* v. *Faraday*, 268 Conn. 174, 197, 842 A.2d 567 (2004); see also *State* v. *Breton*, 264 Conn. 327, 421–22, 824 A.2d 778, cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003); *In re Daniel H.*, supra, 377. Finally, in determining the retrospective applicability of any criminal statute, we must be mindful that the ex post facto clause of the United States constitution[44] bars any state from enacting "any law [that] imposes a punishment for an act [that] was not punishable at the time [that] it was committed; or imposes additional punishment to that then prescribed." (Internal quotation marks omitted.) *Weaver* v. *Graham*, 450 U.S. 24, 28, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981). Although "a law enacted after expiration of a previously applicable limitations period violates the *Ex Post Facto* Clause when it is applied to revive a previously time-barred prosecution"; (emphasis in original) *Stogner* v. *California*, 539 U.S. 607, 632–33, 123 S. Ct. 2446, 156 L. Ed. 2d 544 (2003); because it deprives the defendant of a fully vested defense to prosecution, the constitution "does *not* prevent the State from extending time limits . . . for prosecutions not yet time barred."[45] (Emphasis added.) Id., 632.

---

[44] The constitution of the United States, article one, § 10, provides in relevant part: "No State shall . . . pass any . . . ex post facto Law . . . ."

[45] In *Stogner*, the United States Supreme Court considered the constitutionality of a statute of limitations that, as applied to the defendant, Marion Stogner, revived a prosecution that had been time barred under the original limitation period that was in effect when Stogner allegedly had committed the crimes with which he was charged. *Stogner* v. *California*, supra, 539 U.S. 609. The court concluded that the statute as applied violated the ex

Application of these considerations leads unmistakably to the conclusion that, subject to the limitations of the ex post facto clause, criminal statutes of limitation, including P.A. 76-35, § 1, should be accorded a presumption of retroactivity. Indeed, we long have held that civil statutes of limitation are presumed to apply retroactively because they do not affect or alter substantive rights. *Roberts* v. *Caton*, 224 Conn. 483, 488, 619 A.2d 844 (1993); see, e.g., *Jones Destruction, Inc.* v. *Upjohn*, 161 Conn. 191, 195–96, 286 A.2d 308 (1971). As we have explained, "[a] statute of limitations is generally considered to be procedural, [and therefore presumptively retroactive] especially whe[n] the statute contains only a limitation as to time with respect to a right of action and does not itself create the right of action." (Internal quotation marks omitted.) *Moore* v. *McNamara*, 201 Conn. 16, 22, 513 A.2d 660 (1986); accord *Roberts* v. *Caton*, supra, 488. "This is so because . . . the limitation merely acts as a bar to a remedy otherwise available." *Moore* v. *McNamara*, supra, 22. The fundamental purpose and effect of criminal statutes of limitation are the same as civil statutes of limitation; as the United States Supreme Court has stated in noting the similarities between such statutes, they both "represent a legislative judgment about the balance of equities in a situation involving the tardy assertion of otherwise valid rights: [t]he theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." (Internal quotation marks

post facto clause because it "retroactively withdr[ew] a complete defense to prosecution after it ha[d] already attached"; id., 632; thereby rendering Stogner subject to punishment under the new law for past criminal conduct for which he was not subject to punishment when the new law was enacted. See id., 613. The court also made clear, however, that the extension of a statute of limitations to offenses not barred by a previous limitation period does not implicate the ex post facto clause. Id., 632.

omitted.) *United States* v. *Marion*, 404 U.S. 307, 322–23 n.14, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971). Because both criminal and civil statutes of limitation are predicated on the same general policy considerations and perform the same basic functions, it makes sense to treat them the same for the purpose of determining whether they give rise to a presumption of retroactive or prospective applicability, at least in the absence of good reason not to do so.

We know of no such reason. Unless the statute of limitations that was in effect when a crime was committed has expired with respect to that crime, a defendant accused of that crime has no right to have that limitation period applied to his conduct. Succinctly stated, "[s]tatutes of limitations are measures of public policy only. They are entirely subject to the will of the legislature, and may be changed or repealed altogether in any case [in which] a right to acquittal has not been absolutely acquired by the completion of the [original] period of limitation. Such a statute is an act of grace in criminal prosecutions. The State makes no contract with criminals at the time of the passage of acts of limitations that they shall have immunity from punishment if not prosecuted within the statutory period." (Internal quotation marks omitted.) *People* v. *Isaacs*, 37 Ill. 2d 205, 229, 226 N.E.2d 38 (1967); accord *State* v. *Petrucelli*, 156 Vt. 382, 383, 592 A.2d 365 (1991); see also *State* v. *Hodgson*, supra, 108 Wash. 2d 668 ("until the [criminal] statute [of limitations] has run it is a mere regulation of the remedy . . . subject to legislative control" [internal quotation marks omitted]). In such cases, a defendant also has no legitimate expectancy interest in the application of that limitation period: defendants do not engage in criminal conduct with an eye on the then applicable statute of limitations, and, even if they did,

society, for obvious reasons, is not prepared to recognize any such reliance as reasonable.[46]

[46] We note that a significant number of courts have concluded that applying an amendment to a statute of limitations enlarging the unexpired period of time within which a prosecution may be brought is not a retroactive application of the extended period at all. E.g., *State* v. *Schultzen*, 522 N.W.2d 833 (Iowa 1994) ("applying the extended statute of limitations was not retroactive because the statute barred only prospective prosecutions . . . [and] [b]ecause the prosecution of the defendant was not barred as of the time the amendment became effective" [citation omitted]); *State* v. *Hirsch*, 245 Neb. 31, 43, 511 N.W.2d 69 (1994) ("because the extension of a statute of limitations to offenses not barred by a previous period of limitations does not affect a defendant's existing rights or defenses, the application of the extended statute to existing causes of action is not a retroactive law"); *State* v. *Dufort*, 111 Or. App. 515, 519, 827 P.2d 192 (1992) ("the amended Statute of Limitations is not retroactive legislation and . . . it applies to incidents . . . that had not yet been barred under the previous statute"); *Commonwealth* v. *Johnson*, 520 Pa. 165, 170, 553 A.2d 897 (1989) ("There is nothing retroactive about the application of an extension of a statute of limitations, so long as the original statutory period has not yet expired. . . . Only whe[n] a vested right or contractual obligation is involved is a statute applied retroactively when it is applied to a condition existing on its effective date which resulted from events [that] occurred prior to that date." [Citations omitted; internal quotation marks omitted.]). This view—under which P.A. 76-35, § 1, *would apply* to the conduct at issue in the present case because the application of the amendment would be considered prospective rather than retrospective—arguably finds support in *Landgraf* v. *USI Film Products*, 511 U.S. 244, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994), in which the United States Supreme Court made the following general observations about statutory retroactivity: "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment . . . or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have 'sound . . . instinct[s],' . . . and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." (Citations omitted.) Id., 269–70. As this court recently has observed, however, in criminal cases, we generally look to the date of the offense in determining whether a change in the law is considered retroactive; *In re Daniel H.*, supra, 237 Conn. 377; see also *State* v. *Crowell*, supra, 228 Conn. 401 (rejecting argument of state that applying amendatory extension of statute of limitations to conduct occurring before expiration of preamend-

The canon of statutory construction that procedural or remedial statutes are to be applied retroactively in the absence of a contrary legislative intent is grounded in the presumption that the legislature intended that result because such retroactive application will most broadly and comprehensively effectuate the legislative policy embodied in the enactment without upsetting any settled rights or reliance interests. Labeling a statute as substantive or procedural, however, will not always resolve the fundamental issue of legislative intent.[47] Thus, we have recognized that "[t]he test of whether a statute is to apply retroactively, absent an express legislative intent, is not a purely mechanical one and even if it is a procedural statute, which ordinarily will be applied retroactively without a legislative imperative to the contrary, it will not be applied retroactively if

ment limitation period does not constitute retroactive application of amendment); and, for purposes of this appeal, we adhere to that general rule. It is important to note, though, that regardless of whether the application of an amendment to a criminal statute of limitation is characterized as prospective because the original limitation period had not expired prior to the amendment's enactment, or, under the same factual scenario, that amendment is deemed to apply retroactively because it is procedural or remedial in nature, the result is precisely the same: the limitation period as amended, rather than the original limitation period, is the applicable limitation period.

[47] Indeed, as the Washington Supreme Court has stated, "[a] review of the multitude of cases decided by many courts on [the] subject [of whether an amendment extending a criminal statute of limitation applies to offenses not already time barred when the amendment was enacted] suggests that the labeling of statutes of limitation and changes thereto as 'procedural' or 'substantive', 'prospective' or 'retrospective' or 'retroactive', and as subject to 'strict' or 'liberal' interpretation, and then letting the consequences flow according to the label affixed, tends to obscure rather than clarify the law. We deem it helpful to consider the issue in more fundamental terms of precisely what statutes of limitation in criminal cases are, and how they function." *State* v. *Hodgson,* supra, 108 Wash. 2d 667. We fully agree with the essential thrust of this statement. It bears reiteration that we use the procedural-substantive distinction, like other canons of statutory construction, merely as a means to attain the fundamental goal of ascertaining the presumed intent of the legislature. Indeed, it is only after consideration of "what statutes of limitations in criminal cases are, and how they function"; id.; that we, like the Washington Supreme Court in *Hodgson,* have reached the conclusion that such statutes are presumptively retroactive.

considerations of good sense and justice dictate that it not be so applied." (Internal quotation marks omitted.) *State* v. *Lizotte*, 200 Conn. 734, 741, 517 A.2d 610 (1986); see also *In re Daniel H.*, supra, 237 Conn. 372–73 ("[A]lthough we have presumed that procedural or remedial statutes are intended to apply retroactively absent a clear expression of legislative intent to the contrary . . . a statute which, in form, provides but a change in remedy but actually brings about changes in substantive rights is not subject to retroactive application. . . . The rule is one of obvious justice and prevents the assigning of a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed." [Internal quotation marks omitted.]).

Considerations of good sense and justice dictate that a court give retroactive effect to a criminal statute of limitations, absent an indication of a contrary legislative intent, when, as in the present case, that retroactive application does not revive a prosecution already time barred by a previous limitation period. As we noted previously, statutes of limitation "represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice"; *United States* v. *Marion*, supra, 404 U.S. 322; and as such, they reflect the legislature's considered judgment as to the "difficult balance between the public demand for justice and the [interest] of the individual to be free from the continual threat of prosecution for past misconduct." *State* v. *Ellis*, supra, 197 Conn. 458 n.18. When the legislature implements that policy decision by modifying, through amendment, a preexisting criminal limitation period, we can conceive of no logical reason why the legislature would not have intended for that new limitation period to apply to *all* offenses that were not previously time barred under the original provision. Put differently, it is unreasonable to presume that the

legislature would have intended that the exact same crimes shall be subject to different limitation periods merely because of the fortuity that one defendant committed the crime the day *before* the enactment of the amendment to the limitation period while another defendant committed the identical crime the day *after* the enactment of that amendment.

Furthermore, as we observed in *Paradise,* the language of P.A. 76-35, § 1, sheds no light on whether the legislature intended for that amendment to have retroactive effect. *State* v. *Paradise,* supra, 189 Conn. 353. In *Paradise,* however, we limited our retroactivity analysis to the language of the amendment; see id.; and did not consider the amendment's legislative history. To the extent that the legislative history may be deemed to have a bearing on that issue, it is scant. As we noted in *State* v. *Golino,* supra, 201 Conn. 445, and *State* v. *Ellis,* supra, 197 Conn. 460, however, Senator David H. Neiditz, the sponsor of the amendment, indicated that it was intended to clarify existing law. See 19 S. Proc., Pt. 1, 1976 Sess., p. 341. It is well established that legislation deemed to be clarifying generally is accorded retroactive effect. E.g., *Andersen Consulting, LLP* v. *Gavin,* 255 Conn. 498, 517, 767 A.2d 692 (2001); *Toise* v. *Rowe,* 243 Conn. 623, 628, 707 A.2d 25 (1998). Although not conclusive, Senator Neiditz' comment supports our determination that P.A. 76-35, § 1, has retroactive applicability.[48]

Moreover, our conclusion that an amendment to a criminal statute of limitations is presumptively applicable to crimes not previously barred by the original limitation period is supported by the considerable weight of authority. See, e.g., *People* v. *Sample,* 161 Cal. App.

[48] We note that, in both *Ellis* and *Golino,* we underscored the significance of Senator Neiditz' comment that P.A. 76-35, § 1, was intended to clarify existing law. See *State* v. *Golino,* supra, 201 Conn. 445; *State* v. *Ellis,* supra, 197 Conn. 460.

3d 1053, 1058, 208 Cal. Rptr. 318 (1984); *State* v. *O'Neill*, 118 Idaho 244, 248, 796 P.2d 121 (1990); *People* v. *Isaacs*, supra, 37 Ill. 2d 229; *State* v. *Schultzen*, 522 N.W.2d 833, 835 (Iowa 1994); *State* v. *Nunn*, 244 Kan. 207, 217, 768 P.2d 268 (1989); *Commonwealth* v. *Bargeron*, 402 Mass. 589, 593–94, 524 N.E.2d 829 (1988); *People* v. *Russo*, 439 Mich. 584, 594–97, 487 N.W.2d 698 (1992); *Christmas* v. *State*, 700 So. 2d 262, 266–67 (Miss. 1997); *State* v. *Hirsch*, 245 Neb. 31, 43–44, 511 N.W.2d 69 (1994); *State* v. *Hamel*, 138 N.H. 392, 395–96, 643 A.2d 953 (1994); *State* v. *Nagle*, 226 N.J. Super. 513, 516, 545 A.2d 182 (1988); *People ex rel. Reibman* v. *Warden of County Jail*, 242 App. Div. 282, 284–85, 275 N.Y.S. 59 (1934); *People* v. *Pfitzmayer*, 72 Misc. 2d 739, 741–42, 340 N.Y.S.2d 85 (1972); *State* v. *Buchholz*, 678 N.W.2d 144, 149 (N.D. 2004); *State* v. *Dufort*, 111 Or. App. 515, 519, 827 P.2d 192 (1992); *Commonwealth* v. *Johnson*, 520 Pa. 165, 170, 553 A.2d 897 (1989); *State* v. *Wolfe*, 61 S.D. 195, 199, 247 N.W. 407 (1933); *Rose* v. *State*, 716 S.W.2d 162, 165 (Tex. App. 1986, pet. ref'd), cert. denied, 486 U.S. 1055, 108 S. Ct. 2822, 100 L. Ed. 2d 923 (1988); *State* v. *Lusk*, 37 P.3d 1103, 1109–10 (Utah 2001); *State* v. *Petrucelli*, supra, 156 Vt. 383–84; *State* v. *Hodgson*, supra, 108 Wash. 2d 665–68; see also 21 Am. Jur. 2d 349–50, Criminal Law § 294 (1998) ("Whe[n] a statute extends the period of limitation, the extension applies to offenses not barred at the time of the passage of the act, so that a prosecution may be commenced at any time within the newly established period. Such a statute, however, cannot operate to revive offenses that were barred at the time of its enactment, since that would make the statute ex post facto."). Although several courts have concluded otherwise; see, e.g., *United States* v. *Richardson*, 512 F.2d 105, 106 (3d Cir. 1975); *Stoner* v. *State*, 418 So. 2d 171, 178 (Ala. Crim. App.), cert. denied, 418 So. 2d 184 (Ala. 1982), cert. denied, 459 U.S. 1128, 103 S. Ct. 764, 74 L. Ed. 2d 978 (1983);

*Martin* v. *Superior Court*, 135 Ariz. 99, 100, 659 P.2d 652 (1983); *State ex rel. Manucy* v. *Wadsworth*, 293 So. 2d 345, 347 (Fla. 1974); *State* v. *Merolla*, 100 Nev. 461, 464, 686 P.2d 244 (1984); the courts in those cases relied solely on the faulty premise that the result was dictated by the canon of strict construction. Because those cases, like *Paradise*, are founded on the same rote and erroneous application of that interpretative principle— we have not found one such case in which the court engaged in any meaningful analysis of the issue—they suffer from the same logical infirmity as *Paradise*.

Our conclusion today also resolves a tension between our mode of analysis in *Paradise* and the approach to the construction of statutes in the criminal realm that we have employed more recently in cases such as *In re Michael S.*, 258 Conn. 621, 784 A.2d 317 (2001), *State* v. *Parra*, supra, 251 Conn. 617, and *In re Daniel H.*, supra, 237 Conn. 364. In each of those latter cases, we expressly recognized that the focus of our inquiry was the presumed intent of the legislature, and we thereafter proceeded to identify various relevant interpretative aids, *including* the canon of construction that procedural statutes carry a presumption of retroactivity, as a means to that fundamental end. See, e.g., *In re Michael S.*, supra, 627–29; *In re Daniel H.*, supra, 372–73, 376. In *Paradise*, by contrast, our statutory interpretation was guided solely by the rule of strict construction, an approach that, as we have explained, was unduly cramped and formalistic.

Moreover, in *Parra*, we acknowledged that the rule that we had announced in *Paradise* does not extend to those areas of the criminal process that bear only a remote connection to the criminal conduct for which the defendant was charged. *State* v. *Parra*, supra, 251 Conn. 626. By way of illustration, we noted that the amendatory provision at issue in *Parra* did "not change the elements of the crime with which the defendant

was charged, alter the elements of his defense to that crime or make more burdensome the punishment for that crime, after its commission."[49] Id. The same can be said of criminal statutes of limitation because they also do not purport to define or regulate criminal conduct in any way. We therefore see no reason why a criminal limitation period should not be included among those provisions that, although a part of our system of criminal laws, nevertheless carry a presumption of retroactivity.

In reaching this conclusion, we are mindful, of course, of the doctrine of stare decisis, which "counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. . . . It is the most important application of a theory of decisionmaking consistency in our legal culture and it is an obvious manifestation of the notion that decisionmaking consistency itself has normative value." (Internal quotation marks omitted.) *St. George* v. *Gordon*, 264 Conn. 538, 553–54 n.16, 835

---

[49] We note that these considerations are very similar to the factors to be evaluated in determining whether a retroactive law violates the ex post facto clause of the United States constitution. See, e.g., *Collins* v. *Youngblood*, 497 U.S. 37, 52, 110 S. Ct. 2715, 111 L. Ed. 2d 30 (1990) (concluding that Texas statute did not violate ex post facto clause because it did "not punish as a crime an act previously committed, which was innocent when done, nor make more burdensome the punishment for a crime, after its commission, nor deprive one charged with crime of any defense available according to law at the time the act was committed"). The similarity between the two inquiries is not surprising: both involve a determination of whether the retroactive application of a statute will upset vested rights or reasonable reliance interests such that applying the statute retroactively would be fundamentally unfair. See *Stogner* v. *California*, supra, 539 U.S. 621, 627, 632 (fairness is important factor in determination of whether retroactive application of criminal statute violates ex post facto clause).

A.2d 90 (2003). Stare decisis, however, "is not an end in itself. . . . Experience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better. . . . The flexibility and capacity of the common law is its genius for growth and adaptation." (Citation omitted; internal quotation marks omitted.) *State* v. *Brocuglio*, 264 Conn. 778, 793, 826 A.2d 145 (2003). Indeed, "[i]f law is to have current relevance, courts must have and exert the capacity to change a rule of law when reason so requires." (Internal quotation marks omitted.) *State* v. *Vakilzaden*, 251 Conn. 656, 663, 742 A.2d 767 (1999). "[Thus] [t]his court . . . has recognized many times that there are exceptions to the rule of stare decisis." (Internal quotation marks omitted.) Id.

We also acknowledge that, "[i]n assessing the force of stare decisis, our case law has emphasized that we should be especially cautious about overturning a case that concerns statutory construction. . . . Despite this reluctance, however, we have, on occasion, overruled cases that have involved the interpretation of a statute. . . . Thus the fact that there is preexisting case law on point is not, in and of itself, determinative of the issue presently before us." (Citations omitted; internal quotation marks omitted.) *Waterbury* v. *Washington*, 260 Conn. 506, 538, 800 A.2d 1102 (2002). It is important to note, moreover, that the holding of *Paradise* was considerably more far-reaching than our conclusion therein that P.A. 76-35 has prospective effect only: we also held, in the exercise of our common-law authority, that *all* criminal statutes of limitation are to be applied prospectively unless the language of the statute clearly expresses a contrary intent.[50] The breadth of our holding

---

[50] It might be argued that, having announced the rule in *Paradise* that criminal statutes of limitation will not be applied retroactively in the absence of clear statutory language to the contrary, the legislature is aware of that rule and can tailor its legislative enactments accordingly. See *State* v. *Crowell*, supra, 228 Conn. 401. We reject that contention because we think it

in *Paradise*—involving, as it does, a common-law rule of statutory construction—necessarily tempers our traditional reluctance to upset the settled interpretation of a particular statute.[51] Because "a judicious reconsideration of precedent cannot be as threatening to public

---

is unwise to continue to require the legislature to conduct itself in accordance with a rule that is, itself, unwise and unsound.

[51] It is true that, following our opinion in *Paradise*, the legislature did not further amend § 54-193 to express its intent that § 54-193 should be accorded retroactive effect. As we previously has observed, although legislative inaction following our interpretation of a statute does not necessarily constitute legislative affirmation of that interpretation, such inaction may be understood as a validation of our construction. See, e.g., *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 252, 756 A.2d 1264 (2000). Under the present circumstances, we do not believe that legislative inaction provides a reason to refrain from overruling *Paradise*. We issued our opinion in *Paradise* in March, 1983, approximately seven years after the April 6, 1976, effective date of P.A. 76-35, § 1. Thus, any uncharged murder or class A felony that, under our opinion in *Paradise*, was subject to the five year limitation period of the pre-1976 amendment version of § 54-193, necessarily had been committed no less than seven years prior to the issuance of our opinion in *Paradise*. Consequently, by the time we issued our opinion in *Paradise*, the five year limitation period that we had deemed applicable to those crimes in *Paradise* already would have expired with respect to those crimes.

Although the United States Supreme Court first held in 2003 that the ex post facto clause of the United States constitution prohibits a state from extending the limitation period for an offense committed after the expiration of the original limitation period; see *Stogner* v. *California*, supra, 539 U.S. 632; it was universally recognized at the time of our decision in *Paradise* that an amendment that operated to revive an expired limitation period with respect to a particular offense violated the ex post facto clause. See, e.g., id., 617–19 (explaining unanimous agreement of courts and commentators that ex post facto clause bars amendment to limitation period that revives previously expired limitation period). Indeed, in *Paradise*, we expressly declined to decide whether the retroactive application of a criminal statute of limitation violated the ex post facto clause; *State* v. *Paradise*, supra, 189 Conn. 350; even though, as in the present case, the extended limitation period became effective prior to the expiration of the previously applicable limitation period. See id., 348; see also id., 350 n.3 ("we reserve decision on the question of whether the legislature could have extended the statute of limitations and given it retrospective effect as those offenses on which the limitation period had not already expired"). Because it was clear in 1983 that the ex post facto clause prohibited any amendment to § 54-193 that purported to revive a previously time barred prosecution, we must presume that the legislature elected to refrain from amending the pre-1976 amendment version of § 54-193 for *that* reason, and *not necessarily* because it agreed with our conclusion in *Paradise*.

faith in the judiciary as continued adherence to a rule unjustified in reason . . . [we are confident that] [r]espect for the process of adjudication [will] be enhanced, not diminished, by our ruling [in the present case]." *Moragne* v. *States Marine Lines*, 398 U.S. 375, 405, 90 S. Ct. 1772, 26 L. Ed. 2d 339 (1970).

To summarize, the rationale of *Paradise* does not withstand careful analysis. Although we will not lightly reverse long-standing precedent, we are unwilling to compound the error that we made in *Paradise* by approving it again today. Our responsibility to reconsider prior decisions of this court when a party has so requested, together with our firm conviction that *Paradise* was wrongly decided, prevent us from doing so. We conclude, therefore, that an amendment to a criminal statute of limitations applies to a crime committed prior to the enactment of the amendment, in the absence of a clear expression of legislative intent to the contrary, as long as the preamendment limitation period had not yet expired when the amendment became effective. Because there is no indication that the legislature intended that P.A. 76-35, § 1, was to have prospective effect only, that amendment, contrary to our conclusion in *Paradise*, applies retroactively to crimes that were committed before its effective date but for which the preamendment limitation period had not yet expired. Consequently, P.A. 76-35, § 1, applies to the October, 1975 murder of the victim. Because the defendant had no vested statute of limitations defense prior to the enactment of P.A. 76-35, § 1, and because that provision excludes all class A felonies, including murder, from its five year limitation period, the state's prosecution of the defendant for the victim's murder was not time barred.

## III

The defendant next claims that the state improperly withheld certain exculpatory evidence, namely, a com-

posite drawing of a man observed walking near the crime scene on the evening of October 30, 1975, and two reports prepared by a state investigator profiling Kenneth Littleton and Thomas Skakel as potential suspects. The defendant further claims that the state's failure to disclose that evidence deprived him of his right to a fair trial in violation of *Brady* v. *Maryland*, supra, 373 U.S. 83, and its progeny. We reject each of these claims, which we address in turn.

A

The following facts and procedural history are necessary to our resolution of the defendant's claim that the state violated his rights under *Brady* by failing to disclose the composite drawing. On May 21, 2001, the defendant filed a pretrial motion for disclosure and production, requesting, inter alia, that the state disclose any "[i]nformation and/or material which is exculpatory in nature," including "[p]hotographs, composite sketches or other media replications that depict the likeness or physical attributes of [any] alleged perpetrator of this crime."[52] The state, which had indicated that it was adopting an open file policy for purposes of the case, did not object to this particular request, and, on August 15, 2001, the trial court issued an order requiring that the state comply with this and all other discovery requests to which the state had not objected. In accordance with its open file policy and the court's order pertaining to discovery, the state provided the defendant with numerous reports and documents relating to the investigation of the case.

One such report states that, on October 31, 1975, investigating officers searching the general vicinity of the murder scene were approached by special officer

---

[52] The defendant's discovery request was twenty pages in length. The defendant previously had filed a similar request, on June 12, 2000, at which time the case still was pending in the Superior Court for Juvenile Matters.

Charles Morganti, Jr. Morganti informed the officers that he had been on special duty patrol of the Belle Haven neighborhood the previous evening when, at about 10 p.m., he observed a white male walking in a northerly direction on Field Point Road. Morganti then observed the man turn onto Walsh Lane. Morganti approached the individual and asked him where he was going. The individual replied that he lived on Walsh Lane and that he was going home. Morganti further reported to the officers that he observed the man again, a few minutes later, walking northbound on Otter Rock Drive, just north of the Walsh Lane intersection.[53]

A second such report reflects the fact that Morganti was interviewed by the police again the following day. That report states that Morganti had agreed to "appear at the [d]etective [b]ureau for the purpose of putting [together] a composite picture of the subject that he had observed on Field Point [Road] near Walsh [Lane] on Thursday, [October 30, 1975]."

Another police report indicates that, on November 5, 1975, the police interviewed Carl Wold, a resident of Walsh Lane in the Belle Haven neighborhood. Wold informed the police that, at about 7:20 p.m. on October 30, 1975, he went out for his nightly walk. According to Wold, he walked east on Walsh Lane, turned right onto Field Point Road and then turned south toward Field Point Circle.[54] He recalled having a short conversation with an officer at the Field Point police booth and,

[53] Morganti provided the following description of the individual he had observed walking that evening: "White, male, [six feet] tall, 200 [pounds], late [twenties] to early [thirties], dark rimmed glasses, fatigue jacket, tan [slacks], blonde hair."

[54] Wold gave the interviewing officers the following description of his attire on the evening in question: "Brown (olive) field jacket, yellow corduroy shirt, tan slacks top-sider shoes . . . ." The report also includes the following physical description of Wold: "[Six feet, one inch], 210 [pounds], dark brown, straight hair, medium length and wears silver rimmed glasses." The report further describes Wold as a twenty-three year old white male.

later, on his way home, being stopped by a special police officer on Field Point Road, just south of the Walsh Lane intersection. This officer had inquired of Wold where he was headed, and Wold responded that he was returning to his home on Walsh Lane. Wold further stated that he returned home at about 8 p.m. and remained there for rest of the evening.[55] Wold denied walking on Otter Rock Drive that evening.[56]

Approximately nineteen years later, on October 8, 1994, Inspector Frank Garr of the office of the state's attorney interviewed Morganti again.[57] The written report of that interview reflects that Morganti informed Garr that James F. Murphy, a private investigator who had been retained by the Skakel family, had contacted him and questioned him about the "incident involving the individual [that Morganti had] stopped on Field Point Road, in Belle Haven" on the evening of October 30, 1975. Morganti also told Garr that he saw that person walking north on Field Point Road at approximately 8 p.m. that evening. Morganti further stated that he was replacing a fallen road stanchion just north of the residence of Cynthia Bjork on Otter Rock Drive sometime between 9:30 and 10 p.m. that evening when, from a distance of approximately one hundred yards, he observed the same individual "walking in a northerly

---

[55] Wold's father, with whom Wold resided, corroborated Wold's account of his activities that evening. In addition, a second special duty officer, John Duffy, was on duty at the Field Point police booth sometime between 6 p.m. and 6:30 p.m. on the evening of October 30, 1975, when he observed Wold, who was known to Duffy as a resident of Walsh Lane, taking his daily walk on Field Point Road. Duffy also recalled having a brief conversation with Wold, who told Duffy that he was heading home.

[56] The police contacted Morganti again on November 5, 1975. At that time, Morganti stated that he was certain that the man to whom he had spoken on Field Point Road on the evening of October 30, 1975, was the same individual he later observed walking on Otter Rock Drive.

[57] The copy of the report provided to this court does not indicate the identity of the investigator who authored the report. Both the state and the defendant have indicated, however, that Garr wrote the report.

direction through the front yard of a residence on Otter Rock Drive, across from the Skakel residence."[58] The report also states that, at the time of the original police investigation of the victim's murder, "Morganti reported the entire episode to the [police] investigators and assisted in the making of a composite sketch of the individual. A complete investigation into the matter was instigated, and it was determined that the individual was . . . Carl Wold." The report further states that Garr, who was accompanied by Murphy and, apparently, Morganti, then proceeded to the location on Otter Rock Drive where Morganti recalled having observed the individual for a second time on the evening of October 30, 1975.[59]

Following the jury verdict and shortly before sentencing, the defendant, on August 26, 2002, filed an amended motion for a new trial and request for an evidentiary hearing,[60] claiming, inter alia, that the state had violated his rights under *Brady* by failing to make a timely disclosure of a composite drawing of the individual who Morganti had observed on the evening of October 30, 1975.[61] In support of his claim, the defendant asserted that the state had not provided him with a copy of that drawing

[58] Another police report documents an interview with Bjork, who lived on Otter Rock Drive in the Belle Haven neighborhood at the time of the murder. Bjork told police that her husband had seen Morganti outside her house replacing a fallen road stanchion at about 9:40 p.m. on October 30, 1975.

[59] According to the report, Garr confirmed that this individual was approximately 100 yards from Morganti when Morganti saw the individual for the second time that evening.

[60] Practice Book § 42-53 authorizes the filing of a motion for a new trial. Practice Book § 42-54 provides that, "[u]nless otherwise permitted by the judicial authority in the interests of justice, a motion for a new trial shall be made within five days after a verdict or finding of guilty or within any further time the judicial authority allows during the five-day period."

[61] The defendant's original motion for a new trial was filed on June 12, 2002.

until August 21, 2002,[62] and that the drawing was significant because it tended to buttress his third party culpability defense. In particular, the defendant asserted that the composite drawing bore a strong resemblance to Littleton, a former suspect in the victim's murder whom the defendant, in support of his third party culpability defense, had identified as a likely perpetrator. The defendant further maintained that, although the state had concluded that Wold was the person who Morganti had observed near the crime scene at or near the time of the victim's murder, discrepancies in Wold's and Morganti's statements as to when Morganti saw Wold cast doubt on the state's conclusion.

The trial court heard argument on the defendant's motion on August 28, 2002, the same day that the sentencing hearing commenced. At the hearing on the defendant's motion, defense counsel represented that, despite the state's open file policy in the case, the composite drawing was not among the materials that the state had made available to the defendant's trial counsel prior to trial.[63] Defense counsel further represented that the state had provided the defendant's trial counsel with 1806 pages of discovery in connection with the case.[64]

During the argument, the trial court asked the defendant's trial counsel whether he had received, prior to

---

[62] In his brief to this court, the defendant represents that "[a]fter [he] was convicted, but prior to sentencing, [his] new counsel inquired about the existence of the sketch . . . ." The record otherwise is silent as to when the defendant's new counsel, who filed an appearance on behalf of the defendant after the jury verdict, requested the drawing. The record also is devoid of any indication as to what specifically had prompted the defendant's new counsel to make such a request.

[63] The portion of the hearing during which the parties addressed the issue of the composite drawing was argued on behalf of the defendant by attorney Hubert Santos, whom the defendant had retained after the jury had returned its verdict. The defendant also was represented at the hearing by his trial counsel, Michael Sherman.

[64] The state has not challenged the defendant's representation that his trial counsel had received 1806 pages of materials from the state during the course of pretrial discovery.

trial, the 1975 investigative report that refers to Morganti's willingness to participate in the creation of a composite drawing, and the 1994 investigative report that refers to a completed composite drawing. The defendant's trial counsel answered in the affirmative with respect to both reports. At the conclusion of the argument, the court denied the defendant's motion for a new trial and for an evidentiary hearing on that motion.[65] On appeal, the defendant renews his claim that he was deprived of a fair trial by virtue of the state's failure to produce the composite drawing prior to trial.[66]

Our analysis of the defendant's claim begins with the pertinent standard, set forth in *Brady* and its progeny, by which we determine whether the state's failure to disclose evidence has violated a defendant's right to a fair trial. In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith

[65] The trial court rejected the defendant's claim regarding the composite drawing both on the ground that the claim was untimely and because it lacked merit. In view of our conclusion that the trial court properly rejected the defendant's claim on its merits, we need not address the issue of the timeliness of the defendant's *Brady* claim insofar as it relates to the composite drawing.

[66] We note, preliminarily, the standard of review applicable to both of the defendant's claims. "Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a new trial is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for [a new trial], we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *McIntyre*, 250 Conn. 526, 533, 737 A.2d 392 (1999).

or bad faith of the prosecution." *Brady* v. *Maryland,* supra, 373 U.S. 87. In *Strickler* v. *Greene,* 527 U.S. 263, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999), the United States Supreme Court identified the three essential components of a *Brady* claim, all of which must be established to warrant a new trial: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Id., 281–82; see also *State* v. *Wilcox,* 254 Conn. 441, 452, 758 A.2d 824 (2000) ("[t]o establish a *Brady* violation, the defendant must show that [1] the government suppressed evidence, [2] the suppressed evidence was favorable to the defendant, and [3] it was material [either to guilt or to punishment]" [internal quotation marks omitted]). Under the last *Brady* prong, the prejudice that the defendant suffered as a result of the impropriety must have been material to the case, such that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles* v. *Whitley,* 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). The trial court concluded that the defendant had failed to demonstrate either that the composite drawing was suppressed or that it was material. For the reasons that follow, we conclude that the defendant cannot show that the state suppressed the composite drawing for purposes of *Brady.* Consequently, we need not, and, therefore, do not, reach his claim concerning the materiality prong of the *Brady* test.[67]

---

[67] We note that the trial court rejected the defendant's materiality claim on the ground that the composite drawing would not have been admissible at trial because Morganti did not testify even though he was an available witness and could have described the individual he saw on the evening of October 30, 1975. We agree with the defendant that, contrary to the conclusion of the trial court, the fact that Morganti did not testify at trial has no bearing either on the admissibility or materiality of the drawing; the defendant presumably would have placed the drawing into evidence, through Morganti or otherwise, if the defendant had been provided with a copy of

For purposes of this appeal, we presume that the state did not provide the defendant with a copy of the drawing prior to August 21, 2002.[68] To the extent that the state failed to do so, that failure constituted a violation of the open file policy to which the state had announced it would adhere in the case.[69] That fact alone, however, is not dispositive of the defendant's claim regarding the suppression component of *Brady* because it is well established that "evidence is not considered to have been suppressed within the meaning of *the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.*" (Emphasis added; internal quotation marks omitted.)

the drawing in advance of trial. In any event, the trial court never made any findings on the materiality issue, which necessarily involves a fact specific inquiry into the relative import of any exculpatory evidence that has been suppressed in view of the trial evidence as a whole. See, e.g., *United States* v. *Gil*, 297 F.3d 93, 103 (2d Cir. 2002) ("We assess materiality or prejudice in light of the trial evidence. Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin."); see also *State* v. *Hammond*, 221 Conn. 264, 294, 604 A.2d 793 (1992) (noting that reviewing court will give deference to finding of trial court on claim of possible *Brady* violation because of "difficulty inherent in measuring the effect of nondisclosure in the course of a lengthy trial with many witnesses and exhibits" [internal quotation marks omitted]). For that reason, and because our rejection of the defendant's challenge to the trial court's resolution of the suppression issue is dispositive of the defendant's claim concerning the composite drawing, we do not address the defendant's contention that the trial court improperly determined that the drawing was not material.

[68] We make this presumption in light of the defendant's representation that he had not been provided with a copy of the composite drawing and because the trial court, having rejected the defendant's request for a hearing on the issue, made no factual finding on that issue.

[69] As we previously have stated, "although we encourage the use of open file policies and recognize that this practice may increase the efficiency and the fairness of the criminal process . . . [w]e . . . [nevertheless] urge parties not to consider implementation of an open file policy as satisfaction of the defendant's discovery requests or the state's constitutional obligation to disclose exculpatory materials." (Citation omitted; internal quotation marks omitted.) *State* v. *Wilcox*, supra, 254 Conn. 453 n.19.

*United States* v. *Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995), cert. denied, 516 U.S. 1165, 116 S. Ct. 1056, 134 L. Ed. 2d 201 (1996); accord *United States* v. *Zichettello*, 208 F.3d 72, 103 (2d Cir. 2000), cert. denied sub nom. *Lysaght* v. *United States*, 531 U.S. 1143, 121 S. Ct. 1077, 148 L. Ed. 2d 954 (2001); see also *United States* v. *LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982), cert. denied, 459 U.S. 1174, 103 S. Ct. 823, 74 L. Ed. 2d 1019 (1983). The rationale underlying this exception to the state's disclosure obligation under *Brady* is obvious: *Brady* is designed to assure that the defendant is not denied access to exculpatory evidence known or available to the state but unknown or unavailable to him. See, e.g., *United States* v. *LeRoy*, supra, 619; *United States* v. *Ruggiero*, 472 F.2d 599, 604 (2d Cir.), cert. denied, 412 U.S. 939, 93 S. Ct. 2772, 37 L. Ed. 2d 398 (1973). It is not intended either to relieve the defense of its obligation diligently to seek evidence favorable to it or to permit the defense to close its eyes to information likely to lead to the discovery of such evidence. Thus, the composite drawing will not be deemed to have been suppressed by the state, notwithstanding the open file policy in effect in this case, if the defendant or the defendant's trial counsel reasonably was on notice of the drawing's existence but nevertheless failed to take appropriate steps to obtain it. See, e.g., *United States* v. *LeRoy*, supra, 618–19 (defendant cannot prevail under *Brady* if he was on notice of essential facts that would have enabled him to take advantage of exculpatory evidence but he failed to do so).

We agree with the finding of the trial court that, in the present case, the defendant or his trial counsel clearly was on notice of the existence of the composite drawing. First, the 1975 investigative report refers to the fact that Morganti had agreed to return to police headquarters to assist in the preparation of a composite drawing of the person he had observed in the vicinity

of the crime scene on the evening of October 30, 1975. Second, the 1994 investigative report states that Morganti had "assisted in the making of a composite sketch of [that] individual." Thus, as the defendant had noted in the memorandum that he filed with the trial court in support of his amended motion for a new trial, "[t]he circumstances surrounding the preparation of the sketch are provided in the police reports prepared during the investigation." Finally, the state provided the defendant and his trial counsel with those reports during discovery, and the defendant's trial counsel acknowledged that he was aware of them. The defendant or his trial counsel, therefore, had actual notice of the existence of the composite drawing and, consequently, the defendant was obliged to supplement his general *Brady* request with a specific request for that particular piece of evidence.[70]

Moreover, the defendant was well aware of Morganti's potential significance as a witness long before trial. Indeed, Murphy, the defendant's investigator, interviewed Morganti in 1994 and, together with Garr and Morganti, went to the location where Morganti had observed the individual who the defendant contends may have been Littleton. It is well known, of course, that police investigators routinely use composite drawings to aid in identifying potential suspects, and the defendant's investigator, who had unfettered access to Morganti, had every opportunity to ask Morganti if he had assisted the police in creating one.[71]

[70] Indeed, on April 16, 2002, after the commencement of jury selection but before the evidentiary portion of the trial had commenced, the defendant did file a "supplemental discovery motion for exculpatory evidence" in which he made several specific requests for information relating to Littleton, the individual who the defendant contends strongly resembles the person depicted in the composite drawing, including the results of any scientific or forensic tests tending to link Littleton to the victim's murder. The defendant, however, never filed a supplemental discovery request for the composite drawing.

[71] Because the defendant or his trial counsel had actual notice of the existence of the composite drawing, we need not decide whether the defen-

The defendant asserts that it is unreasonable to conclude that the 1975 and 1994 investigative reports were sufficient notice of the existence of the composite drawing because those reports were "buried" among 1806 pages of other documents produced by the state. This argument founders on the acknowledgment of the defendant's own trial counsel that he was aware of the two reports. Moreover, the defendant makes no claim that the reports were disclosed late or that he or his trial counsel otherwise did not have ample time, opportunity or resources to consider them.[72]

The defendant also contends that, notwithstanding the existence of the 1975 and 1994 reports, he did not have adequate notice of the exculpatory nature of the

dant's ready access to Morganti would have been sufficient, without more, to have relieved the state of its burden of production under *Brady*. See, e.g., *United States* v. *LeRoy*, supra, 687 F.2d 619 (government's failure to disclose witness' allegedly exculpatory grand jury testimony does not constitute suppression of that testimony for purposes of *Brady* when defendant knew of witness and fact that witness might have testified).

[72] We note that the trial court issued its discovery order on August 15, 2001, and that the state filed a notice with the court on September 25, 2001, that it had complied with that order. In the absence of any claim or indication to the contrary, we presume that the 1975 and 1994 investigative reports that refer to the composite drawing were included in the materials turned over to the defendant and his trial counsel in accordance with the state's notice of compliance. Because the evidentiary portion of the trial did not commence until May 7, 2002, the defendant and his trial counsel had more than sufficient opportunity to review those reports prior to trial.

The defendant's reliance on *United States* v. *Gil*, 297 F.3d 93 (2d Cir. 2002), is therefore misplaced. In *Gil*, the government did not disclose a certain exculpatory memorandum until one business day before trial even though the defendant, John Gil, had made numerous specific requests for such evidence. Id., 105–106. In addition, because the memorandum was located "among five reams" of other documents and not clearly indexed, it was "not easily identifiable as a document of significance . . . ." Id., 106. Under all of the circumstances of the government's belated disclosure, the Second Circuit Court of Appeals concluded that the memorandum had been suppressed because, "[a]lthough the . . . memo[randum] was produced before trial, the defense was not in a position to read it, identify its usefulness, and use it." Id. In the present case, the defendant or his trial counsel had notice of the composite drawing well in advance of trial but failed to request it until after the trial had concluded.

composite drawing. This claim is predicated on the defendant's dual assertion that: (1) he could not have known the exculpatory value of the drawing until he saw it and compared it to a photograph of Littleton; and (2) the 1994 report indicated that, in the view of the police, the person depicted in the drawing was Wold, who was not a suspect in the victim's murder. Neither of these assertions is reason to excuse the defendant's failure to have requested the drawing. The defendant had a duty to request the composite drawing because it was *potentially* exculpatory, irrespective of what the state may have thought about the drawing's import. In other words, the defendant could not wait until the completion of the trial to ascertain the value of the drawing to his defense; rather, he was obligated to obtain that evidence and to evaluate its utility prior to trial.

The defendant further argues that he cannot be faulted for failing to make a specific request for the composite drawing, despite the references to the drawing in the reports he did receive, because he was entitled to conclude that, in light of the state's open file policy, the state would have produced the drawing if it existed. In support of this contention, the defendant cites a number of cases that have articulated the general principle that a defendant normally may rely on the government's representation that it has made full disclosure of information to which the defendant is entitled under *Brady*. E.g., *Strickler* v. *Greene*, supra, 527 U.S. 284; see also *United States* v. *Payne*, supra, 63 F.3d 1207–1208. In each of those cases, however, the court also indicated that defense counsel had no reason to know that the government's disclosure was less than complete. See *Strickler* v. *Greene*, supra, 284; *United States* v. *Payne*, supra, 1208. In the present case, by contrast, the defendant or his trial counsel had actual notice of the existence of the allegedly exculpatory evidence, yet

failed to notify the state that it had not provided them with a copy of it. The defendant has cited no case, and we are aware of none, in which a defendant had notice of the existence of potentially exculpatory evidence but nevertheless was excused by the court from taking reasonable steps to obtain it. We, too, decline to endorse such an approach because there simply is no reason why a defendant who is aware of such evidence should not be required to seek it at a point in time when any potential constitutional infirmity arising from the state's failure to provide the evidence can be avoided without the need for a new trial.[73]

Furthermore, the defendant's contention that he reasonably believed that his responsibility to obtain *Brady* material ended with the state's announcement of an open file policy is belied by the record. In particular, long after that announcement, the defendant filed two supplemental written requests for the disclosure of exculpatory evidence under *Brady*. One such request was made during jury selection, the other shortly after the commencement of trial, and each was considerably more specific than the defendant's initial *Brady* request.[74] It is apparent, in light of those supplemental

[73] We fully acknowledge, of course, that, as the United States Supreme Court recently has observed, the decisions of that court "lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks* v. *Dretke*, 540 U.S. 668, 695, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004). Indeed, "[a] rule . . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." Id., 696. Nevertheless, when, as in the present case, a defendant is on notice of the existence of *Brady* material that the state has failed to turn over, the defendant is required to make reasonable efforts to obtain the exculpatory evidence. As we have indicated, any other rule would create a strong incentive for the defendant to await the outcome of the trial before seeking the evidence from the state.

[74] In fact, as we have indicated, one such request involved Littleton, the person who the defendant believes Morganti may have seen on the evening of October 30, 1975. See footnote 70 of this opinion.

requests, that the defendant knew of his continuing responsibility to identify and seek exculpatory material under *Brady* despite the state's open file policy. Cf. *United States* v. *Bagley*, 473 U.S. 667, 682–83, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) ("the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist").

We conclude, therefore, that the facts fully support the trial court's determination that the defendant failed to establish that the state suppressed the composite drawing within the meaning of *Brady*. Consequently, the defendant cannot prevail on his claim that he is entitled to a new trial by virtue of the state's failure to provide him with a copy of the composite drawing prior to trial.

### B

The defendant also contends that the trial court improperly rejected his contention that the state had violated his rights under *Brady* by failing to provide him with two reports, authored by state investigators, profiling Littleton and Thomas Skakel as possible suspects. We also reject this claim.

The factual and procedural background relevant to this claim may be summarized as follows. On May 13, 2002, John F. Solomon, a former supervisory inspector with the office of the state's attorney in the judicial district of Fairfield, testified outside the presence of the jury concerning issues that were raised in a motion then pending before the court. During his testimony, Solomon referred to a copy of a report that he had prepared in connection with the investigation of the victim's murder. Solomon characterized that report, which he wrote in 1992, as a profile of Littleton summarizing why, at the time the report was written, Littleton

was considered a suspect. Immediately after Solomon referred to the report, the defendant's trial counsel requested a copy, to which the court responded: "Not right now. You are talking about examining the witness." At that same proceeding, the state elicited testimony from Solomon indicating that he had prepared a similar profile of Thomas Skakel, who, at one time, also was a suspect in the victim's murder.

The defendant failed to renew his request for those reports before the conclusion of the trial, and his original motion for a new trial, which was timely filed on June 12, 2002,[75] did not refer to the two reports. The defendant did raise the issue, however, in his amended motion for a new trial, which was filed on August 26, 2002, claiming that the state had withheld the profiles of Littleton and Thomas Skakel in violation of its obligation under *Brady* to disclose exculpatory evidence. At the August 28, 2002 hearing on the defendant's amended motion for a new trial, the state asserted that the defendant's claim was time barred because it had not been raised until long after the expiration of the five day period for the filing of such motions prescribed by Practice Book § 42-54,[76] and just prior to the sentencing hearing that also was scheduled to commence on that same day. The state also maintained that the two reports were internal office documents and, therefore, exempt from discovery under Practice Book § 40-14[77] and the

---

[75] The jury returned its guilty verdict on June 7, 2002. Consequently, the defendant's original motion for a new trial, which was filed five days thereafter, was timely under Practice Book § 42-54. See footnote 60 of this opinion.

[76] See footnote 60 of this opinion.

[77] Practice Book § 40-14 provides: "Subject to Section 40-13 and except for the substance of any exculpatory material contained herein, Sections 40-11 through 40-14 [do] not authorize or require disclosure or inspection of:

"(1) Reports, memoranda or other internal documents made by a prosecuting authority or by law enforcement officers in connection with the investigation or prosecution of the case;

"(2) Statements made to prosecuting authorities or law enforcement officers except as provided in Section 40-11 (a) (6);

"(3) Legal research;

work product doctrine,[78] and that it had turned over to the defendant all of the factual information contained in the reports prior to trial, in accordance with the court's discovery order. After reviewing the two reports in camera, the trial court rejected the defendant's claim, concluding that: (1) the defendant had failed to renew his request for the reports during trial; (2) the claim otherwise was untimely because it had not been made within the five day period specified by Practice Book § 42-54, and the defendant had proffered no justification for the untimely claim; and (3) the reports appeared to be work product that is exempt from discovery under Practice Book § 40-14.[79] The court also noted that it had no reason to question the state's representation that the state had provided the defendant with all of the data contained in the two reports during pretrial discovery. Because the discovery documents containing those data had not been filed with the court, however, the court also observed that it had not conducted an independent review of the documents to confirm the accuracy of the state's representation. The court further indicated that, in light of that fact, its rejection of the defendant's claim did not rest on the state's contention that the defendant previously had been provided with all of the factual information contained in the two reports. Finally, at the conclusion of the hearing and after the

---

"(4) Records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of a prosecuting authority."

[78] "The work product rule protects an attorney's interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs and countless other tangible and intangible items. . . . Work product can be defined as the result of an attorney's activities when those activities have been conducted with a view to pending or anticipated litigation." (Citation omitted; internal quotation marks omitted.) *Ullmann* v. *State*, 230 Conn. 698, 714, 647 A.2d 324 (1994).

[79] The trial court aptly described the reports, which we also have reviewed, as "running narratives of the investigation with particular emphasis on two subjects as well as some mental impressions of the investigators."

court had denied the defendant's amended motion for a new trial, the defendant requested permission to file with the court the 1806 pages of documents that the state had turned over to him during pretrial discovery.[80] The trial court granted the defendant's request, and the documents were marked for identification only.[81]

Although we also have no reason to doubt the state's representation that it had provided the defendant, in advance of trial, with all of the data contained in the two reports, that representation also need not be the basis for our resolution of the defendant's claim. Rather, we conclude that the trial court acted within its discretion in rejecting the defendant's claim on the ground that the defendant had failed to raise it in a timely manner under Practice Book § 42-54. Even though the defendant became aware of the two reports during trial, he did not raise a *Brady* challenge to the state's failure to provide him with the reports until two and one-half months after the five day limitation period of Practice Book § 42-54 had expired. The defendant provided the trial court with no reason for the delay, and he has not offered one on appeal. Moreover, because the defendant did not provide the court and the state with copies of the 1806 pages of discovery documents until after the hearing on the defendant's amended motion for a new trial, the court could not ascertain, prior to ruling on the defendant's claim, whether, as the state had maintained, the data contained in those discovery documents had

---

[80] Defense counsel indicated that he wished to file those documents with the court in the interest of having a complete record for purposes of appeal.

[81] Because the defendant had not provided the state with copies of the 1806 pages of documents prior to the conclusion of the hearing, the state was not able to review those documents individually for the purpose of determining which documents contained the information that is the subject of the two reports. In its brief to this court, however, the state, having had the opportunity to review the 1806 pages of documents that the defendant had filed with the trial court, has identified the specific documents that contain the factual information included in the two reports.

been provided to the defendant prior to trial. We conclude, therefore, that the trial court did not abuse its discretion in rejecting the defendant's claim as time barred.

## IV

The defendant next claims that the state's use of the prior testimony of Gregory Coleman violated his rights under the confrontation clause of the sixth amendment to the United States constitution.[82] We disagree.

The following additional facts are necessary to our resolution of this claim. Coleman, a former resident of the Elan School, testified for the state at the defendant's probable cause hearing in April, 2001. Coleman testified that, one night in 1978, while Coleman and the defendant were residents at Elan, the defendant told Coleman that he had killed the victim with a golf club. Coleman, a heroin addict who acknowledged that he was suffering from withdrawal symptoms during his probable cause hearing testimony, was subject to cross-examination at that hearing. Coleman died in August, 2001, prior to the defendant's trial. At trial, the state, over the objection of the defendant, introduced into evidence a transcript of Coleman's probable cause hearing testimony under the former testimony exception to the hearsay rule. See Conn. Code Evid. § 8-6 (1).[83]

[82] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The sixth amendment right of confrontation is made applicable to the states through the due process clause of the fourteenth amendment. *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

[83] Section 8-6 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, provided (A) the issues in the former hearing are the same or substantially similar to those in the hearing in which the testimony is being offered, and (B) the party against whom the testimony is now offered had an opportunity to develop the testimony in the former hearing. . . ."

"With respect to the principles that govern application of the hearsay rule in criminal cases, [a]n out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule. . . .

"Beyond [applicable] evidentiary principles, the state's use of hearsay evidence against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment. . . . The sixth amendment to the constitution of the United States guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. This right is secured for defendants in state criminal proceedings. *Pointer* v. *Texas*, 380 U.S. 400, [403] 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). . . . [T]he primary interest secured by confrontation is the right of cross-examination. *Davis* v. *Alaska*, 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). . . .

"In defining the specific limits of the confrontation clause, the United States Supreme Court consistently has held that the confrontation clause does not erect a per se bar to the admission of hearsay statements against criminal defendants. . . . At the same time, [a]lthough . . . hearsay rules and the [c]onfrontation [c]lause are generally designed to protect similar values, [the court has] also been careful not to equate the [c]onfrontation [c]lause's prohibitions with the general rule prohibiting the admission of hearsay statements. . . . The [c]onfrontation [c]lause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule. . . .

"Traditionally, for purposes of the confrontation clause, all hearsay statements were admissible if (1) the declarant was unavailable to testify, and (2) the statement bore adequate indicia of reliability. *Ohio* v.

*Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). . . . [H]owever, the United States Supreme Court [subsequently] overruled *Roberts* to the extent that it applied to testimonial hearsay statements. See *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). In *Crawford*, the court concluded that the reliability standard set forth in the second prong of the *Roberts* test is too amorphous to prevent adequately the improper admission of core testimonial statements that the [c]onfrontation [c]lause plainly meant to exclude. . . . The court held, therefore, that such testimonial hearsay statements may be admitted as evidence against an accused at a criminal trial only when (1) the declarant is unavailable to testify, and (2) the defendant had a prior opportunity to cross-examine the declarant. . . .

"In so concluding, the court drew a distinction between testimonial hearsay statements and those deemed nontestimonial. Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the [s]tates flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from [c]onfrontation [c]lause scrutiny altogether. . . . In other words, nontestimonial hearsay statements may still be admitted as evidence against an accused in a criminal trial if it satisfies both prongs of the *Roberts* test, irrespective of whether the defendant has had a prior opportunity to cross-examine the declarant.

"Although the court declined to define the terms testimonial and nontestimonial, it considered three formulations of th[e] core class of testimonial statements . . . . The first formulation consists of ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would rea-

sonably expect to be used prosecutorially . . . . The second formulation consists of extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . . Finally, the third formulation consists of statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . . The court did not adopt any one particular formulation, noting that [t]hese formulations all share a common nucleus and then define the [c]lause's coverage at various levels of abstraction around it." (Citations omitted; internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 815–18, 882 A.2d 604 (2005).

The testimony at issue in the present case, namely, Coleman's prior probable cause hearing testimony, falls squarely within *Crawford*'s core class of testimonial evidence. Accordingly, the confrontation clause bars the state's use of that testimony unless Coleman was unavailable to testify at trial and the defendant had a full and fair opportunity to cross-examine Coleman at the probable cause hearing. Coleman's unavailability, due to his death, is undisputed. With respect to the defendant's prior opportunity to cross-examine Coleman, our review of the record of Coleman's probable cause hearing testimony indicates that the defendant's trial counsel questioned Coleman extensively, underscoring Coleman's struggle with drug addiction, his prior acts of misconduct, his prior inconsistent statements about the subject matter of his testimony, his lack of recollection due to the passage of time and ongoing drug abuse, and his failure to report the defendant's alleged confession either to Elan administrators or to law enforcement authorities. Indeed, the defendant does not seriously contest the fact that his trial counsel fully availed himself of the opportunity to

attack Coleman's credibility vigorously at the probable cause hearing.

The defendant contends, however, that the trial court nevertheless should have barred the state from using Coleman's probable cause hearing testimony because, according to the defendant, that testimony was inherently unreliable. As the court in *Crawford* noted, however, although the "ultimate goal [of the confrontation clause] is to ensure reliability of evidence . . . it is a procedural rather than a substantive guarantee." *Crawford* v. *Washington*, supra, 541 U.S. 61. In other words, the confrontation clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The [c]lause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." Id. With respect to testimonial evidence, therefore, *Crawford* makes clear that the *opportunity* for cross-examination satisfies the requirements of the confrontation clause. To the extent that Coleman's probable cause hearing testimony was not worthy of belief, as the defendant claims, the defendant had ample opportunity to challenge Coleman's credibility at that hearing.

Indeed, even if more were needed, for purposes of the confrontation clause, to establish the reliability, and, thus, the admissibility, of Coleman's testimony, that standard clearly has been satisfied. The record indicates that Coleman gave his testimony under oath and that he was subject to penalty for perjury. Moreover, his testimony was given before a judicial tribunal that kept an accurate record of the proceedings. The defendant was present at the hearing at which Coleman gave his testimony and was represented by the same counsel who later represented him at trial. See, e.g., *State* v. *Outlaw*, 216 Conn. 492, 505, 582 A.2d 751 (1990)

(identifying pre-*Crawford* factors for determination of admissibility of prior testimony). Most importantly, however, as we have explained, "defense counsel's cross-examination comported with the principal purpose of cross-examination: to challenge whether the declarant was sincerely telling what he believed to be the truth, whether the declarant accurately perceived and remembered the matter he related, and whether the declarant's intended meaning is adequately conveyed by the language he employed. [*Ohio* v. *Roberts*, supra, 448 U.S. 71] . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Outlaw*, supra, 506. The confrontation clause requires no more.

## V

The defendant also contends that the trial court improperly permitted the state to adduce certain incriminatory statements that he allegedly had made while he was a resident at Elan in violation of his right to due process under the fourteenth amendment to the United States constitution[84] and article first, § 8, of the Connecticut constitution.[85] Specifically, the defendant maintains that the state's use of his statements violated his right to due process because "they were extracted while [he] was subjected to an atmosphere of physical and psychological torture and intimidation" at Elan. The defendant concedes that he did not raise this claim in the trial court, and he therefore seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[86] The state contends that the defendant's federal

[84] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[85] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

[86] In *Golding*, we held that "a defendant can prevail on the claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of

constitutional claim fails as a matter of law because the defendant cannot establish a fundamental element of that claim, namely, that state officials, rather than private actors, were responsible for eliciting the allegedly coerced statements. With respect to the defendant's state constitutional claim, the state contends that the record is inadequate for our review of that claim. We conclude that the defendant cannot establish that the statements at issue were obtained in violation of his right to due process.

The following facts are relevant to our resolution of the defendant's claims. As we explained previously, from 1978 to 1980, the defendant attended the Elan School, a residential school for troubled adolescents located in Poland Springs, Maine. The undisputed evidence revealed that the atmosphere at Elan was extremely harsh and oppressive. Residents at Elan were subjected to a behavioral modification program that was predicated on ridicule and fear. For example, residents of Elan regularly were required to attend "general meetings," the purpose of which was to confront and humiliate residents who, in the opinion of the staff, needed to be disciplined. At those meetings, residents deemed by Elan staff to be in need of discipline were subjected to physical and emotional hazing, and abuse from other residents and staff.[87] See footnote 12 of this opinion.

a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) State v. Golding, supra, 213 Conn. 239–40. Because a defendant must satisfy all four of the Golding prongs, "[t]he appellate tribunal is free . . . to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." Id., 240.

[87] As the state's attorney observed in closing argument, there existed a "concentration camp-type atmosphere" at Elan.

While attending Elan, the defendant made several statements to residents there in which he implicated himself in the victim's murder. The defendant made one such statement to Elizabeth Arnold, who testified that the defendant had told her that his brother had had sex with the victim on the night of the murder. The defendant also told Arnold that he was very drunk that night, that he had experienced some sort of blackout and that he did not know if he or his brother had killed the victim. John Higgins, another former Elan resident, testified that he and the defendant were alone one evening on the porch of their dormitory when the defendant told Higgins that he had been involved in a murder. Higgins further testified that the defendant also had stated that he had taken a golf club from the garage of his home and that he remembered running through the woods with the golf club in hand. Finally, Higgins recalled that the defendant continued to speak about the murder, stating, initially, that "he didn't know whether he did it," followed by "he may have done it," and "he must have done it," and concluding with, "I did it."

The defendant also made incriminating statements to Gregory Coleman, a resident of Elan who had been assigned to "guard" the defendant after the defendant had returned to Elan following his failed escape attempt. According to Coleman, the defendant volunteered that, "I am going to get away with murder because I am a Kennedy . . . ." The defendant further stated that he had made romantic advances toward the victim, that she had spurned these advances and that he had beaten her to death with a golf club.

Another acquaintance of the defendant, Dorothy Rogers, testified that she was speaking with the defendant at an Elan social function when the defendant told her that he had been drinking on the night of the victim's death and that he could not remember what he had

done. According to Rogers, the defendant further explained that his family had sent him to Elan because they were afraid that he had committed the murder. The defendant also had two conversations with Alice Dunn, another Elan resident, about the victim's murder. One such conversation occurred at Elan while the defendant was cleaning the kitchen floor, and a second conversation occurred when Dunn and the defendant were together at a restaurant. In those conversations, the defendant told Dunn that he had been drinking on the night of the victim's murder, that he did not know if he had killed the victim and that either he or his brother could have committed the murder.

The defendant contends that these statements were the product of the coercive environment at Elan and, therefore, that the statements were introduced into evidence in violation of the defendant's right to due process. For the reasons that follow, we reject the defendant's claim.[88]

It is well settled that "any use in a criminal trial of an involuntary confession is a denial of due process of law. . . . In order to be voluntary a confession must

---

[88] The defendant also challenges the admissibility of a statement that he made during a "general meeting" at Elan. At that meeting, the defendant repeatedly was accused of having murdered the victim. When the defendant denied the accusations, he was required to enter a boxing ring that was located in the room where the general meeting was taking place. Several different people took turns in the ring with the defendant, and he was required to fight each of them. The staff at Elan did not terminate the fighting until the defendant stated, "I don't know" or "I don't remember," in response to the accusation that he had murdered the victim. See footnote 12 of this opinion. This testimony was elicited, however, by the defendant's trial counsel, both on cross-examination of a state's witness and on direct examination of several defense witnesses. Because the defendant cannot complain about evidence that he himself adduced, he is not entitled to appellate review of his claim that such evidence was introduced in violation of his due process rights. We therefore limit our review of the defendant's due process claim to those allegedly coerced statements of the defendant that were introduced into evidence by the state.

be the product of an essentially free and unconstrained choice by the maker. . . . If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of the confession offends due process. . . . The determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it . . . including both the characteristics of the accused and the details of the interrogation." (Citation omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 54.

"Under the due process clause of the fourteenth amendment, [however] in order for a confession to be deemed involuntary and thus inadmissible at trial, [t]here must be police conduct, or official coercion, causally related to the confession . . . ." (Internal quotation marks omitted.) Id. Therefore, "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause . . . [because] suppressing [such] statements would serve absolutely no purpose in enforcing constitutional guarantees. The purpose of excluding evidence seized in violation of the [federal] [c]onstitution is to substantially deter future violations . . . ." (Citations omitted.) *Colorado* v. *Connelly*, 479 U.S. 157, 166, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). In the present case, the defendant does not claim that his inculpatory statements were procured, either directly or indirectly, by any state official or any person acting on behalf of the state. Accordingly, the defendant's federal constitutional claim fails as a matter of law.

With respect to the defendant's claim under the due process clause of the state constitution, it is true that, "in some instances . . . the protections afforded to the citizens of this state by our constitution go beyond those provided by the federal constitution . . . ." (Cita-

tion omitted; internal quotation marks omitted.) *State* v. *Medina*, 228 Conn. 281, 295–96, 636 A.2d 351 (1994). Indeed, "this court has [o]n several occasions . . . left open the possibility that our state constitution might render a defendant's involuntary statements inadmissible even if they were motivated by factors other than police coercion . . . ." (Citations omitted; internal quotation marks omitted.) Id., 295. We need not decide whether the state constitution bars the use of involuntary statements that are not the product of police coercion, however, because, even if we assume, arguendo, that the state constitution does prohibit the use of such statements, the record is inadequate for our review of the defendant's state constitutional claim.

"In order to be voluntary a confession must be the product of an essentially free and unconstrained choice by the maker. . . . If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of the confession offends due process. . . . The determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it . . . including both the characteristics of the accused and the details of the interrogation. . . . Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . .

"The trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous." (Citations omitted; internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 328–29, 696 A.2d 944 (1997).

In view of the fact that the defendant failed to raise a challenge in the trial court to the admissibility, on state constitutional grounds, of the statements that he made while a resident at Elan, the trial court never made any inquiry as to the voluntariness of those statements. Because that inquiry necessarily is fact-bound, the absence of a factual predicate is fatal to the defendant's claim on appeal. In other words, "[w]e do not know . . . whether the trial court, after conducting a full evidentiary hearing and applying the state constitutional standard now urged by the defendant, would have found the defendant's statements to have been involuntary. . . . [S]ince such a determination is a question of fact, even if we were to agree with the defendant [on his interpretation of the Connecticut constitution], we would have to remand the case to the trial court for that factual determination, rather than to grant the defendant a new trial. Since, under the test in *Golding*, we must determine whether the defendant can *prevail* on his claim, a remand to the trial court would be inappropriate. The first prong of *Golding* was designed to avoid remands for the purpose of supplementing the record." (Emphasis in original; internal quotation marks omitted.) *State* v. *Medina*, supra, 228 Conn. 300–301.

It is true, as the defendant observes, that, although we defer to the trial court's findings on the subsidiary facts, our scope of review is plenary with respect to the ultimate question of voluntariness. See, e.g., *State* v. *Fields*, 265 Conn. 184, 197, 827 A.2d 690 (2003); *State* v. *Pinder*, 250 Conn. 385, 420–21, 736 A.2d 857 (1999). The defendant contends that, in light of the plenary nature of our review, we may decide his state constitutional claim despite the absence of any factual findings by the trial court. We disagree with the defendant's contention. Because the claim was not raised in the trial court, we do not know the precise circumstances

under which the defendant's statements were made, or the defendant's state of mind when he made them. We therefore are unable to determine the extent to which the atmosphere at Elan may have affected the voluntariness of those statements, if at all. Indeed, to the extent that the defendant's statements were the subject of testimony at trial, there was nothing inherently coercive about the particular circumstances surrounding the statements to indicate that they had not been given freely. In fact, in the case of each such statement, the defendant appears to have been confiding, voluntarily, in a fellow Elan resident. On appeal, we cannot assume that the atmosphere at Elan was so coercive that any incriminating statement by the defendant necessarily was the product of that coercive environment. The defendant's state constitutional claim, therefore, fails under the first prong of *Golding*.

## VI

The defendant further alleges three evidentiary improprieties which, according to the defendant, entitle him to a new trial. Specifically, the defendant claims that the trial court improperly: (1) permitted the state to introduce into evidence a prior inconsistent statement of Mildred Ix even though that statement contained inadmissible hearsay; (2) permitted the state to impeach a witness with three newspaper articles that contained sensational allegations about the defendant and the Kennedy family; and (3) barred the defendant from impeaching Kenneth Littleton with evidence of his 1977 felony convictions. We reject each of the defendant's claims.

We begin by setting forth the standard that governs our review of the trial court's evidentiary rulings. "It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion

in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Perkins*, 271 Conn. 218, 252, 856 A.2d 917 (2004). Furthermore, "[i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion." Id.

Finally, "[i]t is a fundamental rule of appellate review of evidentiary rulings that if [the] error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him. . . . Two lines of cases have developed setting forth the standard for reversing nonconstitutional, evidentiary improprieties. Under one line of cases, the defendant must establish, in order to obtain a reversal of his conviction, that it is more probable than not that the result of the trial would have been different if the error had not been committed. E.g., *State* v. *Cavell*, 235 Conn. 711, 721–22, 670 A.2d 261 (1996); *State* v. *Buster*, 224 Conn. 546, 561, 620 A.2d 110 (1993). According to a second line of cases, the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict. See, e.g., *State* v. *Askew*, 245 Conn. 351, 371–72, 716 A.2d 36 (1998). Under either formulation, [w]hether [the improper admission of a witness' testimony] is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted,

and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the [verdict] of the jury, it cannot be considered harmless." (Citation omitted; internal quotation marks omitted.) *State* v. *Gonzalez*, 272 Conn. 515, 527–28, 864 A.2d 847 (2005).

## A

We first address the defendant's contention that the trial court improperly admitted the prior inconsistent statement of Mildred Ix because it contained hearsay not admissible under any established hearsay exception. We are not persuaded by the defendant's claim.

At trial, the state presented the testimony of Mildred Ix, a resident of the Belle Haven neighborhood at the time of the victim's murder. Mildred Ix testified that she had been close to the defendant's deceased mother, and that she also was a good friend of the defendant's father, Rushton Skakel, Sr. She also testified that, after the death of the defendant's mother, she occasionally helped the defendant's father with problems or other matters relating to his children. On direct examination, the state asked Mildred Ix whether she recalled a conversation in which the defendant's father had confided in her that the defendant had admitted that he may have killed the victim. Mildred Ix responded that she did not. Thereafter, the state offered into evidence the prior grand jury testimony of Mildred Ix in accordance with the rule that we adopted in *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), which allows the "substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testi-

fies at trial and is subject to cross-examination." Id., 753. The proffered testimony provided in relevant part: "I can't remember who told me that, but it was—oh, it was . . . [the defendant's father]. He said . . . [the defendant] had come up to him and he said, you know, I had a lot . . . to drink that night and I would like to see . . . if I could have had so much to drink that I would have forgotten something, and I could have murdered [the victim], and I would like to make sure at that night knowing something like that happened. So he asked to go under Sodium Pentothal[89] or whatever it was."

Defense counsel objected to the state's use of the prior grand jury testimony of Mildred Ix on the ground that the testimony contained hearsay that did not fall within any established hearsay exception. The trial court overruled the objection, concluding that, although the statement contained three levels of hearsay, each level was independently admissible under a firmly rooted hearsay exception. Specifically, the court determined that the first level of hearsay, namely, the grand jury testimony of Mildred Ix, was admissible under the hearsay exception for prior inconsistent statements carved out by this court in *Whelan.* See Conn. Code Evid. § 8-5 (1). With respect to the second level of hearsay, namely, the statement of the defendant's father to Mildred Ix, the court determined that that statement was admissible under the residual exception to the hearsay rule. See id., § 8-9. Finally, the court concluded that the third level of hearsay, namely, the defendant's alleged statement to his father, was admissible as an admission by a party opponent. See id., § 8-3 (1).

On appeal, the defendant does not dispute the trial court's determination that the first and third levels of

[89] Sodium Pentothal is the trade name for thiopental sodium, an anesthetic used in low doses to induce a person to talk without inhibition. See Sloane-Dorland Annotated Medical-Legal Dictionary (1987) p. 727.

hearsay contained in the statement of Mildred Ix were admissible under the hearsay exceptions identified by the trial court. Rather, he challenges the trial court's conclusion that his father's statement to Mildred Ix was admissible under the residual exception to the hearsay rule. Specifically, the defendant contends that the trial court placed unwarranted reliance on the nature of his father's friendship with Mildred Ix in assessing the trustworthiness and reliability of the statement. In support of this contention, the defendant maintains that communications between close friends are not so inherently reliable as to overcome the general prohibition against the admission of hearsay testimony. The defendant further asserts that the trial court improperly concluded that it was unlikely that a father would relay a matter of such a sensitive nature about his son to a close confidant unless it were true. We disagree with the defendant.

As we previously have noted, out-of-court statements offered to establish the truth of the matter asserted are hearsay. Such statements generally are inadmissible unless they fall within an exception to the hearsay rule. "A hearsay statement that does not fall within one of the traditional exceptions to the hearsay rule nevertheless may be admissible under the residual exception to the hearsay rule provided that the proponent's use of the statement is reasonably necessary and the statement itself is supported by equivalent guarantees of trustworthiness and reliability that are essential to other evidence admitted under traditional exceptions to the hearsay rule. Conn. Code Evid. § 8-9; accord *State* v. *Hines*, 243 Conn. 796, 809, 709 A.2d 522 (1998)." (Internal quotation marks omitted.) *State* v. *Aaron L.*, 272 Conn. 798, 812, 865 A.2d 1135 (2005).

The requirement of reasonable necessity "is met when, unless the hearsay statement is admitted, the facts it contains may be lost, either because the declar-

ant is dead or otherwise unavailable, or because the assertion is of such a nature that evidence of the same value cannot be obtained from the same or other sources." (Internal quotation marks omitted.) *State* v. *Hines*, supra, 243 Conn. 809; accord Conn. Code Evid. § 8-9, commentary. At trial, the declarant, namely, the defendant's father, testified that he did not recall confiding in Mildred Ix that the defendant had admitted to him that he may have been involved in the victim's murder. Upon examining the transcript of her grand jury testimony, Mildred Ix confirmed that she had had a conversation with the defendant's father in which he stated that the defendant wanted to take a Sodium Pentothal test, but she denied that the defendant's father had said anything about the defendant's possible involvement in the victim's murder. In light of the fact that the only two parties to the conversation, Mildred Ix and the defendant's father, did not recall the statement that the defendant allegedly had made to his father, the trial court did not abuse its discretion in concluding that admission of the statement was reasonably necessary.

We next address the trustworthiness and reliability of the statement. We previously have identified several factors that bear upon the trustworthiness and reliability of an out-of-court statement, including: (1) whether "the circumstances are such that a sincere and accurate statement would naturally be uttered, and no plan of falsification [could] be formed"; (internal quotation marks omitted) *State* v. *Hines*, supra, 243 Conn. 810; (2) the closeness of the relationship between the declarant and recipient; *State* v. *Rivera*, 268 Conn. 351, 369, 844 A.2d 191 (2004); (3) whether the statement was made spontaneously and in confidence or obtained in response to government questioning conducted in anticipation of litigation; id., 370; (4) the temporal proximity between the alleged statement and the events to which

the statement refers; id., 370–71; and (5) whether the declarant testifies at trial and is subject to cross-examination. *State* v. *Sharpe*, 195 Conn. 651, 665, 491 A.2d 345 (1985). Applying these factors to the present case, we conclude that the trial court did not abuse its discretion in determining that the challenged statement bore the requisite indicia of trustworthiness and reliability for admission under the residual exception to the hearsay rule.

First, Mildred Ix and the defendant's father had a personal relationship, and, from time to time, they spoke about issues involving the Skakel children. Moreover, the defendant's father made the challenged statement to Mildred Ix in confidence and on his own initiative. In such circumstances, it is most doubtful that he would have repeated the defendant's statement to Mildred Ix unless the defendant, in fact, had made such a statement to him. Moreover, as a general matter, it is highly unlikely that a father would implicate his child falsely in a serious crime, and there is nothing in the record to suggest that the defendant's father had any reason or cause to do so in the present case. Furthermore, because the defendant's father made the statement to Mildred Ix in 1980 or 1981, his recall likely was more accurate at that time than when he testified at trial more than twenty years later.[90] Finally, Mildred Ix and the defendant's father testified and were subject to cross-examination concerning the challenged statement and its contents. In such circumstances, the statement bore sufficient indicia of reliability to warrant its admission into evidence. Because the trial court also reasonably concluded that the state had a legitimate need for the statement, we reject the defendant's contention that the trial court abused its discretion in per-

---

[90] We note that, in 1980 or 1981, the defendant was not a prime suspect in the victim's murder.

mitting the state to use the grand jury testimony of Mildred Ix as substantive evidence.

## B

The defendant next claims that the trial court improperly permitted the state to introduce into evidence, for impeachment purposes, three irrelevant and prejudicial newspaper articles,[91] and that that impropriety entitles him to a new trial. We also reject this claim.

At trial, Geranne Ridge testified that, in 1997, the defendant attended a gathering at her home. At that gathering, Ridge overheard the defendant state, "[A]sk me why I killed my neighbor." According to Ridge, the defendant had made that comment "in jest . . . ." Ridge claimed that she could not recall the defendant making any other statements about his alleged involvement in the victim's murder. The state thereafter introduced into evidence, in accordance with *State* v. *Whelan*, supra, 200 Conn. 753, a tape-recorded telephone conversation between Ridge and a friend, Matthew Attanian, that had taken place in February, 2002. In the conversation, Ridge told Attanian in relevant part: "[T]his is the real story. Um, [an unintelligible] name is used from now on, okay? . . . Um, John Doe was, was, um, watching this particular girl at her bedroom window, changing. And he was up in a tree, masturbating, [be]cause he liked her. She went and had sex with his brother Tommy that same night, while he was outside smoking pot and doing LSD and acid and really big-time drugs, mind, you know, altering drugs. After he found out that, that his, that John Doe's brother had sex with this girl, he got so violent and he was so

---

[91] The three articles are: (1) "Shocking Murder Case Evidence Will Blow the Lid Off . . . Kennedy Family's Darkest Secrets," National Enquirer, March 19, 2002, pp. 16–17; (2) T. Kuncl, "Michael Skakel Linked to Shocking Book Proposal That Airs . . . Kennedy Dirty Laundry," Globe, February 29, 2000, pp. 4–5, 8–9; and (3) "Kennedy Heir, His Teen Love and Their Steamy 5-Year Affair," Star, May 13, 1997, pp. 5, 24–25.

screwed up, he did that to her." Attanian replied, "Wow. And he told you he did that?" Ridge responded, "Yes." Ridge also told Attanian that the defendant had told her and the guests at her home that, "I did hit her with a golf club . . . ."

On cross-examination, Ridge maintained that the defendant had not, in fact, made any admissions to her about the victim's murder, and that her only contact with the defendant consisted of her overhearing his "off the cuff" comment, "[A]sk me why I killed my neighbor." Ridge further maintained that it was her houseguest, Marisa Verrochi, and not she, who had invited the defendant to her home, and that she had never even been introduced to the defendant. Ridge also explained that she had lied to Attanian about the defendant's admissions in order to satisfy Attanian's curiosity about the murder and to appear more knowledgeable about that crime than she actually was. In addition, Ridge testified that the information that she had relayed to Attanian "came from magazines, newspapers and from Marisa Verrochi."

On redirect examination, the state's attorney asked Ridge whether three newspaper articles that her attorney had brought to court that day were the source of the information that she had conveyed to Attanian. She responded that they were "[m]ost of the source, yes . . . ." The state's attorney then asked Ridge to examine the three publications and to identify any reference in the articles concerning the details of the statement attributed to the defendant by Ridge in her tape-recorded telephone conversation with Attanian. Defense counsel objected to this inquiry on the ground that the articles were not in evidence, and the court sustained the objection. The state's attorney thereafter questioned Ridge about each specific fact that she had attributed to the defendant in her telephone conversation with Attanian, inquiring as to whether the fact

was mentioned in the three newspaper articles. Ridge responded that each such fact was contained in one or more of the articles.[92] At that point, the state sought to introduce the three newspaper articles into evidence, and defense counsel objected, claiming that the articles were irrelevant and prejudicial. The trial court overruled defense counsel's objection. The court instructed the jury, however, that the articles were not being admitted for the truth of the information contained therein but, rather, for the limited purpose of impeaching Ridge's testimony that they had been the source of the details that she had related to Attanian. The state's attorney then asked Ridge to examine the articles and to point out those portions of the articles that contained the information that she had provided to Attanian. Ridge responded that she had not thoroughly reviewed the articles, but that they did not contain some of the details that she had related to Attanian in their telephone conversation.[93] On recross-examination, Ridge testified that

[92] This colloquy proceeded in relevant part:

"[State's Attorney]: [The newspaper articles] should contain information about the defendant's spying on the victim?

"[Ridge]: One of those newspapers did, Your Honor, in a tree.

"[State's Attorney]: And, about being in a tree masturbating?

"[Ridge]: Yes.

"[State's Attorney]: And, about him really liking her?

"[Ridge]: Yes, sir.

"[State's Attorney]: And, about him having done pot and LSD?

"[Ridge]: Yes, sir.

"[State's Attorney]: And, about the defendant having learned that his brother had had sex with the victim?

"[Ridge]: Yes, sir.

"[State's Attorney]: And, about the fact that learning this so screwed the defendant up that he did that to her, killed her or murdered her?

"[Ridge]: Yes, sir."

[93] This colloquy proceeded in relevant part:

"[State's Attorney]: Wouldn't you agree that there is nothing in any of those three publications that mentions the defendant climbing a tree and spying on a victim?

"[Ridge]: Not that I could see . . . but I wasn't—from what I could briefly scan.

\* \* \*

the three articles were not the only sources of the information that she had conveyed to Attanian. At the conclusion of the trial, the court again instructed the jury regarding the limited purpose for which the articles had been introduced into evidence.

The defendant contends that the trial court abused its discretion in admitting the newspaper articles into evidence because they were irrelevant and prejudicial. Specifically, the defendant maintains that the articles contain sensational stories of sex, alcohol and drugs involving the defendant and the Kennedy family, generally "underscored the pervasive theme of the state's case that the defendant believed [that] he was above the law because he was a Kennedy," and otherwise suggested that the defendant, like other members of his family, was a liar who had much to hide.[94]

---

"[State's Attorney]: Nothing in any of those articles about anybody masturbating in a tree?

"[Ridge]: Not that I could see.

"[State's Attorney]: Or doing LSD or pot or anything like that?

"[Ridge]: Yes, there was a mention of illicit drug use, yes.

"[State's Attorney]: How about learning that his brother had had sex earlier [in] the night with the victim?

"[Ridge]: I believe something to that effect was mentioned. I am not positive.

"[State's Attorney]: We will let the jury decide that when they deliberate. And getting so screwed up that he did that to her, anything in those articles about that?

"[Ridge]: Nothing about that, but just the illicit drug use was mentioned."

[91] We note that only the Globe and National Enquirer articles mention the defendant or the present case. The Globe article is largely devoted to purported Kennedy secrets, many of which allegedly were to be revealed in the defendant's unfinished and unpublished tell-all book; apparently, the book proposal had been leaked to the press. The article does state, however, that the defendant admitted that he had "lied to investigators probing the murder of [the victim] in 1975"; T. Kuncl, "Michael Skakel Linked to Shocking Book Proposal That Airs . . . Kennedy Dirty Laundry," Globe, February 29, 2000, p. 4; and that he once was required to wear a sign around his neck indicating that he had murdered the victim when he was attending the Elan School. Id., p. 9. Although these statements relate directly to the defendant and his purported involvement in the victim's murder, other evidence adduced at trial established the same facts. In particular, the defendant was

It is well established that "[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the

not truthful with the police. He told them that, on the night of the murder, he went to bed shortly after returning from James Dowdle's house and that he did not leave the house thereafter, even though he subsequently admitted that, later that evening, he masturbated in a tree outside the victim's room. Moreover, the defendant himself presented evidence demonstrating that Elan officials had accused him of murdering the victim and that he had been forced to say and do things, including wearing signs, indicating that he had murdered the victim. In addition, the Globe article indicates that, according to the leaked book proposal, the defendant disapproved of his family's "secrets," and did not intend to perpetuate them. For example, the article quotes the defendant as stating: "I am a member of a family sick unto death with generations of secrets"; (internal quotation marks omitted) id., p. 4; "I have concluded that there is no escape from recurrent tragedy that does not begin with telling the truth"; (internal quotation marks omitted) id.; and " 'I have seen wasted lives, tremendous pain and needless death' due to the Kennedy secrets . . . [a]nd [I don't] want to be a part of it any longer." Id., p. 9. We note, finally, that the Globe article contains a disclaimer that the defendant's attorney had informed the Globe that "the book proposal does not contain the words of [the defendant] and that [the defendant] did not endorse or approve the text of the proposal. [The defendant] claims it was written by the co-author, Richard Hoffman.

"[The defendant's] lawyer says the proposal was 'leaked and circulated in an effort to discredit [the defendant] and various members of his family.' " Id.

The National Enquirer article also contains certain references to the defendant and his purported involvement in the victim's murder. In particular, the article mentions the allegedly close friendship between the defendant and a Kennedy family babysitter and recounts the speculation of a "friend" that the defendant may have confessed to the babysitter that he had murdered the victim. "Shocking Murder Case Evidence Will Blow the Lid Off . . . Kennedy Family's Darkest Secrets," National Enquirer, March 19, 2002, pp. 16–17. The article also contains, however, a denial of that speculative comment by the defendant's attorney. See id., p. 17. Additionally, the article mentions "talk of a Kennedy family cover-up" of the victim's murder. Id. The article states that the defendant's brother, Thomas Skakel, "was shipped off to Ireland a month after the investigation began. And [the defendant] refused to cooperate with police." Id.

evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not [unfairly] prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 200–201, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); see also Conn. Code Evid. § 4-1.

We agree with the trial court that the newspaper articles were relevant to the state's contention that Ridge did not, in fact, obtain the information that she had conveyed to Attanian from the newspaper articles but, rather, from the defendant himself, as she had represented to Attanian.[95] In light of Ridge's testimony that the newspapers, and not the defendant, were the source of that information, the fact that most of the information was not contained in the articles provided a proper avenue of impeachment for the state.

With respect to the prejudicial effect of evidence admitted at trial, we have stated that, "[a]lthough relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . [T]he trial

---

[95] The defendant notes that the National Enquirer article, which was published on March 19, 2002, postdated Ridge's conversation with Attanian and, therefore, that article was irrelevant to the issue of from what source Ridge had obtained the information about the defendant that she had provided to Attanian. Although we agree that Ridge could not possibly have obtained the information from that article, that fact supports, rather than undermines, the state's claim that, contrary to Ridge's testimony, the article was not a source of the information that she had provided to Attanian. Moreover, defense counsel neither objected to the state's use of the National Enquirer article on that ground nor offered to stipulate that the article could not have been the source of any of the facts to which Ridge had referred in her conversation with Attanian.

court's discretionary determination that the probative value of evidence is . . . outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates *undue* prejudice so that it threatens an injustice were it to be admitted. . . . [Accordingly] [t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will improperly arouse the emotions of the jur[ors]." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Sandoval*, 263 Conn. 524, 544, 821 A.2d 247 (2003); see also Conn. Code Evid. § 4-3.

Whether the trial court reasonably concluded that the probative value of the articles was not outweighed by their potential prejudicial effect presents a close question. Our review of the articles reveals that they are comprised primarily of sensationalized reports of allegedly scandalous conduct by members of the Kennedy family. Although the articles also mention the defendant's abuse of drugs and alcohol, ample evidence of that abuse was admitted into evidence at trial. Moreover, to the extent that the articles refer to the present case and to the defendant's purported involvement in the victim's murder, those references are relatively brief and, with minor exceptions, involve facts that already were properly before the jury. See footnote 94 of this opinion. Nevertheless, because of the sensational nature and tone of the articles, their introduction into evidence created some risk of prejudice to the defendant. That risk, however, undoubtedly was minimized by virtue of the trial court's limiting instructions.[96] We

[96] Immediately following the admission of the articles, the trial court instructed the jury that the articles were "not being admitted for the truth

need not decide whether the trial court abused its discretion in permitting the state to introduce the articles into evidence, however, because the defendant cannot establish that any prejudice that may have flowed from their admission into evidence was so substantial as to warrant a new trial. In other words, under either formulation of the test that this court applies in determining whether an evidentiary error warrants a new trial; compare *State* v. *Cavell,* supra, 235 Conn. 721–22 (result of trial likely would have been different but for evidentiary impropriety), with *State* v. *Askew,* supra, 245 Conn. 371–72 (prejudice resulting from erroneous evidentiary ruling is so substantial as to undermine confidence in fairness of verdict); the defendant cannot establish harm because the jury already was aware of most of the facts contained in the articles; see *State* v. *Gonzalez,* supra, 272 Conn. 528–29 ("[i]t is well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative of other validly admitted testimony" [internal quotation marks omitted]); and because the trial court repeatedly instructed the jury regarding the limited admissibility of the articles. See *State* v. *McIntyre,* 242 Conn. 318, 330, 699 A.2d 911 (1997) ("[t]he jury is presumed to

of what they contain . . . . They are not being admitted for the truth of what they contain, only in connection with this witness' testimony that she collected them as some sources of information relating to these claims that she gave Mr. Attanian, that she claims not to have known directly from the defendant . . . ." The trial court reiterated its limiting instruction in its charge to the jury: "[Ridge] disavowed some of the statements she attributed to the defendant about what he had said concerning the killing and what she later related to her then friend Attanian. You will recall [Ridge] identifying certain tabloids as representative of the sources she used to make such statements. The tabloids, the papers, were not admitted for the truth of what they published but, instead, as evidence that they did not contain certain information she had accredited to the defendant and related to Attanian. So, the state is asking you to believe that she heard these things from the defendant. That's for you to decide. But this is why those exhibits were admitted, and you must follow this and other limiting instructions."

follow the court's instructions unless there is a fair indication to the contrary" [internal quotation marks omitted]). Accordingly, we reject the defendant's claim.

### C

The defendant also contends that the trial court improperly prohibited him from impeaching Kenneth Littleton with evidence of Littleton's three prior convictions for burglary in 1977. We disagree.

"Generally, evidence that a witness has been convicted of a crime is admissible to impeach his credibility if the crime was punishable by imprisonment for more than one year. General Statutes § 52-145 (b); Conn. Code Evid. § 6-7 (a). In determining whether to admit evidence of a conviction, the court shall consider: (1) the extent of the prejudice likely to arise; (2) the significance of the particular crime in indicating untruthfulness; and (3) the remoteness in time of the conviction. Conn. Code Evid. § 6-7 (a); see *State* v. *Nardini*, 187 Conn. 513, 522, 447 A.2d 396 (1982) (recognizing same three part test at common law prior to adoption of Connecticut Code of Evidence). Moreover, [i]n evaluating the separate ingredients to be weighed in the balancing process, there is no way to quantify them in mathematical terms. . . . Therefore, [t]he trial court has wide discretion in this balancing determination and every reasonable presumption should be given in favor of the correctness of the court's ruling . . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 307, 852 A.2d 703 (2004). With respect to the remoteness prong of the balancing test, we have endorsed a general guideline of ten years from conviction or release from confinement for that conviction, whichever is later, as an appropriate limitation on the

use of a witness' prior conviction. See, e.g., id., 313; *State* v. *Dorans*, 261 Conn. 730, 755–56, 806 A.2d 1033 (2002). "[T]he ten year benchmark . . . [however] is not an absolute bar to the use of a conviction that is more than ten years old, but, rather, serves merely as a guide to assist the trial judge in evaluating the conviction's remoteness." (Internal quotation marks omitted.) *Label Systems Corp.* v. *Aghamohammadi*, supra, 313. We have recognized, moreover, that "convictions having some special significance upon the issue of veracity surmount the standard bar of ten years and qualify for the balancing of probative value against prejudice." (Internal quotation marks omitted.) *State* v. *Dorans*, supra, 755–56.

Although Littleton's burglary convictions are probative of a lack of honesty; see *State* v. *Cooper*, 227 Conn. 417, 436, 630 A.2d 1043 (1993) ("[b]reaking and entering with criminal intent [is] a crime . . . associated with larceny and, therefore, implying dishonesty in the general sense directly affecting the credibility of [a] witness"); see also *State* v. *Askew*, supra, 245 Conn. 363–64 (noting that crimes involving larcenous intent are probative of lack of honesty); we nevertheless conclude that the trial court did not abuse its discretion in excluding them. The twenty-five year time span between Littleton's convictions and his trial testimony[97] greatly surpasses the ten year benchmark. Even though the crimes reflect a lack of honesty, their probative value was minimal, at best, in view of the long span of time

[97] The record reveals that Littleton did not serve a prison sentence in connection with his burglary convictions. Therefore, it is appropriate to look at the time between the year of Littleton's testimony, namely, 2002, and the year of the convictions, namely, 1977, in determining the time span between them for purposes of addressing the issue of whether the remoteness of Littleton's prior convictions warrants their exclusion from evidence. See Conn. Code Evid. § 6-7 (a), commentary (for purposes of remoteness, court looks to "the later of the date of conviction or the date of the witness' release from the confinement imposed for [that] conviction").

between the convictions and Littleton's testimony. See, e.g., *State* v. *Dorans*, supra, 261 Conn. 756 (trial court properly excluded conviction that involved larcenous intent and that was more than twenty years old). Consequently, the trial court acted within its discretion in concluding that the convictions were too remote to have any meaningful bearing on Littleton's veracity as a witness.

The defendant claims, nevertheless, that the trial court improperly excluded the proffered impeachment evidence because that evidence was not unduly prejudicial to the state and because of Littleton's importance to the defendant's theory of the case. In support of this claim, the defendant relies primarily on *State* v. *Askew*, supra, 245 Conn. 351. In *Askew*, the defendant, Willie Askew, was convicted of robbery in the first degree. Id., 352. At trial, Askew testified on his own behalf, and the state was permitted to impeach him with evidence of his prior robbery conviction. See id., 359. The robbery victim, who was the key state's witness; see id., 369; also had a prior felony larceny conviction, which, at the time of the trial, was ten years and seven months old. Id., 356. The trial court barred Askew from using the victim's prior conviction for impeachment purposes because the conviction was more than ten years old. See id., 357. On appeal, Askew claimed that the trial court had abused its discretion in prohibiting him from impeaching the victim with his prior conviction, and we agreed. Id., 371. We observed that, "as a general matter, it is unlikely that the use of a criminal conviction to impeach a state's witness will give rise to any undue prejudice";[98] id., 363; that the crime underlying the vic-

[98] We recognized, however, that "there may be circumstances [in which] the use of a prior conviction to impeach a state's witness will give rise to substantial prejudice to the state. In such circumstances, the trial court must determine whether the prejudice is so overriding as to outweigh the conviction's probative value." *State* v. *Askew*, supra, 245 Conn. 363 n.18.

tim's conviction was probative of a lack of honesty; id.; and that the victim's conviction, "while exceeding our ten year benchmark for presumptive admissibility, [was] not so remote as to impair, to any meaningful degree, its probative value."[99] Id., 364. Additionally, we observed that the state's case rested almost exclusively on the testimony of the victim. See id., 369. Because the outcome of the trial in that case "turned on the jury's assessment of the relative credibility of the victim and [Askew]"; id., 369–70; we were persuaded that the trial court improperly had failed to consider the centrality of the victim's testimony and, thus, the importance of his credibility, in assessing the probative value of the proffered impeachment evidence. See id., 370–71. We concluded, under all of the circumstances, that the trial court had abused its discretion in excluding the victim's prior felony conviction. Id., 371.

In contrast to the conviction at issue in *Askew*, the span between Littleton's prior felony convictions and his trial testimony is not close to the ten year benchmark for admissibility; it surpasses that benchmark by fifteen years. Furthermore, Littleton was not a key state's witness; indeed, he testified that he had no knowledge of the circumstances surrounding the murder of the victim. Although the defendant sought to advance the possibility that Littleton had murdered the victim, the evidence adduced by the defendant in support of that theory was, at best, thin. Finally, because the defendant's third party culpability defense did focus on Littleton, the state had a legitimate concern that the defendant's use of Littleton's twenty-five year old convictions would give rise to an undue risk that the jury's

---

[99] We further concluded that "any possible risk of prejudice to the state was reduced substantially by the fact that [Askew] sought to impeach the victim with a single prior conviction rather than multiple convictions." *State v. Askew*, supra, 245 Conn. 363. In the present case, the defendant sought to impeach Littleton with three prior felony convictions.

attention would be diverted from the important issues in the case. We therefore conclude that the trial court did not abuse its discretion in excluding evidence of those convictions.

## VII

Lastly, the defendant claims that his right to a fair trial was violated as a result of prosecutorial misconduct during closing arguments. Specifically, the defendant contends that the state's attorney improperly: (1) maintained that the defendant had fabricated a story to explain the possible future discovery of his semen at the scene of the crime; (2) asserted that the Skakel family had conspired to fabricate an alibi for the defendant; (3) contended that the Skakel family believed that the defendant was guilty of the murder of the victim; (4) referred to the defendant as a "killer" and a "spoiled brat"; (5) asserted that the defendant had masturbated on the victim's body; and (6) misused evidence in an audiovisual presentation to make it appear that the defendant had confessed to the murder. Although the defendant acknowledges that he did not object to any of the alleged misconduct that he challenges on appeal, he nevertheless claims that he is entitled to a new trial. We disagree.

We begin our analysis by setting forth the legal principles that govern our review of the defendant's unpreserved claims of prosecutorial misconduct. "In [*State v. Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004)], we clarified our due process analysis in cases involving incidents of prosecutorial misconduct to which no objection has been raised at trial.[100] We explained that,

---

[100] We note that the defendant filed his principal brief before the issuance of our opinion in *Stevenson*. In that brief, the defendant sought review of his unpreserved claims of prosecutorial misconduct under *Golding*. In his reply brief, which was filed after the issuance of our opinion in *Stevenson*, the defendant sought review under the analysis that we prescribed in *Stevenson*. We, of course, review the defendant's claims in accordance with our analysis in *Stevenson*.

in such cases, it is unnecessary for the defendant to seek to prevail under the specific requirements of . . . *Golding* . . . and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). As we stated in that case: In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"Regardless of whether the defendant has objected to an incident of misconduct, a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial. The application of the *Williams* factors, therefore, is identical to the third and fourth prongs of *Golding*, namely, whether the constitutional violation exists, and whether it was harmful. *State* v. *Golding*, supra, 213 Conn. 240. Requiring the application of both *Williams* and *Golding*, therefore, would lead . . . to confusion and duplication of effort. Furthermore, the application of the *Golding* test to unchallenged incidents of misconduct tends to encourage analysis of each incident in isolation from one another. Because the inquiry must involve the entire

trial, all incidents of misconduct must be viewed in relation to one another and within the context of the entire trial. The object of inquiry before a reviewing court in [due process] claims involving prosecutorial misconduct, therefore, is always and only the fairness of the entire trial, and not the specific incidents of misconduct themselves. Application of the *Williams* factors provides for such an analysis, and the specific *Golding* test, therefore, is superfluous. In light of these observations, we conclude that, following a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the *Williams* factors to the entire trial.

"This does not mean, however, that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial. . . . [Thus], the fact that defense counsel did not object to one or more incidents of misconduct must be considered in determining whether and to what extent the misconduct contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted. . . . *State* v. *Stevenson*, supra, 269 Conn. 572–76." (Citation omitted; internal quotation marks omitted.) *State* v. *Ancona*, 270 Conn. 568, 591–93, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005).

"We now address the standards that guide our review of claims of prosecutorial misconduct during closing arguments. [P]rosecutorial misconduct of a constitu-

tional magnitude can occur in the course of closing arguments. . . . In determining whether such misconduct has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . This heightened duty derives from our long recognition of the special role played by the state's attorney in a criminal trial. He is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of

counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . .

"Or to put it another way while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. . . . A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows." (Internal quotation marks omitted.) Id., 593–95.

It is well established, furthermore, "that a prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . .

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 400, 832 A.2d 14 (2003). In addition, "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor

appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . No trial—civil or criminal—should be decided upon the basis of the jurors' emotions." (Internal quotation marks omitted.) *State* v. *Ancona*, supra, 270 Conn. 602.

Thus, "[i]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. . . . As we have indicated, our determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540, with due consideration of whether that misconduct was objected to at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Ancona*, supra, 270 Conn. 595–96. With these overarching principles in mind, we turn to the defendant's specific allegations of prosecutorial misconduct during closing argument.

A

The defendant claims that the state's attorney falsely asserted that the defendant had fabricated a story about masturbating on or near the body of the victim for the purpose of explaining the possible future discovery of his semen, through the use of DNA technology, at the scene of the crime. The defendant also contends that the state's attorney improperly imputed this motive to the defendant on the basis of an assertion that was not supported by the record, namely, that the investigatory value of DNA technology was widely known when the defendant made certain statements, in the early 1990s, in furtherance of his masturbation story. The defendant

contends that, contrary to the state's attorney's assertion, the evidence established that DNA technology was only just emerging in the early 1990s and, therefore, its value was not widely known.

The following additional facts and procedural history are relevant to our resolution of this claim. As we previously have explained, the defendant initially told investigators that he had not left his home after returning from the home of his cousin, James Dowdle, on the night of the murder. At trial, however, several witnesses testified that the defendant had told them that, on the night of the murder, he had left his house and masturbated in the vicinity of the location where the victim's body was found. Michael Meredith, one of the state's witnesses, testified that, in 1987, the defendant stated that, on the night of the murder, he had climbed a tree on the Moxley property and masturbated while watching the victim through her bedroom window. Another witness, Andrew Pugh, testified that, in 1992, the defendant told him that, on the night that the victim was murdered, he had masturbated in the tree under which the victim's body was found. Pugh further testified that immediately after the defendant told him this story, Pugh received more than two dozen telephone calls from Sutton Associates, an investigatory agency that the defendant had retained, requesting that Pugh meet with them to discuss the victim's murder. When Pugh did not return the calls, the defendant contacted Pugh and implored him to speak to the investigators, explaining that the investigators were trying to "clear" the defendant's name.

The state also introduced the prior testimony of Gregory Coleman, who testified that while he and the defendant were residents at the Elan School, the defendant confessed to him that, two days after he killed the victim with a golf club, he had returned to her body and masturbated on it. In addition, the state introduced

a 1997 tape-recorded conversation between the defendant and Richard Hoffman in which the defendant explained to Hoffman how he had snuck out of the house on the night of the murder and masturbated in a tree on the Moxley property.

Finally, the state adduced the testimony of Henry Lee, the state's former chief criminalist, who explained that he had published a paper in 1979 about the potential application of DNA technology to forensic science. Lee further testified that, by the end of 1989, DNA technology was being used in criminal investigations in the United States, although, according to Lee, DNA technology still was a new and developing technique as of 1991. Lee also explained that, by the early 1990s, DNA testing had become even "more sensitive" through a new method of DNA typing known as the polymerase chain reaction.

In his closing argument, the state's attorney asserted that the reason that the defendant began telling people that he had left his house on the night of the murder and masturbated in the vicinity of the victim's body was because he feared that his original "1975 alibi wouldn't cover every eventuality, particularly that his semen might one day be identified in a crime lab, or even that one day, someone might surface who had actually seen him over there." The state's attorney further argued that, by the early 1990s, the defendant's need to establish an alternative explanation for the presence of his semen at the crime scene took on a particular urgency because, by then, DNA had become "the real deal in criminal investigation," and because "every criminal investigator on the planet was totally attuned to this miraculous new technology, and, of course, that would include the [private investigators] that the Skakel family had hired to assist them in the defense, Sutton Associates." Thus, according to the state's attorney, what began in 1987 as a story of spying on the victim while

masturbating in a tree outside the victim's bedroom window had, by 1992, evolved into a story of masturbating in the same tree under which the victim's body was found.

The defendant contends that the state's attorney's argument was improper for two reasons. First, the defendant claims that the state's attorney intentionally misrepresented the chronology of events to make it appear as though the defendant, with the assistance of Sutton Associates, had devised the masturbation story only after Lee became involved in the investigation in the early 1990s. Second, the defendant contends that the state's attorney, without support in the record and for the purpose of advancing the theory that the defendant had fabricated the masturbation story in the early 1990s in anticipation of the possible discovery of DNA evidence at or near the crime scene, improperly asserted that, by 1992, DNA was the "real deal" in criminal investigations, and that "every criminal investigator on the planet was totally attuned to this miraculous new technology . . . ."

We reject the defendant's first contention that the state's attorney misrepresented the chronology of events in order to make it appear that the defendant began telling his masturbation story only after Lee had entered the investigation. On the contrary, the state's attorney referred to Meredith's testimony throughout his closing argument, explicitly stating that the defendant had related the masturbation story to Meredith in 1987, five years before Lee's involvement in the case. The state's attorney underscored Pugh's testimony because it lent support to the state's theory regarding the defendant's motive for disseminating the masturbation story in the first place: as we have explained, Pugh testified that, in 1992, the defendant stated that he had masturbated in the same tree under which the victim's body was found. Pugh further testified that, immedi-

ately after the defendant told him this story, he began receiving repeated telephone calls from the defendant's private investigators requesting that Pugh meet with them to discuss the victim's murder. Pugh also explained that, when he did not return their calls, the defendant himself called to urge him to talk to the investigators. In light of the conduct of the defendant and his investigators, it was not improper for the state's attorney to argue that the defendant, or Sutton Associates, or both, in 1992, considered it urgent that Pugh repeat the story that the defendant had told him. It also was not improper for the state's attorney to argue that the defendant's urgent interest in the matter likely was related to the fact that the state recently had reopened its investigation into the victim's murder, and that Lee had part of that investigation. Because the state's attorney merely urged the jury to draw reasonable inferences from the facts, the argument was not improper.

We also are not persuaded that the defendant's due process rights were violated by the state's attorney's assertion that DNA technology and its efficacy were well-known in 1992. We acknowledge that there was not a great deal of testimony regarding the precise state of DNA science as of that date, and that, in light of the relative paucity of such testimony, the state's attorney's comments reasonably might be characterized as something of an overstatement of that testimony. Nevertheless, by 1992, professional investigators, such as Sutton Associates, undoubtedly were aware of DNA technology and its enormous potential in the forensic arena.[101] We are mindful, also, that "closing arguments often have a rough and tumble quality about them, [and that] some leeway must be afforded to the advocates in offering arguments to the jury in final argument." (Internal

---

[101] For example, we take judicial notice of the fact that DNA technology was being used in the investigation of criminal offenses in this state as early as 1989. See *State* v. *Hammond*, 221 Conn. 264, 278, 604 A.2d 793 (1992).

quotation marks omitted.) *State* v. *Morales*, 90 Conn. App. 82, 95 n.7, 876 A.2d 561, cert. denied, 275 Conn. 924, 883 A.2d 1250 (2005). As we previously have noted, moreover, defense counsel's failure to object to the state's attorney's argument when it was made indicates that he did not believe that it was unfair in view of the record of the case at the time. E.g., *State* v. *Stevenson*, supra, 269 Conn. 576. As we also have observed, "defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she wants to . . . refute that argument [later]." (Internal quotation marks omitted.) Id. That may have occurred in the present case. In any event, we reiterate that "[defense] counsel's failure to object at trial, while not by itself *fatal* to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . . Put differently . . . prosecutorial misconduct claims [are] not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial improprieties that . . . have deprived a criminal defendant of his right to a fair trial." (Emphasis in original; internal quotation marks omitted.) Id. Even if the state's attorney's characterization of the state of DNA evidence as of the early 1990s was somewhat overblown, that characterization did not represent the kind of gross or flagrant impropriety for which a new trial is required.

B

The defendant claims that the state's attorney improperly argued that the Skakel family had created an alibi for the defendant. We disagree with the defendant's claim.

At trial, the state adduced evidence that, on the day that the victim's body was discovered, Kenneth Littleton

was directed to take the defendant, his brothers Thomas Skakel and John Skakel, their cousin James Dowdle, and James Terrien to the family's hunting lodge in Windham, New York, which he did the following morning. On cross-examination, Littleton testified that he likely was the one who proposed to the "suits" and lawyers who came to the Skakel home on the day following the murder that he should take the Skakel children to Windham. On redirect examination, however, Littleton indicated that the decision to take the children to Windham probably had been made as a group. Littleton testified that, because, at the time, he could not have known that the Skakels had a house in Windham, he likely heard about the house from one of the "suits," and that he then volunteered to take the children there. The state also adduced testimony from the defendant's father, Rushton Skakel, Sr., who stated that, although he did not specifically recall directing Littleton to take the children to Windham, Littleton would not have had the authority to take the children anywhere without his permission.

Finally, the state adduced the testimony of James Lunney, a former detective with the Greenwich police department. Lunney testified that he had contacted the defendant's father on November 14, 1975, and requested that he bring his children to the station to provide statements about their whereabouts and activities at and around the time of the victim's murder. According to Lunney, the next day, the defendant's father brought all of his children, with the exception of Rushton Skakel, Jr., who was away at college, to the police station. Lunney also testified that the defendant's father remained in the room with the defendant while the defendant gave his statement.

In his closing argument, the state's attorney asserted that the defendant's family, and in particular the defendant's father, had "produced" an alibi for the defendant

after the murder. Specifically, the state's attorney argued that, on the day that the victim's body was found, someone in the family, most likely the defendant's father, had decided to send the defendant, Thomas Skakel and John Skakel to Windham to shield them from the police and to give them time to construct their story. The state's attorney further maintained that, had the trip simply been for the purpose of protecting the Skakel children from a killer on the loose, the defendant's younger brothers and sister also would have gone to Windham, but they had remained at home. Finally, the state's attorney asserted that a few weeks after the trip—and after the defendant's alibi witnesses had been afforded a sufficient opportunity to craft a cohesive story—the defendant's father escorted all of those witnesses to the police station, where they each gave an unsworn statement to the police.

The defendant contends that the foregoing argument was not based on the facts in evidence. We disagree.

With respect to the remarks of the state's attorney about the trip to Windham, the evidence adduced at trial indicated that, on the day that the victim's body was discovered, several unidentified persons, whom Littleton described as "suits," came to the Skakel residence to help take control of the situation. While they were there, it was decided that Littleton would take the defendant, his brothers Thomas Skakel and John Skakel, their cousin Dowdle, and Terrien to the family's hunting lodge in Windham. The defendant's father also testified that Littleton would not have had the authority to take his children anywhere without his permission. Accordingly, we conclude that the state's argument that Littleton was directed to take the four boys out to Windham on the basis of "[s]omeone seeing the police all over the place" was not improper because it was founded on reasonable inferences drawn from the testimony of Littleton and the defendant's father. Moreover,

because the only family members to go to Windham were the chief proponents of the defendant's alibi—the defendant's other siblings were left behind—it also was proper for the state's attorney to argue that the trip had been arranged for the purpose of placing these crucial witnesses temporarily out of reach of the authorities in order to give them time to prepare a unified account of the events that occurred on the night of the murder.

We also are not persuaded that the state's attorney transcended the bounds of proper argument when he urged the jury to infer that the defendant's father had been instrumental in orchestrating the defendant's alibi. There is nothing unusual, of course, about the defendant's father's act of accompanying his children to the police station. The state's attorney urged the jury to consider that conduct, however, in light of the fact that a number of persons had descended on the Skakel residence immediately after the discovery of the victim's body, apparently for the purpose of managing the situation, and, further, that the older Skakel siblings, along with Dowdle and Terrien, had been whisked away to Windham as soon as possible after the murder. Although the state's attorney did not, and could not, point to any direct evidence of a concerted effort by the defendant's father or other members of the Skakel family to orchestrate an alibi for the defendant, it was reasonable for the state's attorney to implore the jury to infer, on the basis of the circumstantial evidence, that such an effort had been undertaken on the defendant's behalf.

C

The defendant also contends that the state's attorney improperly asserted that the defendant's family believed that he had killed the victim because, otherwise, he would not have been sent to the Elan School. The defendant further claims that the state's attorney

improperly argued that the jury could infer from the evidence that the defendant's family had told Elan school administrators that the defendant had been involved in the victim's murder. We also reject these claims.

The following evidence is relevant to our review of this claim. As we have indicated, the state adduced testimony from several former Elan students regarding statements that the defendant had made while he resided at Elan. Two of those witnesses, Gregory Coleman and Dorothy Rogers, testified that the defendant had disclosed to them that he had been sent to Elan by his family to protect him from the authorities responsible for investigating the victim's murder. Several witnesses also testified that it was common at Elan for residents to be confronted either about issues that had precipitated their referral there or about problems they purportedly developed while in residence.[102] Alice Dunn testified that, at a general meeting that was conducted in response to the defendant's failed escape attempt, Joseph Ricci, the executive director at Elan, appeared to be reading from a "good sized" file when he confronted the defendant about the victim's murder. According to Dunn, during the course of this general meeting, Ricci's interrogation of the defendant included references to the golf club that had been used to kill the victim. Dunn further testified that Elan administrators usually obtained the information used to confront residents from institutions that the residents previously had attended or, with their parents' approval, from their therapists.

Detective Lunney testified that the Greenwich police department had played no role in the defendant's referral to Elan, and that the department never had commu-

---

[102] Among others, Sarah Petersen, Michael Wiggins and Donna Kavanah testified about the confrontational tactics employed at Elan.

nicated with Elan administrators about the victim's murder. Lunney further testified that, during the time period in which the defendant was enrolled at Elan, he was not considered a suspect in the murder.

Finally, evidence adduced at trial indicated that the defendant had told his father that he might have killed the victim. In particular, the defendant's father confided in his close friend, Mildred Ix, that the defendant had stated that he had been drinking on the night of the murder and that he might have been involved in the murder.

In his closing argument, the state's attorney outlined the reasons why the defendant had been sent to Elan, underscoring the evidence demonstrating that the defendant's family had sought to shield him from the police and that Elan administrators routinely confronted him with the victim's murder. The state's attorney asserted in relevant part: "One thing that I submit helps tie all this together, particularly on the subject of Elan . . . is the defendant's very presence at that place. The defense scoffs at the idea despite I think such clear evidence of a cover up. Why was the defendant at Elan? This is really not a matter of seeing the forest from the trees. It is genuinely transparent.

"Clearly, the defendant had a major problem. Already he was an alcoholic, a substance abuser. Already he was beyond the control of his family. He was becoming suicidal. I doubt his family was even aware of the sexual turmoil he was going through. Elan was a last resort but why exactly so drastic a resort.

"You heard from Rogers and Coleman [that] he was being hidden from the police is probably part of it. It is likely, also, if it was a private juvenile justice system, basically, a family's response is what can we do to make sure this doesn't happen again. And where does that

ring the truest? At the horrible general meeting with the monster himself, Joe Ricci.

"One thing every client of Elan who was there during that particular era recalls vividly is Joe Ricci referring to a file and telling the defendant that he wasn't getting out of [the boxing] ring until he explained why he killed her, and then being forced to wear a sign, 'Confront me on the murder of my neighbor.'

"Where did Ricci get that information?' Clearly, he didn't get it from the police. Why did Ricci have that information? Why did Ricci confront the defendant with that information? The answer, the only one that makes sense, lies in why the defendant was there in the first place, lies in why his family felt a need to put him in that awful place. Why? Because that's what they decided that they had to do with the killer living under their roof."

The defendant contends that this argument was improper because it was based on inadmissible hearsay, namely, statements about the defendant's involvement in the victim's murder that the defendant's family allegedly had made to Ricci and on inadmissible opinion evidence, namely, evidence that the defendant's family had sent him to Elan because they believed that he had murdered the victim. We are not persuaded by either of these contentions.

The assertion of the state's attorney that the defendant had been sent to Elan because of his apparent involvement in the victim's murder was not founded on inadmissible hearsay but, rather, on the testimony of Rogers and Coleman, both of whom testified that the defendant himself had explained that his family had enrolled him at Elan to shield him from the police. With respect to the defendant's challenge to the argument of the state's attorney that the defendant's family had informed Elan administrators of their concern that the

defendant had been involved in the victim's murder, the focus of that argument was the likelihood that the defendant had disclosed his involvement in the murder to one or more members of his family. The inference that the state's attorney urged was founded on the evidence: several witnesses testified that it was common practice at Elan for students to be confronted by school administrators about events that had precipitated their enrollment at the school. On several occasions, Elan staff members had confronted the defendant regarding his involvement in the victim's murder. Furthermore, the defendant was not a suspect in the victim's death when he attended Elan, and the police had no contact with Elan officials while the defendant was a student there. Finally, the defendant had intimated to his father that he was involved in the victim's murder. In light of that evidence, the argument of the state's attorney as to what Elan administrators likely had learned from the defendant's family about the defendant's involvement in the victim's murder was not improper.

D

The defendant next claims that, during the state's attorney's closing argument, he improperly referred to the defendant as a "killer" and a "spoiled brat . . . ." We conclude that the state's attorney's use of the term "killer," when placed in its proper context, was not improper. We also conclude that the state's attorney's reference to the defendant as a "spoiled brat," although arguably injudicious, manifestly did not violate the defendant's right to a fair trial.

In his closing argument, the state's attorney asserted that the defendant's family had sent the defendant to Elan "[b]ecause that's what they decided that they had to do with the killer living under their roof." When the word "killer" is considered in the fuller context of the argument in which it was used, it is clear that the state's

attorney's use of that word was neither gratuitous nor inflammatory; rather, the state's attorney employed the term merely as a shorthand for "the person who had killed the victim." When considered contextually, the challenged reference was benign.

On two occasions during his closing argument, the state's attorney described the defendant as a "spoiled brat . . . ." On each such occasion, the state's attorney used the expression while underscoring the evidence that the defendant had told Coleman that he had killed the victim and that he was going to get away with it. In particular, in his initial closing argument, the state's attorney asserted that, "before any resident in Elan had an inkling of the defendant's having committed this murder, the spoiled brat smugly boasted, I can get away with anything and continued to describe to Coleman how he had beaten [the victim's] head in with a golf club . . . ." Later, during rebuttal argument, the state's attorney made a similar assertion, again referring to the defendant as a "spoiled brat . . . ."

The state argues that the state's attorney's use of the term "spoiled brat" was proper because it was based on the testimony of two Elan witnesses, one of whom testified that, while the defendant was a student at Elan, he had been forced to wear a large sign around his neck that stated, "Please confront me on why I am a spoiled brat," and another who testified that officials at Elan required the defendant to wear a large white poster board around his neck that stated, "I am a spoiled brat, please confront me on the murder of my friend, Martha Moxley . . . ." The state further maintains that the state's attorney's reference to the defendant as a "spoiled brat" merely was intended to counter the suggestion, which defense counsel had raised during his cross-examination of Coleman, that, contrary to Coleman's testimony, the defendant would not have spoken in such an arrogant manner to Coleman because, at

the time the defendant allegedly made his remarks to Coleman, Coleman was standing guard over him with a baseball bat. In essence, therefore, the state contends that the state's attorney's reference to the defendant as a "spoiled brat" was not inappropriate because the reference reasonably was intended to explain the defendant's "smug bravado in confessing to Coleman."

Notwithstanding the evidentiary basis for the state's attorney's remarks and the justification advanced by the state for those comments, we believe that it would have been preferable for the state's attorney to have avoided using the moniker, "spoiled brat," in referring to the defendant. When the objectionable references are viewed in the broader context of the entire trial, however, it is apparent that they were isolated, relatively innocuous and not unduly prejudicial to the defendant. Because there is no likelihood that the challenged comments affected the fairness of the defendant's trial, his claim of a due process violation is clearly without merit.

### E

We next consider the defendant's contention that the state's attorney improperly asserted that the defendant had masturbated on the victim's dead body. Specifically, the defendant claims that the state's attorney's remarks were improper because they were based, in part, on the untrustworthy testimony of Coleman. The defendant also contends that the state's attorney's remarks were improper because they were unsupported by the evidence. We disagree.

As we have explained, the state introduced into evidence the prior sworn testimony of Coleman. In that testimony, Coleman explained that the defendant had confessed to killing the victim and returning to her body two days later and masturbating on it. Coleman also testified in detail about his struggle with drug addiction

and its effect on his memory. Coleman also acknowledged the discrepancy between his testimony that the defendant had admitted to returning to the victim's body two days after her death, and the fact that the victim's body was found the day after she was murdered. In his closing argument, the state's attorney argued that, after killing the victim, the defendant then had masturbated on her dead body.

We disagree with the defendant's claim that the state's attorney's argument was improper because Coleman was not a credible witness. The defendant was free to argue, and he did argue, and the jury reasonably could conclude, in light of Coleman's long history of drug abuse, and the questionable nature of his recall with respect to the timing of crucial events, that Coleman's testimony was not credible. Indeed, Coleman's testimony that the defendant had admitted to returning to the victim's body two days after her death lacks credibility because the victim's body was discovered within a day of her killing. Nevertheless, a fact finder is free to credit one aspect of a witness' testimony and to discredit another portion thereof. See, e.g., *State* v. *Meehan*, 260 Conn. 372, 381, 796 A.2d 1191 (2002) ("[i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve, and it is within the province of the jury to believe all or only part of a witness' testimony"). The fact that the jury could have concluded that some, or even all, of Coleman's testimony was unworthy of belief, however, did not render the state's attorney's reliance on that testimony improper.

The defendant further contends that the state's attorney improperly argued that two red marks found on the inside of the victim's right and left thighs tended to substantiate his contention that the defendant had masturbated on the victim. This claim also lacks merit.

Henry Lee, the criminalist, testified that two reddish marks discovered on the upper portion of the victim's

inner thighs were consistent with bloody hands attempting to push the victim's legs apart. On the basis of this evidence, and in view of the defendant's statement to Coleman that the defendant had masturbated on the victim's dead body, the state's attorney urged the jury to conclude that the defendant had masturbated on the victim's dead body after pushing her legs apart.

We agree with the state that Lee's testimony, coupled with the defendant's alleged statement to Coleman that he had masturbated on the victim's body, provided a sufficient factual basis for the state's attorney's argument. Although the inference urged by the state's attorney was far from inescapable, we do not judge the propriety of the state's attorney's argument by that standard; we ask, rather, whether the inference was reasonably supported by the evidence. The state's attorney's argument satisfies that test.

The argument also finds support in the fact that the defendant acknowledged to other witnesses that he had masturbated in a tree next to the victim's home. In fact, Pugh testified that the defendant had indicated that the tree under which the defendant masturbated was the same tree under which the victim's body was found. On the basis of this testimony, the state's attorney argued forcefully that the defendant belatedly had fabricated this version of the events to explain any future discovery of his semen on the victim's dead body. That argument, which, as we previously have concluded, is supported by the evidence, dovetails persuasively with the state's theory that the defendant had, in fact, masturbated on the victim's body after killing her.

Finally, the defendant contends that the state's argument was inconsistent with the fact that an autopsy of the victim failed to disclose the presence of semen. It is true that no semen was discovered during the victim's autopsy. Harold Wayne Carver II, the state's chief medi-

cal examiner, testified, however, that, although the pathologist who performed the victim's autopsy had failed to detect the presence of semen in the victim's pubic region, nothing in the autopsy report indicated that any attempt had been made to determine whether semen was present on other areas of the victim's body, including her buttocks. Because the autopsy did not rule out the possibility of the existence of semen on those other parts of the victim's body, the state's attorney's argument underscoring that possibility was not improper.

## F

Finally, the defendant challenges the propriety of the state's attorney's use of audiovisual evidence in its rebuttal argument. Specifically, the defendant asserts that the state manipulated the defendant's tape-recorded comments about masturbating in a tree to make it seem as if he were confessing to murder. The defendant claims that the state did this by splicing together a "deceptively edited version" of his tape-recorded interview and then using it as a voice-over to photographs of the murder scene. We disagree that the state's use of the audiovisual exhibits was improper.

At the close of the state's rebuttal argument, the state's attorney played for the jury, in three separate segments, approximately two minutes of the thirty-two minute tape-recorded interview that the defendant had given to Richard Hoffman and which previously had been played for the jury in its entirety during the state's case-in-chief.[103] In each segment, the state displayed a transcript of the interview on a screen while the corresponding audio was amplified over a speaker. In the first segment, the following transcript was displayed while

---

[103] When the tape-recorded interview initially was played for the jury, a corresponding transcript also was displayed on a screen so that the jury could read the transcript while listening to the tape.

the corresponding audio was amplified: "[A]nyway, we got home and all the lights, most of the lights were out, and I went walking around the house. Nobody was on the porch, um, went upstairs to my sister's room. Her door was closed, um, and I remember that Andrea [Shakespeare] had gone home . . . ." After a short pause, the same text appears on the screen again, only this time the last phrase, "and I remember that Andrea [Shakespeare] had gone home" appears in slightly larger font and in red letters, while the rest of the text appears in slightly smaller, black letters. Immediately following the first segment, the state's attorney argued to the jury in relevant part: "On supposedly getting home from [James Dowdle's house] he goes to his sister's room and remembers that [Shakespeare] had gone home. If you recall the credible testimony in this trial, the Monty Python tour, it already departed when Julie [Skakel] and [Shakespeare] had stepped out of the house to take [Shakespeare] home. Somebody who had actually left already would have had no idea of [Julie Skakel's] trip to take Andrea [Shakespeare] home. On the other hand, the 'Michael come back here' [figure], as he ran past Julie [Skakel] as she exited the house, would have been fully aware of this fact."[104]

The second segment displayed the following text while the corresponding audio of the defendant's voice was amplified over a speaker: "I said, 'Fuck this, [y]ou

[104] The state's attorney's reference to the "Michael come back here" figure is a reference to a statement that Julie Skakel had made on the evening of the victim's murder. Specifically, evidence adduced at trial indicated that, after Rushton Skakel, Jr., and Dowdle had departed from the Skakel residence to go to Dowdle's house, Julie Skakel, who had agreed to drive Shakespeare home, saw a person running across her front lawn and yelled, "Michael come back here." As reflected by his argument, the state's attorney claimed that Julie Skakel's statement provided support for the state's attorney's contention that the defendant had remained at the Skakel residence, and had not traveled with Rushton Skakel, Jr., and Dowdle to Dowdle's residence.

know why should I do this, you know, Martha likes me, I'll go, I'll go get a kiss from Martha.' 'I'll be bold tonight.' [Y]ou know booze gave me, made me, gave me courage again."

Finally, at the very end of his rebuttal argument, the state's attorney stated in regard to the interview conducted by Hoffman: "And then, the defendant does the most amazing thing . . . . He takes us on his staggering walk down memory lane. He first avoids the driveway oval where the club head was found and, more likely, [where] he first caught up with [the victim], given [Henry] Lee's testimony about blood in the driveway where the whole terrible thing started. Then he has himself under a street light throwing rocks and yelling into that circle with the exact same motion that had to have been [sic] used to beat [the victim] to death.

"Why this explanation. It's kind of obvious. As he explained to . . . Hoffman, what if somebody saw me last night and then . . . ." At this point, the state's attorney stopped talking and the third segment of the Hoffman interview appeared on the screen while the corresponding audio was amplified over the speaker: "And then I woke up, went to sleep, then I woke up to [Dorothy] Moxley saying 'Michael, have . . . you seen Martha?' " Just as the defendant finishes saying, " 'Michael, have . . . you seen Martha,' " a photograph of the victim, smiling, appeared in the lower right hand corner of the screen beneath the written text. After a short pause, the following text appeared on the screen while the corresponding audio was amplified: "I'm like, 'What?' And I was like still high from the night before, a little drunk, then I was like 'What?' I was like 'Oh my God, did they see me last night?' And I'm like, 'I don't know,' I'm like, and I remember just having a feeling of panic." At this point, a photograph, previously introduced into evidence, depicting the victim's body lying under the pine tree, appeared in the lower right-hand

corner of the screen, to the side of the written text. After a few seconds, the photograph disappeared and the following text appeared while the corresponding audio was amplified: "Like 'Oh shit.' You know. Like my worry of what I went to bed with, like may . . . I don't know, you know what I mean. I just had, I had a feeling of panic." Another photograph, which also had been introduced into evidence, depicting the victim's badly beaten body, then appeared in the lower right-hand corner of the screen, next to the written text. The state's attorney argued: "How could the sight of Dorothy Moxley possibly produce a feeling of panic in an innocent person, in a person who had gone to sleep knowing nothing of [the victim's] murder. The evidence tells you that only a person who had experienced that poor girl lying under the tree, not in his dreams but firsthand, would have a cause to panic on awakening that morning."

As we previously have stated, "counsel is entitled to considerable leeway in deciding how best to highlight or to underscore the facts, and the reasonable inferences to be drawn therefrom, for which there is adequate support in the record. We therefore never have categorically barred counsel's use of such rhetorical devices, be they linguistic or in the form of visual aids, as long as there is no reasonable likelihood that the particular device employed will confuse the jury or otherwise prejudice the opposing party. Indeed, to our knowledge, no court has erected a per se bar to the use of visual aids by counsel during closing arguments. On the contrary, the use of such aids is a matter entrusted to the sound discretion of the trial court." *State* v. *Ancona*, supra, 270 Conn. 598.

We conclude that it was not improper for the state's attorney to play for the jury approximately two minutes of the defendant's tape-recorded interview with Hoffman and to display trial exhibit photographs of the

victim while the tape was being played. Because the defendant does not contest the propriety of the state's use of the first two segments of the tape-recorded interview, we focus solely on the defendant's claims regarding the third segment. In particular, the defendant claims that the state's use of the third segment of the tape-recorded interview was improper because it omitted portions that contradicted the argument of the state's attorney.[105] Specifically, the defendant argues that "[t]he omitted passage just before the excerpts highlighted by the state clearly indicates that the defendant was talking about his panic regarding masturbating in the tree, not about his involvement in the murder of [the victim]." The defendant contends that, by not playing the earlier portions of the tape and by displaying two gruesome photographs of the murder scene while the jury listened to the defendant express his fear that he may have been seen in the victim's yard on the night of the murder, the state conveyed to the jury the unfair impression that the defendant's panic was due to the fact that he had murdered the victim, when, in reality, it was due to his fear that someone may have seen him masturbating in the tree on the Moxleys' property.

---

[105] Specifically, the defendant claims that the state omitted a portion of the tape in which he discussed with Hoffman his fear that someone had seen him masturbating. The defendant claims that the following was the full text of his remarks to Hoffman: "And then I was like 'I'm running home,' I ran home, and I remember thinking 'Oh my God. I hope to God nobody saw me jerking off.' And I remember thinking before I went to bed that I was gonna tell Andy Pugh that I thought I saw somebody in there that night. And then I woke up, went to sleep, and then I woke up to [Dorothy] Moxley saying, 'Michael have, have you seen Martha?' I'm like, 'What?' And I was like still high from the night before, a little drunk, then I was like, 'What?' I was like 'Oh my God, did they see me last night?' And I'm like 'I don't know,' I'm like, and I remember just having a feeling of panic. Like 'Oh shit.' You know, like my worry of what I went to bed with, like may . . . I don't know, you know what I mean . . . ." The defendant claims that when he stated "Oh my God, did they see me last night?" he was referring to whether they had seen him masturbating.

After viewing the audiovisual presentation, we are not persuaded that there is any reasonable likelihood that the state's presentation confused the jury or prejudiced the defendant in any way. Contrary to the defendant's claim, the presentation itself was not deceptive. That presentation consisted of the written transcript of the interview with Hoffman, which the jury already had seen in its entirety, the corresponding audio and three unaltered photographs of the victim that had been entered into evidence, one of which depicted her alive and smiling and two of which had been taken at the scene of the crime. As we previously have noted, the three photographs were juxtaposed with the transcript of the defendant's statements to Hoffman describing his panic upon seeing the victim's mother on the morning after the victim's murder but before her body had been discovered. By juxtaposing the photographs of the victim with the defendant's statements, the state's attorney sought to convey to the jury in graphic form what the state believed was the real reason for the defendant's panic, that is, that he had killed the victim. The state's attorney's prefatory and follow-up remarks to the segment make this point unmistakably clear.[106] Accordingly, we reject the defendant's claim that the state's use of audiovisual aides during closing argument violated his right to a fair trial.[107]

---

[106] We reject, moreover, the defendant's claim that the state "splic[ed] together a deceptively edited version of his [tape-recorded] interview with Hoffman" so as to omit critical portions of the defendant's comments indicating that the reason he woke up in a panic was that he feared that someone may have seen him masturbating the night before. Contrary to the defendant's claim, the segment of the interview that the state played for the jury, in which the defendant described to Hoffman his feelings of panic upon waking up the morning after the murder, was not altered or spliced in any way.

[107] We note, finally, that defense counsel raised no objection to the state's rebuttal presentation. Apparently, defense counsel did not believe that the state's use of the audiovisual aides was misleading or otherwise inappropriate. Although that fact is by no means dispositive of the defendant's claim on appeal, as we have explained; see, e.g., *State* v. *Stevenson*, supra, 269

The judgment is affirmed.

In this opinion SULLIVAN, C. J., and VERTEFEUILLE and ZARELLA, Js., concurred.

---

KATZ, J., concurring. I agree with the majority's well reasoned and thorough opinion concluding that the judgment of conviction of the defendant, Michael Skakel, for the 1975 murder of Martha Moxley must be affirmed. With respect to the threshold issue, however, of whether the defendant's prosecution was time barred, although I agree with the majority that it was not, I reach that conclusion by a different route. I would dispose of that issue on the basis of the statute of limitations in effect at the time of the 1975 murder, as did the trial court, consistent with our long-standing jurisprudential approach to construction of criminal statutes, and in response to the state's principal argument to this court, and, therefore, I would not reach the issue of whether the 1976 amendment to the statute of limitations had a retroactive effect. In my view, the crime of murder was not subject to the statute of limitations in effect in 1975, and, indeed, there never has been a limitations period on the prosecution of murder. Accordingly, I join in all but part II of the majority opinion.

As with any issue of statutory construction, I begin with the pertinent language of the statute itself. The statute of limitations in effect at the time of the murder, General Statutes (Rev. to 1975) § 54-193, provided in relevant part: "No person shall be prosecuted for . . . any crime or misdemeanor of which the punishment is or may be imprisonment . . . except within five years next after the offense has been committed . . . ." The defendant was charged and convicted of the crime of

Conn. 576; we nevertheless consider that fact in reviewing the merits of an unpreserved claim of prosecutorial misconduct.

murder under General Statutes (Rev. to 1975) § 53a-54a (c), which provided: "Murder is punishable as a class A felony unless it is a capital felony and the death penalty is imposed as provided by section 53a-46a."[1]

The defendant was not charged under the capital felony statute, General Statutes (Rev. to 1975) § 53a-54b, and, therefore, could have been sentenced only to a term of imprisonment and not sentenced to death. In accordance with that fact, the defendant makes the following arguments in support of his claim that the prosecution is time barred: (1) the plain language of the statute of limitations precludes his prosecution because the defendant was indicted for a class A felony, punishable by imprisonment, and not a capital felony; (2) in *State* v. *Paradise*, 189 Conn. 346, 353, 456 A.2d 305 (1983), this court implicitly recognized, under facts indistinguishable from this case, that the same statute of limitations barred the prosecution of the defendants in that case; (3) when the legislature amended the Penal Code in 1973 to reinstate the death penalty, it intended that only the most heinous murders—those designated as capital felonies—would not be subject to the statute of limitations; and (4) the legislature's intent to exclude only capital felony murders from the statute of limitations is consistent with the legislative history of the murder statutes because noncapital murders that formerly were labeled "second degree" murders were subject to a statute of limitations for 125 years—from 1846 to 1971.

As an initial matter, I reject out of hand the defendant's reliance on *State* v. *Paradise*, supra, 189 Conn. 346, and welcome the opportunity to correct a misimpression of the law that it suggests. In *Paradise*, the "sole issue" before the court was whether the 1976

---

[1] Unless expressly stated otherwise, all references in this concurring opinion to § 53a-54a and § 54-193 are to the 1975 revision.

amendment to § 54-193, which expressly permitted unlimited prosecution of any class A felony, not just a capital felony, was by its own terms retroactive so as to apply to a 1974 murder. Id., 347. The state had failed to assert that the pre-1976 version of § 54-193 did not apply to a class A felony murder, and, consequently, the *Paradise* court undoubtedly proceeded from the premise that the defendants' prosecution in that case was time barred under § 54-193 when addressing the state's claim that the 1976 amendment to that statute applied retroactively. As such, the *Paradise* court never considered the question at issue here, relying on the superficial reading of the statute of limitations conceded by the parties in that case.

Looking beyond a superficial reading of § 54-193, I disagree that the "plain language" of the statute of limitations compels the result suggested by the defendant. As the discussion that follows amply demonstrates, the "crime" to which the statute of limitations refers is the general crime of murder—a crime punishable *either* as a class A felony or as a capital felony. Accordingly, the crime of murder implicitly is excluded from the statute of limitations. See *State* v. *Ellis*, 197 Conn. 436, 441, 497 A.2d 974 (1985) (concluding that crimes that must or *may* be punished by death are excluded by necessary implication from statute of limitations), on appeal after remand sub nom. *State* v. *Paradise*, 213 Conn. 388, 567 A.2d 1221 (1990). My conclusion, however, rests not only on the language of the statute, but also on the well settled principle of statutory construction that the court does not construe a statute in a manner that runs counter to reason. See General Statutes § 1-2z (permitting resort to legislative history when plain meaning of statute yields absurd or unworkable result); *State* v. *Sandoval*, 263 Conn. 524, 553, 821 A.2d 247 (2003). The defendant's "plain language" construction would yield such a result because, contrary to the defendant's view,

it would disturb a long-standing and consistent practice in this state of excluding murder from the statute of limitations. I begin, therefore, with the history of the statute of limitations and the murder statutory scheme evidencing this long-standing practice and then turn to the amendments to this scheme immediately preceding and following 1975 to ascertain whether the legislature intended to depart radically from that practice by subjecting the prosecution of most murders to a five year statute of limitations.

It is undisputed that the crime of murder was excluded, by implication, from Connecticut's earliest statutes of limitations, beginning in 1672 until 1846.[2] See *State* v. *Ellis*, supra, 197 Conn. 441–44. Throughout this period, murder was a capital offense. Id., 448–49. Although, in 1846, our legislature divided murder into first degree (capital) and second degree (noncapital) offenses; Public Acts 1846, c. 16; thereby permitting certain less heinous murders to be punished by imprisonment, our early case law indicates that the legislature did not intend by this change to alter the bedrock rule that murder is not subject to a statute of limitations.[3]

---

[2] Section 54-193, the statute of limitations at issue in this appeal, is for all intents and purposes the same as the 1821 statute of limitations, from which § 54-193 traces its origin. The 1821 statute of limitations provided in relevant part: "No person shall be indicted, informed against, complained of, or in any way prosecuted, before any court . . . for any crime or misdemeanor, whereof the punishment is, or may be, imprisonment in new-gate prison, unless the indictment . . . be made and exhibited within three years, next after the offence shall have been committed . . . ." General Statutes (1821 Rev.) tit. 59, § 11. The following limited changes were made to the statute of limitations from 1821 until 1976: (1) in 1827, "new-gate prison" was changed to "Connecticut State prison"; Public Acts 1827, c. 27, § 9, p. 166; (2) in 1850, a tolling provision was added for those who had fled the jurisdiction; Public Acts 1850, c. 56, p. 40; (3) in 1882, the three year statute of limitations for "state prison" offenses was changed to five years; Public Acts 1882, c.15, p. 126; and (4) in 1969, the term "state prison" was changed to "Connecticut Correctional Institution, Somers." Public Acts 1969, No. 297.

[3] In *State* v. *Ellis*, supra, 197 Conn. 455, this court reached a contrary conclusion, reasoning that, when the legislature divided murder into two degrees, it must have intended for second degree murder to become subject

See *State* v. *Dowd*, 19 Conn. 388, 392 (1849) ("It is apparent from [the 1846 public act], that it was not the design of the legislature to create any new offen[s]e; or [to] change the law applicable to murder, except so far as the punishment was concerned. The crime still remains, as it was at common law; and in the more

to the statute of limitations because that offense was punishable only by imprisonment. The entirety of the *Ellis* court's reasoning for the distinction was as follows: "The purpose of the 1846 [public] act is stated clearly in its preamble. According to that preamble, murder was divided into degrees because 'the several offenses which are included under the general denomination of murder differ so greatly from each other in the degree of their atrociousness that it is unjust to involve them in the same punishment . . . .' Public Acts 1846, c. 16. We believe that the 1846 legislature effectively divided murder into separate crimes for purposes of the statute of limitations." *State* v. *Ellis*, supra, 456.

This summary conclusion, which was merely dicta, must be rejected as unsound in the absence of any support beyond the legislature's general statement of purpose explaining its rationale for imposing a two tier punishment scheme. The *Ellis* court did not consider any of our early case law cited in our previous discussion in the text of this opinion, which strongly indicates a contrary conclusion. Indeed, other jurisdictions have concluded, when analyzing statutory schemes structured similarly to our two degree murder scheme, that this division was intended to affect merely the punishment imposed and not the limitations period for prosecuting the common-law crime of murder generally. See *People* v. *Haun*, 44 Cal. 96, 97–98 (1872) (making distinction between first and second degree murder as to seriousness of offense, but not as to statute of limitations); *State* v. *Brown*, 22 N.J. 405, 412, 126 A.2d 161 (1956) ("All this [common law or statutory history] reveals the essential quality of murder as a single offense, divided by the statute . . . into degrees, first and second, for the purpose of punishment alone, according to the gravity and heinousness of the felonious act, the moral obliquity that determines the difference between express and implied malice. . . . These statutes have not altered the nature of murder at common law; they are concerned only with the character of the punishment; the degrees do not constitute separate and distinct crimes, but merely grades of the same offense. Murder in either of the statutory degrees is murder at common law." [Citations omitted.]); *State* v. *Short*, 131 N.J. 47, 56–57, 618 A.2d 316 (1993) (affirming reasoning of *Brown* and distinguishing between degrees of murder and manslaughter under statute of limitations); *State* v. *Vance*, 328 N.C. 613, 622–23, 403 S.E.2d 495 (1991) (The court noted that a 1893 act dividing murder into first and second degree offenses was made only for "purposes of assigning punishment; it does not define or redefine the crime of murder. . . . [T]he definition of that crime remains the same as it was at common law . . . ." [Citations omitted.]).

aggravated cases, the person convicted is liable to the original punishment, while others, whose crimes are less aggravated, are punished with less severity."); *State* v. *Cross*, 72 Conn. 722, 729, 46 A. 148 (1900) ("The meaning of our statute defining murder in the first degree, as enacted in 1846, has not been changed by subsequent legislation. It does not define a new crime, nor in any way affect the definition of the crime of murder as it before existed; it simply sets forth the circumstances attending the crime which must determine the punishment of murder, whether it be death or imprisonment for life."); *State* v. *Rossi*, 132 Conn. 39, 43–44, 42 A.2d 354 (1945) ("[t]he [1846 public act] was not designed to create any new offense or change the law applicable to murder except as to the punishment"), overruled in part on other grounds by *State* v. *Tomassi*, 137 Conn. 113, 123, 75 A.2d 67 (1950); see also *State* v. *Jacowitz*, 128 Conn. 40, 44, 20 A.2d 470 (1941) ("Murder, at common law, is the unlawful killing of one human being by another with malice aforethought. . . . The Connecticut statute, Cum. Sup. 1935, § 1685c, has not changed this definition but provides a more severe penalty where certain features such as premeditation are present."). Indeed, for twenty-four years after the 1846 amendment, until 1870, the state was not even required to specify the degree of the murder in the indictment; the jury made such a distinction after determining whether the defendant was guilty of the general common-law crime of murder. See General Statutes (1849 Rev.) tit. 6, c. 2, § 3 ("the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty, ascertain in their verdict, whether it be murder in the first degree or second degree"); *State* v. *Hamlin*, 47 Conn. 95, 117 (1879) (noting that legislature changed law in 1870; Acts of 1870, c. 73; requiring that indictment specify degree of offense). Even then, the impetus for doing so apparently

was to give notice to the defendant of whether the state alleged that the crime was premeditated. See *State* v. *Hamlin*, supra, 117.

What implicitly had been understood under well established practice—that there was no statute of limitations on the common-law crime of murder, irrespective of whether the defendant had been convicted of first or second degree murder—became manifest as a result of the legislature's enactment of the Penal Code in 1969. See Public Acts 1969, No. 828, §§ 54, 55. Under the 1969 Penal Code, which was made effective in 1971, the legislature abolished the distinction between the two degrees of murder, providing a single, simplified definition of murder and conferring discretion on the jury or the court to decide in each case whether to impose the death penalty depending on the circumstances of the crime.[4] See General Statutes (Rev. to 1972) § 53a-46 (b) (permitting jury or court to consider either death or imprisonment); General Statutes (Rev. to 1972) § 53a-54 (c) ("[m]urder is punishable as a class A felony unless the death penalty is imposed as provided by section 53a-46"). Thus, under the 1969 Penal Code, there clearly was no statute of limitations on murder. In other words, because *any* murder potentially could be punished by death, there was no statute of limitations on the prosecution of *all* murders under the 1969 Penal Code.

---

[4] Under the 1969 Penal Code, murder was defined simply as an intentional killing, thereby eliminating the distinction of premeditation and deliberation that previously had been required to differentiate first degree murder from second degree murder; however, the legislature added an affirmative defense of extreme emotional disturbance that could reduce the offense of murder to first degree manslaughter. See Public Acts 1969, No. 828, §§ 54, 55; Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. (West 1985) § 53a-54a, pp. 32–33. Notably, there is nothing in the extensive legislative history to the enactment of the 1969 Penal Code reflecting that the code would effectuate any change to the statute of limitations.

In 1973, however, the legislature repealed that scheme and enacted § 53a-54a,[5] pursuant to which the defendant in the present case was convicted, providing for punishment of murder *either* as a class A felony or, under specific circumstances, as a capital felony. See Public Acts 1973, No. 73-137, § 2 (P.A. 73-137); General Statutes (Rev. to 1975) § 53a-54a. Thus, the critical question is whether the legislature intended, when making these changes, to disturb the existing, long-standing statutory scheme under which murder was not subject to a statute of limitations. The context in which these changes took place and the legislative history of P.A. 73-137 strongly indicate that the legislature did not intend to distinguish between class A felony murder and capital felony murder for statute of limitations purposes.

The legislature's actions in 1973 to repeal and replace the existing murder scheme was necessitated by the 1972 decision of the United States Supreme Court in *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), in which that court struck down as unconstitutional the broad, discretionary type of capital murder scheme that was in effect under our 1969 Penal Code. See *State* v. *Aillon*, 164 Conn. 661, 661–62, 295 A.2d 666 (1972). House Bill No. 8297 proposed to repeal that discretionary scheme and to adopt § 53a-54a, which deemed murder a class A felony unless it was a capital felony, and General Statutes § 53a-54b, which defined five specific circumstances under which murder consti-

---

[5] Section 53a-54a was essentially identical to its predecessor, § 53a-54, except for the addition of the following italicized words: "Murder is punishable as a class A felony unless *it is a capital felony and* the death penalty is imposed as provided by section 53a-46a." General Statutes (Rev. to 1975) § 53a-54a (c). Felony murder, however, which previously had been encompassed within § 53a-54, was separated into its own section under Public Acts 1973, No. 73-137, § 2. See General Statutes (Rev. to 1975) § 53a-54c (felony murder provision).

tuted a capital felony.[6] Although the bill was debated vigorously and extensively in the legislature, it is telling that, in 350 pages of transcribed floor debates and committee hearings, there is not a single reference to the statute of limitations. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1973 Sess., pp. 125–33, 144–86, 192–200; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1973 Sess., pp. 369–77, 407–10, 417–28, 470–80, 484, 488–500, 510–13, 533–50, 556–60, 569–70, 576–79, 593–96, 601–605; 16 H.R. Proc., Pt. 6, 1973 Sess., pp. 2932–3003; 16 S. Proc., Pt. 4, 1973 Sess., pp. 1861–1978. Instead, the predominant focus of the debate was on the contours of the capital felony provision and whether the proposed bill would pass constitutional muster.[7]

---

[6] As originally enacted, the capital felony provision designated six offenses that were death penalty eligible, only one of which was not predicated on murder. See P.A. 73-137, § 3 ("[a] person is guilty of a capital felony who is convicted of any of the following: [1] Murder of a member of the state police department or of any local police department, a county detective, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18 of the 1969 supplement to the general statutes, an official of the department of correction authorized by the commissioner of correction to make arrests in a correctional institution or facility, or of any fireman, as defined in subsection [10] of section 53a-3 of the 1971 noncumulative supplement to the general statutes, while such victim was acting within the scope of his duties; [2] murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain; [3] murder committed by one who has previously been convicted of intentional murder or murder committed in the course of commission of a felony; [4] murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment; [5] murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; [6] the illegal sale, for gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone, provided such seller was not, at the time of such sale, a drug-dependent person").

[7] The following comments exemplify the focus of the discussion in this regard on House Bill No. 82-97. Representative James F. Bingham, the chairman of the judiciary committee in the House of Representatives, stated: "This bill was drafted very carefully to comply with the death penalty deci-

It simply runs counter to reason to conclude that the legislature intended to impose, *for the first time in the state's history*, a statute of limitations on all murders except those committed under the five limited circumstances constituting capital felonies—rendering all class A felony murders subject to a five year statute of limitations—without a discussion or any expression of opposition. See *Statewide Grievance Committee* v. *Rozbicki*, 211 Conn. 232, 244, 558 A.2d 986 (1989) ("[a] major change in legislative policy, we believe, would not have occurred without some sort of opposition or at least discussion in the legislature" [internal quotation marks omitted]). Indeed, the absence of opposition is especially telling considering that the capital felony provision enacted in 1973 did not yet include the murder of a child; see Public Acts 1995, No. 95-16, § 4; or the murder of two or more persons or a murder committed in the course of a sexual assault. See Public Acts 1980, No. 80-335. We have recognized that, "[i]n the interpretation of a statute, a radical departure from an established policy cannot be implied. It must be expressed in unequivocal language." (Internal quotation marks

sion . . . ." 16 H.R. Proc., supra, p. 2928. Senator Joseph I. Lieberman, after discussing the *Furman* decision at length, stated: "The Bill before us today has been devised I presume in the hope that changing the sentencing procedure by providing a mandatory death penalty for conviction of certain enumerated crimes and carefully defining the circumstances under which judges and juries must act before imposing death will result in legislation able to withstand the scrutiny of the United States Supreme Court." 16 S. Proc., supra, p. 1904. "I do not believe that the proposed legislation could withstand the constitutional test." Id., p. 1908, remarks of Senator Lieberman. Senator Romeo G. Petroni remarked in support of the bill: "In my judgment, the fullest due process we can find within the guidelines of *Furman* is clearly set forth in this bill." Id., p. 1924. Senator George C. Guidera, the chairman of the judiciary committee in the Senate and a sponsor of the legislation, commented extensively about *Furman* and then remarked: "The mitigating and aggravating circumstances which are outlined in this Bill . . . have received great thought not only by the Judiciary Committee in Connecticut but by the Judiciary Committee in Washington D.C. [and] I think will prove to make the Bill constitutional . . . . [It] will set a guideline for the jury so that there is no doubt as to how they should approach the subject of the sentence." Id., p. 1870.

omitted.) *State* v. *Ellis*, supra, 197 Conn. 459. In accordance with these principles, this court previously has recognized that legislative changes to punishments under the Penal Code may not necessarily reflect a legislative intent to affect the limitations period. See *State* v. *Golino*, 201 Conn. 435, 442–47, 518 A.2d 57 (1986) (concluding that literal reading of statute of limitations did not apply to murder, even though defendant could be sentenced only to imprisonment after death penalty held unconstitutional); *State* v. *Ellis*, supra, 457 ("we fail to see how legislation specifically addressed to capital punishment, and only indirectly affecting the statute of limitations, is any better gauge of legislative intent").

The legislative history to § 53a-54a, therefore, indicates that the crime of "murder," a crime punishable either as a noncapital, class A felony or as a capital felony, was excluded from the statute of limitations. See *State* v. *Jones*, 234 Conn. 324, 364–65, 662 A.2d 1199 (1995) (*Borden, J.*, concurring in part and dissenting in part) (Agreeing with the majority "that capital felony is a form of the generic crime of murder, as is arson murder under General Statutes § 53a-54d, and indeed felony murder under General Statutes § 53a-54c. That conclusion is consistent with our pre-penal code legislation, under which the single crime of murder was divided into two degrees. . . . It also follows from the language and structure of our current homicide statutes, under which murder is defined by . . . § 53a-54a, and pursuant to which '[m]urder is punishable as a class A felony in accordance with subdivision [2] of section 53a-35a unless it is a capital felony or murder under section 53a-54d.' " [Citation omitted.]).

To the extent that any doubt lingered as to its intent in 1975 in that regard, the legislature made its intent manifest by clarifying the statute of limitations in a 1976 amendment, wherein for the first time it expressly,

rather than implicitly, excluded class A and capital fel-
onies from the statute's scope.[8] Public Acts 1976, No.
76-35, § 1, codified at General Statutes § 54-193 (a)
("[t]here shall be no limitation of time within which a
person may be prosecuted for a capital felony, a class
A felony or a violation of section 53a-54d or 53a-169");
see also *State* v. *Golino*, supra, 201 Conn. 445 (referring
to amendment as clarifying); *State* v. *Ellis*, supra, 197
Conn. 459–60 (same). Accordingly, to construe § 53a-
54a as the defendant would have us do in the present
case would create the anomaly that for a three year
period out of the state's history since colonial times—
from 1973 until 1976—the legislature subjected all mur-
ders except those five circumstances designated as cap-
ital felony murder to a statute of limitations. It is clear
that such an irrational construction cannot stand.[9] See
*State* v. *Burns*, 236 Conn. 18, 27, 670 A.2d 851 (1996)
(rejecting construction creating irrational and unin-

[8] Although the legislative history to the 1976 amendment is sparse, the few
comments made on the proposed amendment indicate that the legislature
intended to clarify, rather than substantively change, the statute of limita-
tions. Senator David H. Neiditz, the sponsor of the amendment, Senate Bill
No. 203, explained: "This bill clarifies the statute . . . of limitations for a
capital or a class A felony, that there is no statute of limitations on these
offenses and it clears up the language in the statute which, up until now,
is referred to for a crime for which someone may be sent to a specific
institution. It was made necessary by the abolition of capital punishment
and the reinstatement of capital punishment . . . ." 19 S. Proc., Pt. 1, 1976
Sess., p. 341. Senator George L. Gunther appeared before the judiciary
committee to speak in favor of several pending bills, remarking: "The last
[bill] is [Senate Bill No. 203] which is concerning the statute of limitations
and Mr. Chairman, I'm happy to see a clarification of this part of the statute."
Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1976 Sess., p. 163.

[9] Notably, even under the defendant's construction of the statutory
scheme, wherein he claims that second degree murder was subject to a
statute of limitations, his position defies reason. It would require us to
conclude that the legislature eliminated such a distinction in 1969, without
comment, then four years later, in 1973, decided to subject almost all murders
to a five year limitations period, even those that previously had been
excluded from the statute of limitations as first degree murder, and then
three years later, in 1976, amend the statute to exclude once again all
murders from the statute of limitations.

782

tended result); *State* v. *Tucker*, 219 Conn. 752, 758, 595 A.2d 832 (1991) (same). Accordingly, because I conclude that the defendant's prosecution is not time barred under the statute of limitations in effect at the time of the murder, I respectfully concur in all but part II of the majority opinion.